# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION AT CINCINNATI

| | | |
|---|---|---|
| IN RE: CINCINNATI POLICING | : | Case No. C-1-99-3170 |
| | : | |
| | : | **District Judge Susan J. Dlott** |
| | : | **Magistrate Judge Michael Merz** |
| | : | |
| | : | |
| | : | |
| | : | **AFFIDAVIT OF GREGORY KORTE IN** |
| | : | **SUPPORT OF AMICUS CURIAE BRIEF** |
| | : | **OF THE CINCINNATI ENQUIRER** |

Affiant, after being duly cautioned and sworn, states as follows:

1.      My name is Gregory Korte. I am a reporter employed by The Cincinnati Enquirer.

2.      As part of my research for articles on relations between the Cincinnati Police Department and the community, I requested a copy of the contract between the City of Cincinnati and the University of Cincinnati for the analysis of traffic stop data gathered by the Cincinnati Police Department. The City provided me with a copy of the contract, a true and accurate copy of which is attached hereto as Exhibit 1.

3.      On or about October 6, 2003, in connection with a story on the traffic stop study and subsequent report commissioned by the City of Cincinnati and prepared by the University of Cincinnati, I spoke with Kenneth Lawson, a lawyer for the American Civil Liberties Union. Mr. Lawson stated that that he had requested that the Court seal the report and prohibit disclosure of its contents to the public until after the November 4, 2003 City Council election, because "we don't want it to be used to further somebody's political agenda."

4.      On October 7, 2003, in a story published in the Cincinnati Enquirer about the traffic stop report, I used the information I had obtained from my interview with Mr. Lawson. A true and accurate copy of the story is attached hereto as Exhibit 2.

5.      On October 10, I requested a copy of the traffic stop report from Rita McNeil, the City Solicitor. A true and accurate copy of the letter to Ms. McNeil requesting the report is attached hereto as Exhibit 3.

6.      Also on October 10, Ms. McNeil responded to my request , indicating that the City could not provide me with a copy of the traffic stop report due to an order issued by Magistrate Michael R. Merz on October 6, 2003. Magistrate Merz' order prohibited the release of the report to the public for a period of 45 days. A true and accurate copy of Ms. McNeil's response is attached hereto as Exhibit 4.

7.      As of the date of this affidavit, neither Ms. McNeil nor anyone from the City has provided the traffic stop report to me.

FURTHER AFFIANT SAYETH NAUGHT.


_____
Gregory Korte


**STATE OF OHIO**            )
                             ) ss:
**COUNTY OF HAMILTON**       )

Sworn to and subscribed before me, a Notary Public, this 14th of October, 2003.


**SHIELA A. HOLMES**
NOTARY PUBLIC, STATE OF OHIO
MY COMMISSION EXPIRES 10-16-05

_____
Notary Public


357654.1

# CITY OF CINCINNATI
## AND
## UNIVERSITY OF CINCINNATI

Professional Services Agreement No. *15X0024*

THIS AGREEMENT is made and entered into by and between the City of Cincinnati (the "City") and the University of Cincinnati on behalf of its College of Education, Department of Criminal Justice ("the University").

## WITNESSETH

WHEREAS, pursuant to Cincinnati Municipal Code Section 321-19, Procurement Professional Services, the Department of Safety on May 29, 2001 issued a Request for Proposals for Professional Services seeking analysis of statistical data from motor vehicle stops by the Police Division; and

WHEREAS, the University timely submitted a Proposal on June 13, 2001; and

WHEREAS, in accordance with Administrative Regulation #23, the University's Proposal was selected as "Most Advantageous" to City on August 1, 2001; and

WHEREAS, this Agreement between the City and the University is substantially in conformance with the City's Request for Proposals and the Proposal submitted by the University; now, therefore,

FOR AND IN CONSIDERATION of the promises, covenants, and agreements herein contained, the parties mutually agree as follows:

### SECTION 1. SCOPE OF SERVICES

The University shall, in accordance with current professional standards and in a satisfactory and proper manner as reasonably determined by the City Manager of the City, provide the services according to the Project Schedule set forth in Exhibit A, Scope of Services, attached hereto and by this reference made a part of this Agreement. In addition to the described services, at no additional charge, the University's Principal Investigators shall be available upon reasonable notice to present their findings and report to representatives of the City and public.

It is understood and agreed that the University's services may include advice and recommendations, but all decisions in connection with the implementation of such advice and recommendations shall be the responsibility of, and made by, the City.



EXHIBIT

1

SECTION 2.  TERM

This Agreement shall commence as of the date this Agreement is executed by the parties hereto.  The term of this Agreement shall be for a period of one (1) year plus one (1) one-year renewal period if approved in writing by both parties.  The extended term is incorporated to allow the City to work with the University on continuing issues related to the analysis and study required herein.

## SECTION 3.  COMPENSATION AND METHOD OF PAYMENT

Compensation

Maximum payment for all work assigned under this Agreement shall not exceed $146,075 unless amended.  The University shall be paid in accordance with the rates and terms set forth in Exhibit B, Budget, attached hereto and by this reference made a part of this Agreement.

In the event the City of Cincinnati determines that it is necessary to amend the payment schedule or reimbursable expenses or both, such an amendment may be done administratively so long as the total amount of this Agreement is not exceeded.

Method of Payment

The City shall make payment in five equal installments of $29,215.00, payable on September 30, 2001, November 30, 2001, January 31, 2002, March 31, 2002 and April 30, 2002; provided that the University submit approvable vouchers within thirty days of each payment date, and that the University demonstrates acceptable progress towards completion of the project and report.  No payment shall be made for any item unless the item qualifies under the requirements of the Agreement.  Invoices must be submitted to:

> Cincinnati Police Division
> Attn: Lieutenant Daniel Gerard
> Fiscal and Budget Section
> 310 Ezzard Charles Drive
> Cincinnati, Ohio 45214

## SECTION 4.  SUBCONTRACTING

None of the work or services covered by this Agreement shall be subcontracted without the prior written approval of the City.  Any work or services subcontracted hereunder shall be specified by written contract reviewed by the City before execution, which contract shall explicitly state that it is subject to each provision of this Agreement.

SECTION 5.  ASSIGNABILITY

The University shall not assign any interest in this Agreement, and shall not transfer any interest in the same, whether by assignment or notation, without prior written consent of the City. Provided, however, that the claims for money due or to become due the University from the City under this Agreement may be assigned to a bank, trust company, or other financial institution. Notice of any such assignment or transfer shall be furnished promptly to the City.

SECTION 6.  TERMINATION

A.      Termination of Agreement for Cause.  If, through any cause, the University shall fail to fulfill in a timely and proper manner its obligations under this Agreement, the City shall have the right to terminate this Agreement by giving written notice to the University specifying the effective date.  In such event, copies of all finished or unfinished documents, data, studies and reports prepared by the University under this Agreement shall, at the option of the City, become its property and the University shall be entitled to receive equitable compensation for any work satisfactorily completed.  Notwithstanding the above, the University shall not be relieved of liability to the City for damages sustained by the City by virtue of any breach of the Agreement by the University.

B.      Termination for Convenience of City. The City may terminate this Agreement at any time by giving at least thirty (30) days notice, in writing, from the City to the University.  If the Agreement is terminated by the City as provided herein, the University will be paid an amount which bears the same ratio to the total compensation as the service actually performed bear to the total services of the University covered by this Agreement, less payments of compensation previously made.

C.      Alternatives to Termination. In the event the University fails to fulfill the terms and conditions of this Agreement in a timely and diligent manner, the City reserves the right, at its sole option, as an alternative to termination of the Agreement, to reduce the services required herein of the University and reduce the project in a manner which reflects such a reduction, by giving notice of such, in writing, stating the date such reduction will become effective.

SECTION 7.  COMPLIANCE WITH LAWS AND POLICIES

A. Laws      This Agreement is subject to and  the University shall comply with all applicable statutes, ordinances, regulations, and rules of the federal government, the State of Ohio, Hamilton County, and the City of Cincinnati. Whenever notices, approvals, authorizations, waivers, instructions, or determinations by the City are required under this Agreement, such shall be effective only when given in writing and signed by the City.

3

B. Equal Employment Opportunity Program

This Agreement is subject to the provisions of the Equal Employment Opportunity Program of the City of Cincinnati contained in Chapter 325 of the Cincinnati Municipal Code. Section 325-9 of the Cincinnati Municipal Code is hereby incorporated by reference into this Agreement.

C. Small Business Enterprise Program

This Agreement is subject to the provisions of the Small Business Enterprise Program contained in Chapter 323 of the Cincinnati Municipal Code. Section 323-99 of the Cincinnati Municipal Code is hereby incorporated by reference into this Agreement.

Details concerning this program can be obtained from the Office of Contract Compliance, 2 Centennial Plaza, 805 Central Avenue, Suite 130, Cincinnati, Ohio 45202. Phone: (513) 352-3144.

The University shall make good faith efforts to recruit and maximize the participation of all qualified segments of the business community in subcontracting work, including the utilization of small, minority and women business enterprises. This includes the use of practices such as assuring the inclusion of qualified Small Business Enterprises in bid solicitation and dividing large contracts into smaller contracts when economically feasible.

SECTION 8. LIABILITY

The University hereby agrees to accept responsibility for any and all damages or claims for which it is legally liable, including ambiguities and errors in the study and analysis prepared by the University, caused by the negligence of its officers, employees or agents in the performance of the University's obligations agreed to herein. Likewise, the City agrees to accept responsibility for any and all damages or claims for which it is legally liable arising from the negligence of its officers, employees or agents in the performance of the City's obligations agreed to herein.

In the case of ambiguities or errors which are detected by the City, the City shall afford the University a reasonable opportunity to remedy or clarify such errors or ambiguities within a reasonable time after discovery by the City if such correction or clarification can be timely accomplished without delaying a related project.

The City shall promptly notify the University of any claim, demand, action, cause of action, other liability or situation for which it intends to seek remediation, clarification or damages.

SECTION 9. SERVICES BY THE CITY

The City shall make available the necessary staff support and other technical assistance necessary for the preparation of the work identified in Section 1 of this Agreement and Scope of

4

Services.

### SECTION 10. REPORTS, INFORMATION AND AUDITS

The University, at such time and in such form as the City may require, shall furnish the City such reports as may be requested pertaining to the work or services undertaken pursuant to this Agreement, the direct costs and obligations incurred or to be incurred in connection therewith, and any other matters covered by this Agreement. The University shall retain all financial and administrative records for a minimum of three years following completion of this Agreement, and shall permit the City or any of their representatives or auditors access such records during normal business hours.

### SECTION 11. CONFLICT OF INTEREST

The University shall take appropriate steps to comply with the Ohio Revised Code - Ethics Law Chapter 102 which delineates conflict of interest regulations and the University's policy on Research Ethics & Conflicts of Interest - 3361:10-17-08.

### SECTION 12. UNIVERSITY INSURANCE

The University shall comply with the laws of the State of Ohio relating to insurance coverage. The University's workers' compensation coverage is statutory. The University shall carry the following minimum amount of insurance:

(a)     General Liability Insurance in the amount of $1,500,000.00 for bodily injuries including those resulting in death of any one person and on account of any one accident or occurrence.

(b)     Property Damage in the amount of $1,500,000.00 from damages on account of any one accident or occurrence.

(c)     Professional Liability in the amount of $1,500,000.00 for errors, omissions or negligent acts.

It shall be the responsibility of the University to update the above information concerning insurance if companies or self-insured status change due to policy changes, year changes or expirations.

### SECTION 13. SEVERABILITY

In the event that any provision of this Agreement is declared or determined to be unlawful, invalid or unconstitutional, such declaration shall not affect, in any manner, the legality of the remaining provisions and each provision of the Agreement will be and is deemed to be separate and

5

severable from each other provision.

SECTION 14. NONDISCRIMINATION

The University shall not discriminate against any employee or applicant for employment because of race, color, religion, sex, age or national origin.

SECTION 15. NAME, ADDRESS, AND FEDERAL ID NUMBER

Name:            Office of Sponsored Programs, University of Cincinnati
Address:         PO Box 210627, Cincinnati, Ohio 45221-0627
Federal ID No.:  31-6000-989-W

IN WITNESS WHEREOF, the City of Cincinnati and University of Cincinnati have executed this Agreement in triplicate on the date set opposite their names.

UNIVERSITY OF CINCINNATI

By: _____            Date: ___8/19/01___

Title: _____
JAMES E. WESNER
as
Contracting Officer

CITY OF CINCINNATI

By: _____            Date: ___10/15/01___
for John F. Shirey, City Manager

RECOMMENDED:

_____                9-27-01
Director of Safety

APPROVED BY CONTRACT COMPLIANCE

                                         Approved as to Form

CERTIFIED B...   OCT 02 2001
_____                _____
Contract Compliance Officer              Assistant City Solicitor

# EXHIBIT A

## PROPOSAL TO ANALYZE DATA ON CINCINNATI POLICE VEHICLE STOPS

John Eck, Ph.D.
Division of Criminal Justice and Center for Criminal Justice Research
University of Cincinnati

Lin Liu, Ph.D.
Department of Geography and Joint Center of GIS and Spatial Analysis
University of Cincinnati

## CONTENTS

**PROPOSAL NARRATIVE**
I. Introduction
II. Questions
III. Design
IV. Data
V. Analysis
VI. Community And Police Input
VII. Report
VIII. Project Schedule
IX. Project Staffing
X. Budget

2

# PROPOSAL TO ANALYZE DATA ON CINCINNATI POLICE VEHICLE STOPS

**John Eck, Ph.D.**
Division of Criminal Justice and Center for Criminal Justice Research
University of Cincinnati

**Lin Liu, Ph.D.**
Department of Geography and Joint Center of GIS and Spatial Analysis
University of Cincinnati

## I. INTRODUCTION

On May 29, the City of Cincinnati issued a request for proposal to analyze data about police vehicle stops. As stated in the RFP,

> "The City of Cincinnati seeks to analyze statistical data from motor vehicle stops by the Police Division. The purpose of this analysis will be to determine the number of motor vehicle stops by race/ethnicity in proportion to the race/ethnicity of the driving population of the City of Cincinnati. This analysis will determine whether persons of various races/ethnicities are over or under represented, proportionally, based on the above statistical data. Proposal must include a documented statistical gathering method for achieving baseline driving population numbers for the City of Cincinnati." (page 8)

In short, this RFP asks researchers to determine if there is racial disparity in who the police stop, taking into account the racial characteristics of people driving vehicles. Implied in the demand that the driving populations of racial/ethnic groups be taken into account, is the request that the research help address a related question; what are the possible causes of any disparity uncovered.

This proposal is a response to this RFP. In it we describe how we will address these and related questions in a scientifically valid manner.

We must acknowledge, at the outset, that while it is possible to determine if "persons of various races/ethnicities are over or under represented, proportionally..." it is impossible to produce a scientifically definitive answer to the question "What causes any such misrepresentation?" The reasons for this are described throughout the proposal. Nevertheless, we do feel we can assist the city by improving the accuracy of estimates of possible disparities and by narrowing the range of possible explanations for these disparities.

This proposal is divided into ten parts. In the next section we describe the questions that this analysis will examine. In section three, we describe the research design; the manner in which we will organize the data and the types of comparisons we will examine. The

3

fourth section describes the types of data sources we will use. In the fifth section we outline the analysis procedures. Section six describes how we will seek community input for the interpretation of the preliminary findings. Section seven describes the products from this proposal. The eighth section provides the project schedule. Project staffing is described in the ninth section. In the last section, budget details are provided.

## II. QUESTIONS

Because the racial composition of the city is overwhelmingly European and African Americans, we will restrict our analysis to these two groups. Though it is theoretically possible that other racial or ethnic groups may be stopped by the police out of proportion to their numbers in the population, two factors argue against their inclusion in this analysis. First, their numbers are too small to give reliable estimates of disparity, even if such disparity exists. Second, recent events strongly indicates that it is the possibility of a disparity between European and African Americans that is of greatest concern to the citizens of the city.

The analysis will be organized around three questions and associated subsidiary questions.

1. What are the characteristics of police traffic stops?
    - Where do stops take place?
    - When do stops occur?
    - Who gets stopped?
    - What are the reasons for stops?
    - What are the outcomes of stops?

Answering these questions provides that background for interpreting answers to subsequent questions.

2. Is there a difference in the relative frequency of stops by race?
    - How big a difference?
    - Where do such differences occur?
    - How do such differences vary by time of day?

The answers to these questions address the question proposed in the RFP.

3. What could account for such differences?
    - Does repeat offending contribute to the differences?
    - Do hot spots of offending contribute to the differences?
    - Are there other explanations for the differences?

Findings from this section of the analysis can help identify potential causes for any racial differences found.

## III. DESIGN

**Measuring Disparity in Police Stops of Citizens.** Evidence of racial disparity involves the comparison of ratios. The first ratio is the proportion of European-American drivers stopped by the police; Es/Ed (where Es is the number of European-American drivers

4

stopped and Ed is the number of European-American drivers). The second ratio is the proportion of African-American drivers stopped by the police; As/Ad (where As is the number of African-American drivers stopped and Ad is the number of African-American drivers). When Es/Ed - As/Ad = 0 there is no disparity. When Es/Ed - As/Ad > 0 European-Americans are being stopped in greater proportion to their numbers in the driving population than are African-Americans. When Es/Ed - As/Ad < 0 African-Americans are being stopped in greater proportion to their numbers in the driving population than are European-Americans.

**Measuring Geographic Variation in Disparity.** The City of Cincinnati is not racially homogeneous. The proportions of African-Americans and European-Americans driving vary considerably across Cincinnati neighborhoods. As a consequence, it is vitally important to look for any geographic variation in disparities. The statistical analysis we propose will be to map the difference between the two ratios discussed above. If there is no disparity, then this difference will be zero. The results can be displayed as a contour map where the elevations significantly above zero indicate disparity against one group, the depressions significantly below zero indicate disparity against the other group, and areas with elevations around zero indicate little or no disparity against either.

**Measuring Temporal Variation in Disparity.** It is possible that the racial composition of drivers in neighborhoods varies by time of day. A largely African-American neighborhood with a large commuter route running through it may have many more European-Americans in the neighborhood during weekdays, than in the evenings and on weekends. These temporal changes in the driver populations need to be accounted for. We will, therefore, attempt to map these ratios for different time periods (see part V. ANALYSIS – traffic modeling software).

**Determining Statistically Significant Differences.** Since random fluctuations outside the control of the police can influence these data, we will look for differences that exceed standard scientific thresholds of statistical significance (10%). That is, only differences between the European-American and African-American stop rates that have less than a 10 percent likelihood of being due to chance, will be deemed meaningful. Differences with more than a 10 percent chance of being due to chance have too high a likelihood of being due to random fluctuations, and will be treated as if the true difference is zero.

## IV. DATA

We will use four types of data. The first type describes the stops. The second describes the driving population. The third type of data describes repeat driving violations among people stopped by the Cincinnati Police. The last type of data shows concentrations of crime and disorder (hot spots) throughout the city.

**Stop Data.** Stop data describe the numerator of the ratios (Es and As). These data will come from the Cincinnati Police Division and are based on Contact Cards completed by patrol officers when they stop a vehicle. Though contact cards describe whether a citation was issued or an arrest was made, we will examine citation and arrest files to

5

make sure we have a complete database of police vehicle stops. If all citations and arrests stemming from vehicle stops are accounted for in the contact card database, we will rely on the contact card records. Otherwise we will use the arrest and citation databases as well. We will assess the accuracy of the stop location and make any corrections necessary prior to analysis. After cleaning the data, we will be able to use information from the contact cards to examine:

- The number of stops and their duration;
- Reasons for stops (i.e., moving violation, equipment violation, suspect vehicle description, stolen auto, etc.);
- Whether a search was conducted, type of search (i.e., Terry, person, property) and duration;
- If a search was conducted, the legal basis for the search (i.e., consent, probable cause, plain view, and other), and what was seized (i.e., nothing, drugs, alcohol, stolen property, other);
- Whether an arrest or citation was made, and for those with an arrest or citation, the type of arrest or citation.

Police began collecting this data in May. To produce reliable estimates, we will need at least five months of data. The May data has a high chance of being error prone. There are two reasons for this. First, it is the first month the data was collected so there maybe start-up problems that were corrected later. Second, the April civil disturbances may influence the May data more than subsequent months. For both reasons, we do not expect sufficient data to begin analysis before the end of November.

**Driving Population.** There is no single good source for estimating the number of drivers, by race, on the streets of Cincinnati at different times of the day. Therefore, we will use two types of data – drivers' license and census – to estimate the driving populations. These data will serve as inputs to traffic flow analysis that will provide baseline racial characteristics of drivers in small neighborhood areas by time of day. Comparisons of findings between the two types of data will provide estimates of the reliability of findings. If the results are similar, regardless of the data used, then we will have confidence in the findings. If the results are widely dissimilar, then the findings will have to be treated with a high level of caution. Before discussion on the data we will use, it is important to discuss why another form of data will not be used.

**Why Observational Data is Invalid and Too Costly.** Some earlier studies of the causes of racial disparities in police stops have used observer counts of people driving along highways and their driving infractions. It is important to note that such surveys were undertaken for purposes of litigation and have not been scientifically examined to test their validity or reliability. (For example: Were the drivers the observers said were engaged in infractions, engaged in the types of behaviors that a similarly placed law enforcement officer would have noted as a stoppable infraction? This is a validity question. Would multiple, independent observers of the same drivers come to the same conclusion? This is a reliability question.) For this reason, we cannot assume they were reasonable measures. Regardless of the validity and reliability of such measures for

6

examining disparity of stops along highways, these measures are unlikely to be applicable to a congested urban environment. An observer, watching passing vehicles will not be aware of the fact that the driver and vehicle match the descriptions of the suspect and car involved in a recent crime. An observer will not be aware of the number of outstanding warrants for the driver. Nor is the observer likely to be aware of legal but contextually suspicious behavior about which an officer familiar with an area might be cognizant of.

In addition to the validity and reliability problems with observational data, we must also consider the costs of collecting such data. As noted above, racial disparity in stops is likely to vary across the city and across the time of day. Failure to consider the geographic and temporal patterns of these differences is likely to result in misleading findings. For observational data to be useful requires observers to be stationed at posts throughout the city and at different times at each post. Adequate coverage of the city will require several hundred observation posts at least four different times of day. When the costs of such an undertaking are considered along with the highly uncertain validity of data resulting from these observations, it is clear that this is not a scientifically prudent method of collecting data.

**Drivers' License Data.** We will estimate the numbers of European and African American drivers using drivers' license data for the metropolitan area surrounding Cincinnati (including relevant counties in Ohio, Kentucky, and Indiana). Drivers' license data from the States of Ohio, Indiana and Kentucky can provide us with the number of licensed drivers living and traveling through in city neighborhoods, along with the race of these drivers. A limitation of this data is that it does not account for unlicensed drivers. Since such individuals are in violation of the law, they are the types of people the police can legitimately seek out. A second limitation is that these data do not indicate if the license holder has engaged in other behaviors that make them a legitimate target for a police stop. If unlicensed driving and other stoppable behaviors are not evenly distributed among European and African American drivers, then these behaviors need to be taken into account. Not doing so could make it appear that the police are engaged in discriminatory practices when in fact they are acting in accordance with the law and good police practices. For these reasons, we will not rely exclusively on drivers' license data.

**Census Data.** To help address these concerns, we will also use census data to estimate the numbers of European and African American drivers. Census data at the tract level should be available by November 2001. From these data we will calculate the number of young males (ages 15 to 30) of each race living in neighborhoods across the city. We will use data on young males for a very simple fact. There is substantial criminological evidence that people driving without a license or engaged in stoppable behaviors are more likely to be young males than they are to be female or older males. (Even though people engaged in these behaviors are more likely to be young males, it does not follow that most young males engage in these behaviors. It is the concentration of such behavior among young males that is of interest here.)

7

Neither of these two sets of data is wholly adequate, for two reasons. First, neither contains direct evidence of behaviors for which the police can legitimately stop people. The census data is somewhat superior in this regard to the license data, but it is at best indirect information. This problem cannot be surmounted without detailed surveys of individuals asking about their driving behaviors and other involvement in misconduct. We do not propose to conduct such a survey, though it may be desirable for the city to fund such research in the future.

Second, neither data set describes who is on the road where and when. This problem can be addressed to standard traffic analysis models (see part V. ANALYSIS). These models use data about residential and work patterns, street network information, and knowledge about traffic flows to estimate how people move through a city. We propose to use such a model with the license and census data to account for the racial makeup of drivers on the road in different places at different times.

**Repeat Stops.** If a few drivers receive a disproportionate share of the traffic stops, and these drivers are more prevalent among one race than another, this will influence estimates of racial disparity in traffic stops. We will examine the traffic stop information to see if such concentrations exist. A finding that such stops are not heavily concentrated among a few drivers, would lend credence to an allegation of racial discrimination. A finding that a few drivers account from far more than their share of the stops would indicate that police officers use individual behavioral characteristics rather than racial characteristics when deciding to stop a vehicle. We will examine repeat violations using both names of drivers and vehicle license plate numbers.

**Hot Spots of Crime and Disorder.** If stops are the outcome of citizen illegitimate activity – associated with crime or disorder – we expect to see a close fit between the concentration of stops and the concentration of deviance in and around hot spots. If the geographic distribution of stops is independent of the distribution of crime and disorder, then it is harder to claim that any racial disparity in stops is due to differential racial involvement in deviancy. Hot spot information will come from police calls for service and crime data for the years 2000 and 2001. Two years of data will provide stable estimates of crime and disorder hot spots.

**Confidentiality of Data.** The data describing police vehicle stops will contain the names and other individual identifiers. This information is critical for repeat stops, crime hot spot analysis, and other issues. This data will only be accessible to project staff and individual names or other identifiers will not be provided in any reports (draft or final), derivative products, or in any presentations.

## V. ANALYSIS

**Statistical Analysis Software.** Data from the various sources will be analyzed using SPSS. SPSS contains the algorithms required to produce the necessary tables and charts to answer the first set of questions (see part II. QUESTIONS). SPSS data files can be read by the other software we will use (see below).

8

GIS software. We will use Arc/Info and ArcView GIS software for analyzing all four types of data. These packages will be used to detect crime hot spots, estimate commuting traffic through neighborhoods, derive baseline driving populations, and generate graphical presentations of spatial-temporal distributions of neighborhood based stops/baseline ratios.

Traffic modeling software. We have access to commuting traffic flow data from one Transportation Analysis Zone (TAZ) to another for the Greater Cincinnati Area. A TAZ is smaller than that of a census tract; therefore it provides sufficiently detailed data for this project. We will develop an algorithm to assign the commuting traffic flows to individual street segments. Since we know the racial, age, and gender composition of each TAZ (from drivers' license data and census data), we can estimate the racial makeup of commuters on each street segment during the morning and afternoon commuting hours. Thus we can derive a reliable baseline driving population by race, age, and gender for police vehicle stops during commuting hours. For non-commuting hours, we will use neighborhood population data to derive a baseline driving population by race, age and gender.

## VI. COMMUNITY AND POLICE INPUT

It is important that the input of informed community members be used in this analysis. To this end, we have asked Jay Rothman, Special Master for the US Federal Court, to assist us. Mr. Rothman has agreed to convene a meeting of community leaders (see letter Appendix A). We will meet with this group twice. The first meeting will take place prior to the data analysis to discuss our approach and to seek input as to alternative ways of looking at the data. The second meeting will take place once preliminary findings have been produced. At this time we will ask the group to give us their interpretation of the findings and to suggest further analysis that might make the findings clearer.

Separate discussions with the command staff of the Cincinnati Police Division will be undertaken at the same time the meetings described above. Members of the command staff will be asked to provide the same types of input.

We take the input of community members and the police seriously. Nevertheless, the research team has the responsibility to undertake the analysis in a manner that is scientifically defensible and objective. Decisions as to how to carry out this research and interpret the findings will remain with the research team.

## VII. REPORT

A draft report will be submitted to the Cincinnati Police Division for their review. After consultation with the Cincinnati Police Division, the research team will create the final report. The report will address the questions stated above (part II. Questions), along with an explanation of the methodology used to analyze the data, and overall conclusions. The final report will be written so that is understandable to readers with little or no experience in social science research or geographic information systems.

9

Again, though we will listen carefully to members of the Cincinnati Police Division, this proposal is being submitted under the assumption that the analysis is independent of possible police interests. The principle investigators, Eck and Liu, will solely determine the contents of the final report.

The final report will be a public document. If this proposal is accepted, it is understood that the city will make the final report available to the press and the public. Further, the Center for Criminal Justice Research will have the right to distribute copies of the report. Finally, members of the research team will have the right to develop scientific papers and articles based on the data and analysis conducted during this study without having to seek permission of the City of Cincinnati or the Cincinnati Police Division.

## VIII. PROJECT SCHEDULE
Two important types of data will not be available before November: five months of reasonably accurate data on police stops, and the 2000 census information. For this reason, most of the work will not begin until late in 2001. Prior to that, the project team will refine the analysis procedure, test alternative models, and check incoming stop data for accuracy and completeness.

| Model & data verification | July-October 2001 |
| Discussions -- -- community and police input | October 2001 |
| Analysis Data | November 2001- February 2002 |
| Draft Report | March 2002 |
| Review – community and police input | March 2002 |
| Final Report | April 2002 |

## IX. PROJECT STAFFING
This project will be conducted by Dr. John Eck and Dr. Lin Liu through the Center for Criminal Justice Research at the University of Cincinnati. Two graduate students in the Division of Criminal Justice and the Department of Geography and one research associate John Schwartz from the Division of Criminal Justice will assist Drs. Eck and Liu. Both Drs. Eck and Liu have extensive experience in conducting scientific research. Dr. Eck has almost a quarter of a century of conducting scientific studies of policing. Dr. Liu is an internationally recognized scholar in Geographic Information Systems and their application to urban policy.

**Dr. John Eck** is an Associate Professor in the Division of Criminal Justice at the University of Cincinnati, where he teaches graduate courses in research methods and police effectiveness. For over twenty-four years, Dr. Eck has studied almost every facet of police operations: rapid response, patrolling, investigations, prevention, and drug enforcement. He has written articles and reports on criminal investigations management, problem-oriented and community policing, police handling of drug problems, crime hot spots, crime displacement, preventing crime at places and crime mapping. He is the author of "Preventing Crime at Places," chapter 8 in Preventing Crime: What Works,

10

What Doesn't, What's Promising and the co-editor (with David Weisburd) of Crime and Place, volume 4 in the series Crime Prevention Studies. Dr. Eck serves on the National Academy of Sciences Panel on Police Research and Policy and is a consultant to the Charlotte-Mecklenburg (NC) Police Department. From 1996 through 1998 Dr. Eck was the Evaluation Coordinator for the Washington/Baltimore High Intensity Drug Trafficking Area, a multi-agency regional drug investigation and treatment program. Prior to that, Dr. Eck was the Research Director for the Police Executive Research Forum, in Washington, D.C. He has been a consultant to the London Metropolitan Police and the Royal Canadian Mounted Police. Dr. Eck holds a Ph.D. in Criminology from the University of Maryland (1994) and a Master of Public Policy from the University of Michigan (1977). Currently, he lives with his family in Cincinnati, Ohio.

**Dr. Lin Liu** is an Associate Professor of Geography at University of Cincinnati. He holds a Ph.D. in geography with a specialization in geographic information systems (GIS) from the Ohio State University. Dr. Liu has been working in the field of GIS since 1984. He participated in the design and development of multiple GIS software packages. His research interest includes scientific visualization of spatio-temporal data, spatial data mining, applications of GIS to urban/economic and environmental problems. Since 1999 Dr. Liu has become interested in geography of crime, specifically in the area of integrating GIS and crime analysis. He has worked on detecting crime hot spots, spatial-temporal modeling of drug-related crime, and crime simulation models. The results have been presented in various national conferences, including Academy of Criminal Justice Sciences Annual Conference, Crime Mapping and Research Conference, Association of American Geographers Annual Conference, and Annual Conference of University Consortium of Geographic Information Sciences. He is the PI of a number of research projects, funded by the National Science Foundation, Ohio EPA, University of Cincinnati, and local government agencies. He has publications in various GIS related journals, book chapters, and conference proceedings. Dr. Liu has taught more than ten different courses in GIS, computer cartography, location analysis and regional geography. As an ESRI authorized instructor, he has offered various GIS training courses for GIS professionals. Dr. Liu served as the former President of the Association of Chinese Professionals in Geographic Information Systems – Abroad (CPGIS). He organized a number of international conferences on GIS. He has also served as a GIS consultant for a number of public agencies and private industries.

**Mr. John Schwartz** is the Associate Director of the Center for Criminal Justice Research, University of Cincinnati. He holds a Masters of Science in Criminal Justice from the University of Cincinnati. Mr. Schwartz has administered over seventy criminal justice related studies, including ten studies involving police data. Through various projects, Mr. Schwartz has worked directly with the Oakland, California, Dallas, Texas and the Cincinnati, Ohio Police departments. His project experience includes data entry, data analysis, and project coordination.

11

## X. BUDGET
### July 1, 2001 – April 30, 2002

| | Total |
|---|---|
| **A. Personnel** | |
| Principal Investigator John Eck | |
| $55,736.05 x 75% recess effort | $18,288 |
| | |
| Principal Investigator Lin Liu | |
| $59,000 x 50% recess effort | $12,906 |
| | |
| Graduate Assistants | |
| 2 x $1,500/month x 10 months | $30,000 |
| | |
| Research Associate John Schwartz | |
| $40,450.20 x 22.5% annual effort | $9,101 |
| **Personnel Subtotal** | **$70,295** |
| | |
| **B. Fringe Benefits** | |
| John Eck $18,288 x 30.0% | $5,486 |
| Lin Liu $12,906 x 30.0% | $3,872 |
| Graduate Assistants $30,000 x 4.0% | $1,200 |
| John Schwartz $9,101 x 31.5% | $2,867 |
| **Fringe Benefit Subtotal** | **$13,425** |
| **C. Other Direct Costs** | |
| Tuition | |
| $1,977/quarter x 3 quarters x 2 students | $11,862 |
| Computer | |
| Pentium computer with CD-Rom | $3,000 |
| Photocopying | |
| $100/month x 10 months | $1,000 |
| **Other Direct Costs Subtotal** | **$15,862** |
| | |
| **D. Total Direct Costs** | |
| A+B+C = | $99,583 |
| | |
| **E. Facilities and Administration** | |
| D-Tuition x 53% | $46,492 |
| | |
| **F. Total Project Cost** | |
| D+E = | $146,075 |

12

Budget Justification

**A. Personnel**

Personnel include the Principal Investigators Drs. John Eck and Lin Liu, two graduate assistants and Research Associate John Schwartz. Drs. Eck and Liu will be responsible for the overall project while the graduate assistants and research associate will assist the PI's in all aspects of the project.

**B. Fringe Benefits**

Benefit rates are based on actual rates for faculty 30.0%, exempt staff 31.5%, and students 4.0% non-federal awards.

**C. Other Direct Costs**

3 quarters of tuition is requested for each graduate assistant. This will cover their tuition during the life of the project. One Pentium computer with CD-Rom is needed for data analysis and data security. The computer will be designated solely to the project. All current computers in the Division of Criminal Justice and the Geography Department are shared. In order to protect the integrity of the data, one computer is needed that can be password protected and only project members will have access to it. Photocopying is estimated at $100/month to cover reports and analysis.

**D. Total Direct Cost**

A+B+C= $99,583

**E. Facilities and Administration Costs**

A rate of 53% was negotiated between the University of Cincinnati and the US Department of Health and Human Services for on-campus research.

**F. Total Project Cost**

D+E = $146,075

# AMENDMENT TO CITY OF CINCINNATI
# AND
# UNIVERSITY OF CINCINNATI

Professional Services Agreement No. 15X0024

This Amendment # 1 to the Agreement made and entered into this ____ day of _____, 200_ by and between the City of Cincinnati (the "City") and the University of Cincinnati ("the University").

Whereas, the parties entered into an Agreement on October 15, 2001 (Original date of Agreement).

Whereas, the parties have agreed upon certain changes to the Agreement.

For and in consideration of the mutual promises, covenants and agreements, the parties agree to amend and supplement the aforementioned Agreement in the following respects and in those respects only, all other terms and conditions of the original Agreement to remain in full force and effect:

### Article I:  Period of Performance

SECTION 2.  TERM The previous period of performance is hereby amended with a no-cost extension and shall be from (original date) October 15, 2001, through (new end date) September 30, 2003.

IN WITNESS WHEREOF, the City of Cincinnati and University of Cincinnati have executed this Amendment in triplicate on the date set opposite their names.

UNIVERSITY OF CINCINNATI

By: _____          Date: _____

Title: _____

CITY OF CINCINNATI

By: _____     1     Date: __2/6/03__
    Valerie A. Lemmie, City Manager

RECOMMENDED:                                         CERTIFICATION OF ADDITIONAL
                                                    FUNDS NOT REQUIRED.
_____                                    William E. Moller
Thomas H. Streicher, Police Chief
                                                    FEB 0 4 2003

APPROVED BY CONTRACT COMPLIANCE          APPROVED AS TO FORM

_____                _____
Contract Compliance Officer              Assistant City Solicitor





UNIVERSITY OF **Cincinnati**

**College of Education**

**Center for Criminal Justice Research**
University of Cincinnati
PO Box 210389
Cincinnati OH 45221-0389

508 Dyer Hall
Phone    (513) 556-1913
Fax       (513) 556-2037

September 10, 2002

Lieutenant Dan Gerard
Cincinnati Police Division
Fiscal and Budget Section
310 Ezzard Charles Drive
Cincinnati, OH 45214

Dear Lt. Gerard:

I am writing to request a no cost extension of the grant, *Cincinnati Traffic Stop Analysis*. The end date would be June 30, 2003. This extension is necessary because we have yet to receive all of the data needed for the analysis. While the grant began in October of 2001, we did not begin to receive data until June 2002. During that down time, we have taken on three tasks. First, we assisted the Records Division in creating the final database into which the data would be entered. Second, we developed the computer model to be used for traffic flow and stop analysis. And, third, we completed a verification of the driver counts on Cincinnati streets previously done by the City.

For the past three months, we have begun data entry error analyses on the first batch of data we obtained from the Records Division (about 500 records). Preliminary results reveal that there is a significant amount of errors in the first batch. Once we have all of the data, we can begin cleaning and coding the data for statistical analysis which will take at least 6 months to finish assuming the error pattern of the remaining data is similar to that of the first batch. This extension will allow us to properly analyze the data as well as write the final report.

If you have any questions, please feel free to contact Lisa Growette Bostaph at 513-556-9956.

Sincerely,

John E. Eck
Professor
Division of Criminal Justice

# City of Cincinnati



Thomas H. Streicher, Jr.
Police Chief

Police Department
310 Ezzard Charles Driv
Cincinnati, Ohio 45214
(513) 352-3536
(513) 352-2949 (FAX)

October 9, 2002

Dr. John E. Eck
Professor, Division of Criminal Justice
University of Cincinnati
Center for Criminal Justice Research
P.O. Box 210389
Cincinnati, Ohio 45221-0389

Dear Dr. Eck:

This letter confirms your no cost extension of the grant, Cincinnati Traffic Stop Analysis. The Police Department is aware of the need for this extension and your extensive background work during this time.

If you have any questions, feel free to contact Lieutenant Dan Gerard at 352-2958.

Sincerely,

Lt. Colonel Richard Janke
Acting Police Chief





CINCINNATI.COM \ ENQUIRER \ WCPO \ REDS \ BENGALS \ JOBS \ CARS \ HOMES \ WEATHER \ TRAFFIC \ SUBSCRIBE

## THE CINCINNATI ENQUIRER
ONLINE EDITION OF THE REGION'S #1 NEWSPAPER

Oct. 10, 2003

HOME    LOCAL    SPORTS    BUSINESS    EDITORIALS    TEMPO    ENTERTAINMENT    CLASSIFIED    ARC

**TODAY'S ENQUIRER**
Front Page
► Local News
Sports
Business
Editorials
Tempo
Travel
Health
Technology
Weather
Back Issues
Search
Subscribe

**SPORTS**
Bearcats
Bengals
High School
Reds
Xavier

**VIEWPOINTS**
Jim Borgman
Columnists
Readers' views

**ENTERTAINMENT**
Movies
Dining
Horoscopes
Lottery Results
Local Events
Video Games

**CINCINNATI.COM**
Giveaways
Maps/Directions
Send an E-Postcard
Coupons
Visitor's Guide

**CLASSIFIEDS**
Jobs
Cars
Homes
Obituaries
General
Place an ad

**HELP**
Feedback
Subscribe

Tuesday, October 7, 2003

# Judge withholds racial data

## Profiling study kept secret in suit against city

**By Gregory Korte**
**The Cincinnati Enquirer**

University of Cincinnati researchers have completed their study of whether Cincinnati police target African-American motorists - but have been ordered by a federal judge not to disclose their findings.

A federal magistrate issued a gag order on the racial-profiling report Monday.

Plaintiffs in a class-action lawsuit against the city had argued against disclosure, saying the parties need additional time to analyze the report.

Under the order by U.S. Magistrate Judge Michael R. Merz, the soonest the analysis could be released is 45 days.

The issue of racial profiling has been a central question in the city's police reform efforts. In May 2001 - a month after a police shooting in Over-the-Rhine led to riots - City Council required officers to record the race, gender and age of every person they came into contact with.

UC professor John Eck has been analyzing those 50,000 contact cards for two years in an effort to find out whether police improperly target African-Americans.

Since then, the data collection has been wrapped into the racial-profiling lawsuit settlement, also called the collaborative agreement.

The court's gag order came after City Council's Law and Public Safety Committee moved to make the information public. Chairman Pat DeWine said that because taxpayers paid for police to collect the data, they deserve to know what it says.

"The collaborative should not be used to insulate important information from the public," DeWine said. "The police have been collecting this data for too long without there being a

Updated E

**AP TOP HEADLINE NEW**

• Iranian Activist Wins Prize
• 2 U.S. Soldiers Dead, Baghdad
• 6 Palestinians Killed Raid
• China Confirms Laun Space Trip
• Agency Decries Cuba Condition
• Democratic Hopefuls Debate
• Cheney Defends Dec Iraq
• Lawyers Present Cas Hearing
• Dow Up 26, Nasdaq U Warning
• Yankees Defeat Red S ALCS

**NATIONAL NEWS**

• Philly Mayor Says FB Computer
• Sniper Suspect Plans Defense
• Democratic Hopefuls Debate
• Lawyers Present Cas Hearing
• Schwarzenegger App Auditor
• Episcopalian Group F Stance
• Missouri to Keep Gun Secret
• GOP Lawmakers Seek Aid Package
• Calif. Indicts Couple Charges
• Ex-FBI Agent Accuse Conspiracy

**WORLD NEWS**

• 2 U.S. Soldiers Dead, Baghdad
• 6 Pal Raid
• Irania

EXHIBIT

2

ALL-STATE LEGAL®

Judge withholds racial data
Page 1 of 3

Search
Survey

public discussion about the value of it."

But Kenneth L. Lawson, a lawyer for the American Civil Liberties Union of Ohio, said the findings should be kept under wraps until after the Nov. 4 City Council election.

"We don't want it to be used to further somebody's political agenda," he said.

Instead, lawyers for all sides - including the Cincinnati Police Department and the Fraternal Order of Police Queen City Lodge No. 69 - should take time to decide what changes, if any, should be made in response to Eck's analysis.

"The findings are very complex. Let's say there's evidence that blacks are getting stopped more often than whites. Does that mean there's racial profiling?" Lawson said.

---

E-mail gkorte@enquirer.com

————————————————————

**ENQUIRER COLUMNISTS**
Pulfer: Permanent 'Purple People P&G Bridge' pending
Korte: Inside City Hall

**TOP LOCAL HEADLINES**
Sewer fixes could triple bills
Taft hails Genome Institute alliance
Cancer drug offers hope
Brides say dress shop jilted them
Judge withholds racial data
Officials getting free storage

**TRISTATE HEADLINES**
Munoz featured at Butler Chamber
Warren candidate accused
Defense: Slaying wasn't planned
Woman accused of taking $565,000
4 areas could split $44,314
Bicyclist wears heart on sleeve
Domestic call leads to meth lab
Student aims to bolster safety
Students to spend night in boxes
Regional Report
National Guard saves cemetery from disrepair

**KENTUCKY HEADLINES**
Big bash is worth beans
Campers to take case to the feds
Kids on air in living color
Man jailed after gunfire
Lexington smoking ban still on hold
Kentucky to do

Prize
- Groups Hail Ebadi for Democracy Work
- Afghan Truce Signing to Area
- Myanmar Blocks Suu March

**BUSINESS NEWS**
- Lufthansa Plans to C German Jobs
- Japan's Central Bank Target
- Cree Probe Finds All Merit
- New York Foreign Ex
- No Plans to Sell Fiat

**SPORTS NEWS**
- Yankees Defeat Red ! ALCS
- Lawyers Present Cas Hearing
- Thrashers Honor Sny Columbus
- Cubs' Young Gun Go Tonight
- Two Share Lead at La Invitational
- Rain Delays Annika's Parade
- Hunsicker Expected t With Mets
- Newman Wins Eighth NASCAR Season
- Laura Davies Misses Open
- Family Sues NFL in G

October 10, 2003

J. Rita McNeil
City Solicitor
City of Cincinnati
801 Plum Street, Room 214
Cincinnati, Ohio 45202

**VIA FACSIMILIE: (513) 352-1515**

Dear Rita:

*The Cincinnati Enquirer* would like to request, under the Ohio
Public Records Act, a copy of Dr. John Eck's recent analysis of
racial profiling data performed under authority of City Council
Ordinance 88-2001.

This request includes all supporting tables, analysis and related
work product from Professors Eck and Lieu, regardless of form.


Regards,


Gregory Korte


cc: John C. Greiner, Esq.



EXHIBIT
3

# City of Cincinnati



Office of the City Solicitor

Room 214, City Hall
801 Plum Street
Cincinnati, Ohio 45202
Phone (513) 352-3394
FAX (513) 352-1515

J. Rita McNeil
*City Solicitor*

October 10, 2003

Gregory Korte
Cincinnati Enquirer
312 Elm Street
Cincinnati, Ohio 45202

RE: Public Records Request; Traffic Stop Data Analysis

Dear Mr. Korte:

I am in receipt of your October 10, 2003 letter in which you make a Public Records request for a copy of Dr. John Eck's recent analysis of traffic stop statistical data compiled by the Cincinnati Police Department. I am regrettably unable to comply with your request because the City is not in possession of such data. Under Ohio law, a public agency has no duty under the Public Records Act to provide documents which are not in its possession. *State ex rel. Robert Cobb v. Guyton*, 1998 Ohio App. Lexis 1605; *State ex rel. Fant v. Mengel*, 62 Ohio St.3d 197 (1991).

Further, the recent order issued by Judge Michael Merz specifically precludes the City from making such materials available to you. The order is attached for your convenience. In his October 6, 2003 order, Judge Merz ordered that such materials could not be publicly released until after a 45-day period. Since the documents are currently under a protective order issued by Judge Merz, the City is unable to comply with your request at this time.

Sincerely,

J. Rita McNeil
City Solicitor

EXHIBIT

4