**City of Cincinnati
Independent Monitor's
Ninth Quarterly Report**

**April 1, 2005**

Quarterly Report regarding compliance with and implementation of the Memorandum of Agreement between the United States Department of Justice and the City of Cincinnati and the Cincinnati Police Department, and the Collaborative Agreement between the Plaintiffs, the Fraternal Order of Police and the City of Cincinnati

Saul A. Green                           Richard B. Jerome
Monitor                                 Deputy Monitor

**www.cincinnatimonitor.org**

## INDEPENDENT MONITOR TEAM

Saul Green
Independent Monitor


Richard Jerome
Deputy Monitor


Joseph Brann

Rana Sampson

Nancy McPherson

John Williams

Timothy Longo

David McDonald

Raven Sword

TABLE OF CONTENTS

**PAGE**

EXECUTIVE SUMMARY ........................................................ 1

CHAPTER ONE.  INTRODUCTION ....................................... 4

CHAPTER TWO.  MEMORANDUM OF AGREEMENT ......... 10

I.          General Policies ............................................... 10

            A.      Mental Health Response Team................. 10

            B.      Foot Pursuits ......................................... 11

II.         Use of Force ..................................................... 12

            A.      General Policies...................................... 13

B.          Chemical Spray ................................................ 16

            C.      Canines .................................................. 18

            D.      Beanbag Shotguns................................... 19

III.        Incident Documentation, Investigation ............ 20

            A.      Documentation........................................ 20

            B.      Investigation .......................................... 23

            C.      Review of Critical Firearms...................... 24

IV.         Citizen Complaint Process ............................... 26

            A.      Openness of Complaint Process............... 26

            B.      Investigation of Complaints ..................... 27

            C.      Adjudication of Complaints ..................... 28

            D.      Investigations by the CCA ....................... 29

V.          Management and Supervision........................... 31

            A.      Risk Management.................................... 31

            B.      Audit Procedures.................................... 34

            C.      Video Cameras........................................ 36

            D.      Police Communications Section ............. 37

            E.      Discipline Matrix.................................... 38

VI.        Training ........................................................ 39

     A.    Use of Force - Management Oversight and Curriculum ....................................... 39

     B.    Handling Citizen Complaints ................... 41

     C.    Leadership/Command Accountability ..... 41

     D.    Canine Training ....................................... 42

     E.    Scenario Based Training .......................... 43

     F.    Training on Review of Civil Lawsuits ....... 43

     G.    Orientation to the MOA .......................... 44

     H.    FTO Program .......................................... 45

     I.     Firearms Training .................................... 46

CHAPTER THREE.  COLLABORATIVE AGREEMENT ......... 47

I.         Implementation of CPOP ................................. 47

II.       Evaluation Protocol ......................................... 71

III.      Pointing Firearms Complaints .......................... 73

IV.     Fair, Equitable and Courteous Treatment ........ 73

     A.    Data Collection and Analysis ................... 74

     B.    Training and Dissemination of Information ............................................. 78

     C.    Professional Conduct .............................. 78

V.        Citizen Complaint Authority ............................ 79

     A.    Establishment of CCA and CCA Board .... 79

     B.    Executive Director and Staff .................... 80

     C.    CCA Investigations and Findings ............. 81

Appendix A  Benchmarks and Standards for Defining MOA Compliance ........................................... 84

Appendix B  Investigations Template ............................... 150

**CITY OF CINCINNATI
INDEPENDENT MONITOR'S NINTH
QUARTERLY REPORT**

**EXECUTIVE SUMMARY**

This is the ninth Report of the Independent Monitor under the Memorandum of Agreement (MOA) between the City of Cincinnati and the United States Department of Justice (DOJ), and the Collaborative Agreement (CA) among the City of Cincinnati, the Plaintiff Class, and the Fraternal Order of Police (FOP). The period covered is from November 1, 2004 through December 31, 2004, though we also review more recent activities from January 1, 2005 to March31, 2005.

This report details the implementation of and level of compliance with the MOA and the CA. The MOA calls for police reforms in the areas of police use of force, citizen complaints, risk management, and training. The CA calls for the implementation of Community Problem-Oriented Policing (CPOP), mutual accountability and evaluation, bias-free policing and the establishment of the Citizen Complaint Authority (CCA).

During this quarter, there were several important actions and events relating to the instances of non-compliance that were described in the Monitor's Eighth Quarterly Report and the Plaintiffs' motion seeking a finding of material breach of the CA and the MOA. First, in a stipulation entered in federal court, the City agreed that it had taken the actions that were the basis of the Monitor's finding of material breach. The Parties also agreed to remedial measures for restoring trust and the spirit of cooperation among the Parties through a series of meetings facilitated by Magistrate Judge Michael Merz. Second, Judge Merz issued his Decision and Recommendation, holding that the City had engaged in a material breach of the CA, and recommending that the CA be deemed a court order. Third, Judge Susan Dlott issued an Order Adopting Report and Recommendation of Magistrate Merz, entering the Collaborative Agreement as an Order of the Court. Also, during this quarter, Judge Merz conducted two facilitated meetings with the Parties and the Monitor. These initial meetings addressed the issues of implementation of CPOP and use the of Tasers.

1

**MEMORANDUM OF AGREEMENT**

Over the last several quarters, the Monitor has been in discussions with the City and the Department of Justice regarding the definition and standards to be used in determining compliance with the MOA. The Monitor has prepared a draft matrix of compliance standards, with input from the City and the Department of Justice that will be finalized during the next quarter. A working draft matrix is attached as an appendix to this Report.

The purpose behind defining compliance and setting standards for assessing compliance and MOA implementation is to provide the City, the Justice Department and the public with specific expectations for CPD performance and improvement. Our establishment of compliance standards and definitions takes into account considerations of the overall goals of the MOA, and the objectives behind, and reasons for, inclusion of the individual provisions of the MOA.

Also during this quarter, the Monitor developed a new template for reviewing use of force and complaint investigations, and assessing whether officers are implementing CPD's use of force policies in compliance with the MOA. The investigations template is attached as an appendix to this Report. The Monitor's determination on compliance and implementation of the MOA provisions on use of force and complaint investigations will be included in the Tenth Quarterly Report.

**COLLABORATIVE AGREEMENT**

There have been both challenging and positive developments this quarter on CA implementation. Judge Merz's involvement has allowed the Parties to meet and try to reach consensus about aspects of community problem-oriented policing (CPOP) for Cincinnati. The Parties have now reached an agreed-upon definition of CPOP. Also, in the Parties' CA Status Report, the City and the CPD publicly state its acceptance of the CA requirement that problem solving be the principal policing approach of the Cincinnati Police Department. The CPD must now demonstrate that Department-wide adoption of this approach permeates the Department's tactics, training, promotions and assignments. Issues that remain in contention and under discussion include: improving the CPOP problem tracking system; agreement on what types of CPD activities can be characterized as problem solving; and the CPD's performance evaluation system, including its new performance appraisal form.

The Community Police Partnering Center (CPPC or Partnering Center) continues to make contributions to the City of Cincinnati. This quarter, it brought in national experts for a joint training of CPD members and Partnering Center outreach workers on key components of CPOP. This spring, the CPD and the Partnering Center will jointly be facilitating CPOP training for

Cincinnati neighborhoods.  Also, the Partnering Center is offering training that is tailored to specific types of crime.

**CHAPTER ONE. INTRODUCTION**

**I.    Significant Developments this Quarter**

The Monitor's Eighth Quarterly Report chronicled a period of repeated violations of the MOA and CA by the City of Cincinnati. At the time of publication of the Eighth Report the Monitor had also filed a Special Master Report to the Conciliator, stating that "[t]he City's non-compliance with the CA is a material breach of the Agreement. ...Therefore, the Conciliator should forward his findings and conclusions to the Court, for a finding that the City has engaged in a material breach of the Agreement."

During this quarter, the Parties took important strides to continue the implementation of the MOA and CA, while awaiting the disposition of the issue of material breach by the Court. Actions and events during this quarter that bear noting include:

- The entry of the Stipulations of the Parties Regarding Breach of Collaborative Agreement and Memorandum of Agreement by City of Cincinnati and Proposed Remedial Measures. Through these Stipulations, the City agreed that it had taken the actions that were the basis of the Monitor's finding of material breach. In addition, the Parties agreed to remedial measures for restoring trust and the spirit of cooperation among the Parties through a series of meetings facilitated by Magistrate Judge Michael R. Merz.

- On January 26, 2005, Judge Merz issued his Decision and Recommendation, holding that the City had engaged in a material breach of the CA, and recommending that the CA be deemed a court order.

- Judge Merz has conducted two facilitated meetings with the Parties and the Monitor. These initial meetings have addressed the issues of implementation of CPOP and use of Tasers. Between facilitated meetings the Parties have met to attempt to reach agreement on the issues identified in the Stipulations.

- On February 16, 2005, the Cincinnati City Council passed a Resolution "expressing the continued commitment of the City to achieve the goals as stated in the MOA with the DOJ and the CA, and to continue to work with the Parties to those Agreements to accomplish the mutually agreed objectives as set forth in those Agreements."

- On March 28, 2005 Judge Dlott issued an Order Adopting Report and Recommendation of Magistrate Merz entering the Collaborative Agreement as an Order of the Court.

As these actions and events unfolded, important work relating to the implementation of CPOP and the establishment of Benchmarks and Standards for Defining MOA Compliance continued.  This important work is described below.

## II.    Community Problem-Oriented Policing (CPOP)

While the last few months have been challenging for all Parties, this quarter also witnessed positive developments.  Judge Merz's involvement allowed the Parties to sit down again to try to reach consensus about aspects of community problem-oriented policing for Cincinnati.  At the close of this quarter, it is clear from the Parties' CA Status Report that the leadership of the City and the CPD have publicly stated their acceptance of the CA requirement that problem solving be the principal policing approach of the Cincinnati Police Department.  It will be up to the CPD to demonstrate that Department-wide adoption of this approach permeates the Department's tactics, training, promotions and assignments.

The Parties also have reached an agreed-upon definition of CPOP.  Another issue under discussion is improving the CPOP problem tracking system.  Issues that remain in contention include what types of CPD activities can be characterized as problem solving, and the CPD's performance evaluation system, including its new performance appraisal form.

The Community Police Partnering Center continues to make contributions to the City of Cincinnati.  This quarter, it brought in national experts for a joint training of CPD members and Partnering Center outreach workers on problem-oriented policing, crime prevention through environmental design, and situational crime prevention, all key components of CPOP.  Sixteen CPD members attended.  On the horizon for this spring are community CPOP trainings that will be jointly facilitated by the Partnering Center and the CPD. In addition, the Partnering Center is offering crime-tailored training, so that groups that want to know more specifically about turning around open-air drug markets can attend that training as well.

## III.    Benchmarks and Standards for Defining MOA Compliance

### A.    Goals of Compliance and Compliance Definition

Over the last several quarters, the Monitor has been in discussions with the City and the Department of Justice regarding the definition and standards to be used in determining compliance with the MOA.  The Monitor has prepared a draft matrix of compliance standards, with input from the City and the Department of Justice that will be finalized during the next quarter.  We attach this working draft matrix at Appendix A of this Report.

The purpose behind defining compliance and setting standards for assessing compliance and MOA implementation is to provide the City, the Justice Department and the public with specific expectations for CPD performance and improvement. The CPD will know where it stands and what steps still need to be taken, and the public will have a greater understanding of the progress that has been made. The standards used to assess compliance should be understandable, accessible, and credible. Where possible, they also should be verifiable. Last, they should take into account the capacity of the City and the CPD (i.e., they should be achievable), the difficulty of the task, and the importance of the task to the overall goals of the MOA.

Our establishment of compliance standards and definition takes into account considerations of the overall goals of the MOA, and the objectives behind, and reasons for, inclusion of the individual provisions of the MOA. The MOA was entered to resolve the Department of Justice's investigation as to whether there was a "pattern or practice" of police misconduct. Its purpose is to minimize the risk of excessive use of force and to promote police integrity. As stated in the MOA, the settlement reflects the City's willingness to implement "meaningful change."

## B. Existing Approach

The MOA calls on the Independent Monitor to review and report on the CPD's implementation of, and compliance with, the Agreement. The Monitor is responsible for monitoring and reporting on each substantive provision of the Agreement, and conducting "compliance reviews" to ensure that the City and the CPD have implemented the measures required by the Agreement. Our quarterly reports have detailed the City's compliance with and implementation of the MOA. The MOA may terminate before the end of its five year term if the Department of Justice and the City agree that the City and the CPD are in "substantial compliance" with each of the provisions of the Agreement, and that substantial compliance has been maintained for at least two years.

During the time that we have monitored the Agreements, the Monitor Team has undertaken a variety of activities to assess and report on the CPD's implementation of and compliance with the MOA. These include review of CPD policies and procedures, review of sample investigations, review of other files, records and documents, observations of training, ride alongs, interviews and meetings with individuals both inside and outside the CPD. Based on these activities, we have made determinations and judgments regarding whether CPD and the City have complied in a consistent fashion with the individual provisions of the MOA. These determinations have been a mix of qualitative judgments (such as whether complaint investigations were complete, or whether interviews of witnesses or officers used leading questions) and quantitative judgments (e.g., the percentage of chemical spray incidents in which a warning of impending use of force was given and documented). In

assessing compliance, we have used the terms "in compliance," "not in compliance" and "partial compliance."

Generally, the terms "Compliance," "Partial Compliance," and "Not in Compliance" have the following meanings:

**Compliance** - the requirement has been adopted as policy, has been incorporated into training, and is being routinely and consistently complied with in actual practice. Compliance with the requirement in individual incidents should be the norm, with any deviations being infrequent, identified by CPD, and corrected. Compliance is an ongoing responsibility. Compliance in one quarter does not necessarily mean that there will be compliance in future quarters.

**Partial Compliance** - this term is used where: (a) one aspect of a requirement has been met, but another has not; (b) the number of incidents where the requirement has not been followed, or where compliance cannot be documented, is limited, and where improvement is evident; (c) a requirement has been consistently complied with in earlier quarters, but recent incidents suggest there may be some slippage; or conversely (d) recent incidents indicate that the requirement is now being applied, but earlier quarters of non-compliance raise questions regarding whether the compliance will be consistent and continuing.

**Not in Compliance** - where compliance is not evident or cannot be documented.

## C.    Standards

There is no one standard or threshold that will apply to all of the provisions of the MOA. Different kinds of provisions lend themselves to different kinds of assessments, standards, and performance measures. Compliance with some provisions can be assessed as a yes/no question. For example, paragraph 12(b) requires that the CPD's use of force policy define force as that term is defined in the Agreement. Because the CPD use of force policy contains the exact same definition of force as the MOA, word for word, it is easy to state that CPD complies with this paragraph. Some provisions can be measured quantitatively. For example, paragraph 83 requires that the CPD sergeants promoted to supervisory rank be provided with leadership training within 30 days of assuming supervisory responsibilities. As Monitor, we can review, for any given period, the training records of those sergeants who have been promoted (or a sample of those promoted) and determine the percentage of those who received the requisite training within the required time. Other provisions are qualitative, and call for a judgment based on the expertise of the Monitor Team. As a general matter, a number of provisions of the MOA have

multiple requirements and multiple facets of compliance. In reviewing these provisions, we assess:

- whether the CPD has adopted a policy or procedure relating to the provision, requiring its members to comply with the provision's requirements;

- whether CPD has trained its members on the provision and the policy or procedure adopted;

- whether officers in the field are actually implementing and complying with the requirements of the provision; and

- whether CPD has put in place a supervisory and/or internal audit process to ensure compliance, and whether CPD identifies and corrects non-compliance.

### D. Quantitative Standards

For provisions that we believe can be assessed using a quantitative measure, we have proposed using a percentage standard of "greater than 94 percent." Thus, for example, we would find Cincinnati in compliance with paragraph 26 if, in over 94% of the use of force cases we reviewed, a supervisor responded to the scene of the use of force, and the supervisor who investigated the incident was not involved in the incident or authorized the use of force. This is a measure that has been used in several other monitoring situations. In implementing a quantitative measure, we propose adopting the following approach:

- We believe that using such a standard makes sense where there are a sufficient number of cases to review. For paragraphs where the number of applicable incidents is small, we propose to use a more qualitative review comparable to assessments we have made in our earlier reports.

- In situations where a particular requirement was not documented, we will generally count the lack of documentation as non-compliance. There may be other circumstances, however, where documentation is absent because the requirement did not apply to the particular situation.

- For some provisions, a particular action is required unless there are exigent circumstances. We will count as compliance situations where: (a) the action was taken; (b) exigent circumstances were documented; or (c) the exigent circumstances were clearly apparent to the Monitor Team.

- For some provisions that we believe call for a qualitative judgment, such as whether an investigation considered all relevant evidence, we will continue using a qualitative assessment, even where there are a significant number of cases to which the provision applies.

- Generally, we will try to make an assessment of compliance for each quarter, based on the cases we review in the quarter. Where the sample size is small in a particular quarter, the Monitor may decide to defer an assessment of compliance until the following quarter, and aggregate the cases from the two quarters.

Also, we do not view the 94 percent figure to be ironclad. Where the CPD identifies instances of non-compliance and takes corrective action, we will generally determine that the City is in compliance with a particular paragraph, even if the level of compliance is less than 94 percent. If, however, the corrective actions taken by the CPD do not result in compliance in the following quarters, the Monitor will assess whether the more stringent 94 percent standard should be applied.

## IV.   Commitment Moving Forward

This quarter saw some great challenges, but it ultimately led to a stated recommitment by the City and the CPD in accepting the Collaborative Agreement; important work by all of the Parties on issues for restoring trust and a spirit of cooperation among them; and progress on establishing compliance standards for the MOA. The City Council voiced its support for the Collaborative Agreement. We believe the importance of that document holds an opportunity for building a police agency whose approach and tactics are supported throughout the City, in both poor and wealthy neighborhoods, in neighborhoods of color and predominantly white neighborhoods.

**CHAPTER TWO.  MEMORANDUM OF AGREEMENT**

**I.      General Policies**

**A.      Mental Health Response Team [MOA ¶ 10]**

**1. Requirement**

The CPD is required to create a "cadre of specially trained officers available at all times to respond to incidents involving persons who are mentally ill." These officers will be called to the scene and assume primary responsibility for responding. Training for these officers shall include multi-disciplinary intervention training, with a particular emphasis on de-escalation strategies, as well as instruction by mental health practitioners and alcohol and substance abuse counselors. The CPD also shall implement a plan to partner with mental health care professionals, to make such professionals available to assist CPD officers on-site with interactions with mentally ill persons.

**2. Status**

During this reporting period, the CPD received 1,548 calls involving mentally ill persons. In 143 of those instances, the call did not meet the criteria for dispatch and was cancelled or the call was handled by another agency. In 221 cases, the call was dispatched as another incident type and later changed to a MHRT by the responding officers. This equates to 1,184 calls eligible for MHRT officer dispatch. For 1040 of the calls, a MHRT officer was dispatched. Thus, MHRT officers were dispatched to 88 percent of MHRT eligible calls.

For this reporting period, there were only 19 calls for which an MHRT officer was working but not available for dispatch, and there were two instances for which an MHRT officer was not working. An additional 37 calls handled were categorized as "unknown." The remainder of the calls (95) were ones in which an MHRT response was disregarded by the supervisor or the situation was handled before MHRT arrival.

The Psychiatric Emergency Services Department of University Hospital continues its partnership with the CPD. This partnership has enabled Mobile Crisis Team personnel to work within police districts in conjunction with police personnel. Currently, the program operates in Districts One and Five.

For the fourth quarter of 2004, statistics were maintained for individuals in both districts who could be identified as being in need of mental health services. Identification is made through an incident history, police reports (Form 316), or by hospital records. Information regarding the number of MHRT

runs handled by police, the Mobile Crisis Team, or a combination of both is also tabulated.

| 2004 Fourth Quarter | District One | District Five |
|---|---|---|
| Total runs | 249 | 196 |
| CPD only | 176 | 120 |
| Mobile Crisis Team only | 23 | 24 |
| CPD assisted by the Mobile Crisis Team | 37 | 40 |
| Mobile Crisis Team assisted by CPD | 13 | 12 |
| Total individuals identified | 179 | 146 |
| Mobile Crisis Team consultations | 10 | 3 |

### 3.    Assessment

The Monitor finds the CPD to be in compliance with these requirements.

## B.    Foot Pursuits [MOA ¶11]

### 1.  Requirement

The MOA requires the CPD to develop and adopt a foot pursuit policy. The policy must require officers to consider particular factors in determining whether a foot pursuit is appropriate.

### 2.  Status

The CPD states in its most recent MOA Status Report that supervisors are reviewing officers' foot pursuits in every Use of Force report.  Supervisors assess whether the foot chase was tactically sound and in conformance with the CPD's policy and procedure.  The tactical and risk considerations involved in foot pursuits were reiterated this quarter during roll-call training on December 17, 2004.

### 3.  Assessment

The CPD's policy and training on foot pursuits is in compliance with this MOA paragraph.  The Monitor will assess compliance in actual practice in the next quarterly report.

## II.  Use of Force

In the table below, we provide the statistics for Use of Force incidents for the last ten quarters.  As can be seen from the table, the most significant development in 2004 was the widespread introduction of the Taser as a part of the CPD's continuum of force.  This significant change continued in the fourth quarter of 2004.  Use of the Taser and Taser training are discussed below.

### USE OF FORCE TABLES

| | 3rd Q 2002 | 4th Q 2002 | 1st Q 2003 | 2nd Q 2003 | 3rd Q 2003 | 4th Q 2003 | 1st Q 2004 | 2nd Q 2004 | 3rd Q 2004 | 4th Q 2004 |
|---|---|---|---|---|---|---|---|---|---|---|
| Chemical Irritant - Unrestrained Subjects | 64 | 102 | 96 | 140 | 84 | 90 | 76 | 30 | 10 | 8 |
| Restrained Subjects | 24 | 15 | 26 | 15 | 19 | 15 | 10 | 9 | 10 | 9 |
| Physical Force | 52 | 67 | 71 | 79 | 27 | 29 | 17 | 4 | 2 | 1 |
| Takedowns w/ injury | | | | | 26 | 12 | 11 | 4 | 8 | 6 |
| Non-compliant suspects | | | | | 35 | 48 | 40 | 41 | 30 | 3 |
| PR 24 | 9 | 7 | 5 | 3 | 5 | 4 | 0 | 0 | 1 | 0 |
| Canine | 5 | 5 | 2 | 5 | 2 | 2 | 4 | 1 | 3 | 5 |
| Taser | 1 | 1 | 1 | 2 | 0 | 0 | 72 | 177 | 198 | 148 |
| Beanbag/ Foam round | 1 | 0 | 0 | 4 | 0 | 0 | 1 foam | 0 | 0 | 0 |
| Pepperball | 1 | 0 | 1 | 1 | 5 | 2 | 0 | 0 | 0 | 1 |
| Firearms Discharge | 0 | 0 | 1 | 0 | 0 | 1 | 3 | 2 | 0 | 0 |
| **Total** | 186 | 212 | 229 | 264 | 222 | 218 | 244 | 277 | 262 | 191 |

12

**Use of Force**

| | 2002 | 2003 | 2004 | Change from 2003 |
|---|---|---|---|---|
| **Chemical irritant** | 366 | 485 | 163** | -66% |
| **Physical Force (18F, 18I, 18NC)** | 144 266* | 327 | 167 | -49% |
| **PR24** | (included above) | 17 | 1 | |
| **Beanbag/Foam** | 23 | 4 | 1 | |
| **Pepperball** | (included above) | 9 | 1 | |
| **TASER** | (included above) | 3 | 595 | |
| **Canine** | 12 | 11 | 13 | |
| **Firearms** | 0 | 2 | 5 | |
| **Totals** | 811 | 858 | 945 | +10.1% |

* The 266 figure is for Injury to Prisoner forms; some of these injuries are not the result of use of force.  **There are some chemical spray incidents included in this figure where other uses of force (such as a takedown) were also used in the incident.

Although use of force has increased 10.1 percent over 2003, the CPD notes that total arrests increased 2 percent from 2003 to 2004 (37,061 in 2003 versus 37,818 in 2004), and drug arrests increased 8 percent (11,057 in 2003 versus 11,920 in 2004).

## A. General Policies [MOA ¶¶12-13]

### 1. Requirements

Under the MOA, Cincinnati is required to revise its Use of Force policy. The revised policy must do the following:

- It must clearly define the terms used in the policy

- The term "force" must be defined as it is defined in the MOA

- It must incorporate a "Use of Force model" that relates the officer's responses and use of force options to the actions of the subject, and teaches that disengagement, area containment, or calling for reinforcement may be an appropriate response to a situation

- Whenever possible, individuals should be allowed to submit to arrest before force is used

13

- Advise against excessive force

- Prohibit choke holds

- The term "restraining force" must be removed from the CPD's policy

- The CPD's revised Use of Force policy must be published on the CPD's website and be disseminated to community groups

**2.  Status**

There were no changes in CPD's Use of Force policies or procedures in the fourth quarter of 2004.

In the fourth quarter of 2004, there were 148 Taser deployments.  There were 23 minor injuries to subjects associated with these incidents, mostly minor abrasions and cuts.  Three other injuries resulted in a fractured collarbone, fractured wrist, and dislocated shoulder.

The number of injuries to suspects/prisoners has dropped dramatically between 2003 and 2004:

**Suspect/Prisoner Injuries Resulting from Police Contact[1]**

|  | 02/01/03 12/31/03 | 02/01/04 – 12/31/04[2] |
|---|---|---|
| **Hard hands with injury and foot pursuits** | 204 | 90 |
| **Beanbags** | 1 | 0 |
| **Pepperball** | 9 | 0 |
| **40 mm foam** | 0 | 0 |
| **Chemical Spray** | 0 | 0 |
| **TASER** | 0 | 85 |
| **Other force[3]** | 85 | 19 |
| **Totals** | 299 | 194 |

---

[1] Does not include ingestions of contraband, injuries sustained to prisoners as a result of a vehicle crash from a pursuit, injuries from canine bites, etc. (any injury where the TASER would not have been a force option in an incident is not included).  In regard to contraband, suspects normally swallow contraband before the officer comes in contact with them.
[2] Full implementation of the TASER began in February 2004.
[3] Includes strikes, kicks, PR 24, firearms

The table highlights a 35% decrease in injuries to suspects/prisoners over last year.  Additionally, injuries to officers resulting from arrest and assault dropped 56% from 2003 to 2004 (64 in 2003 versus 28 in 2004).

In our last Report, we noted a concern that officers might not be giving subjects sufficient time to comply with commands, prior to a second or subsequent deployment of the Taser.  The CPD concurs that investigating supervisors should identify these issues in their investigations, and addressed this issue during the in-service training for supervisors during the fourth quarter of 2004.

Of great importance is ensuring that officers do not use Tasers in situations where force is not necessary.  The CPD should ensure that officers are properly considering alternatives to force such as de-escalation, verbal commands, or arrest control techniques.  The CPD has noted that in each Use of Force Report, the following information is documented:

- Decision to arrest, including the basis for the stop and seizure
- How the subject resisted arrest
- Subject's resistive behavior
- Officer's tactics and actions to counter the resistance/assault
- The supervisor's analysis of the propriety of the officer(s)' use of force

Each report also addresses verbal commands given to the noncompliant subject.  According to the CPD, if there is a problem with an arrest, processes are in place to address and correct the matter by management.

The CPD also notes that in regards to "de-escalation," during the last quarter, 54 percent of Taser deployments occurred as a result of a foot chase.  According to the CPD, the majority of foot chases involve subjects fleeing from police during drug investigations, in which case the subject may have contraband on his/her person.  The Monitor Team will evaluate the Taser incidents from the fourth quarter of 2004 and first quarter of 2005 to assess whether officers' uses of force were consistent with the MOA requirement.  As part of that review, the Monitor team will take into consideration the CPD's position that in foot pursuits the officer will not be able to apprehend the subject using verbal commands or de-escalation.

15

### 3. Assessment

The Monitor has previously determined that the CPD's Use of Force policy and training are in compliance with the MOA provisions.  During this quarter, the Monitor developed a new template for reviewing use of force and complaint investigations, and assessing whether officers are implementing CPD's use of force policies in compliance with the MOA.  The investigations template is attached as Appendix B.  The Monitor's determination on use of force implementation will be included in the Tenth Quarterly Report.

## B.    Chemical Spray [MOA ¶¶14-19]

### 1. Requirements

The CPD must revise and augment its chemical spray policy to do the following:

- Clearly define terms

- Limit use of spray, including against crowds, to only those cases where force is necessary to effect the arrest of an actively resisting person, protect against harm, or prevent escape

- Provide that chemical spray may be used only when verbal commands would be ineffective

- Require supervisory approval for use of chemical spray against a crowd, absent exigent circumstances

- Require a verbal warning and the opportunity to comply before using a chemical spray, unless doing so would be dangerous

- Require officers to aim at the subject's face and upper torso

- Provide guidance on duration of bursts and recommended distance

- Require officers to offer to decontaminate sprayed individuals

- Request medical response for complaining subjects

- Prohibit keeping sprayed subjects in a face down position any longer than necessary

- Prohibit use of spray on a restrained person, except to protect against harm or escape

- Use of spray against restrained persons must be investigated, including tape recorded statements of officers and witnesses

- Investigations of these incidents must be reviewed by the CPD's Inspections Section

- Provide restraining equipment in CPD squad cars

- Provide in-service training on chemical spray

- Account for chemical spray canisters

- Periodically review research on chemical spray

## 2.  Status

In August 2004, each supervisor was provided a wallet-size laminated reminder concerning use of force investigations, including the following information:

> **Critical Issues which must be addressed in the narrative of Use of Force Reports**
> - Decision to arrest, include the basis for the stop and seizure
> - Verbalization, including warning of impending force
> - Suspect's noncompliance
> - Officer's counterforce
> - Exigent circumstances, e.g. reason for no verbalization, reason for partial/no effect on force used, etc.
> - Analysis of foot pursuit
> - Analysis of the propriety of the officer's use of force. Note:  If two or more different types of force are used, e.g. takedown and Taser, the analysis should evaluate each.

In addition, the lieutenant assigned to the CPD's Police Relations Section reviews drafts of Use of Force reports which occurred the previous day to ensure these points are being covered.  This reminder card and redundancy of review is designed to ensure that all Use of Force forms are completed in accordance with policy.

There were 17 deployments of chemical irritant for the fourth quarter.  Of the 17 reports, two do not document a warning of impending force (2004-51830 and 2004-51928).  The Monitor Team will be reviewing all 17 of the reports for the next quarter, and will assess whether the two reports that did

17

not document a warning of impending force explain any exigent circumstances justifying why no warnings were given.

### 3. Assessment

The CPD's policies regarding the use of chemical spray comply with the MOA. In our next quarterly Report, the Monitor will evaluate compliance with the MOA's requirements that officers provide a warning of force before chemical spray is used; that chemical spray be used against a restrained individual only where the subject or another person is likely to suffer injury, or escape, absent the use of chemical spray; that the duration and targeting of chemical spray is consistent with the MOA and CPD policy; and that subjects sprayed are offered an opportunity for decontamination.

## C.     Canines [MOA ¶20]

In the fourth quarter of 2004, there were 148 total canine deployments, 25 canine apprehensions (where a suspect was found and arrested) and five canine bites. This is a bite ratio of 20 percent.

### 1. Requirements

The MOA requires the CPD to revise and augment its canine policies, subject to the review and approval of the Department of Justice. The CPD is to make continued improvements in its canine operations, including the introduction of an "improved handler-controlled alert curriculum" and the use of new canines. Specifically, the new canine policy must:

- Limit off-leash deployments to searches of commercial buildings or for suspects wanted for a violent offense or reasonably suspected of being armed.

- Require approval of a supervisor before deployment, except for on-leash deployments.

- Provide for a loud and clear announcement, warning of the canine deployment, and require officers to allow the suspect time to surrender.

- Handlers shall not allow their canines to bite a person unless the person poses an imminent danger, or is actively resisting or escaping.

- Where the canine does bite a person, the dog shall be called off at the first moment the dog can safely be released. The policy shall

prohibit canines from biting nonresistant subjects.  Also, immediate medical attention must be sought for all canine related injuries.

• The CPD shall track deployments and apprehensions, and calculate bite ratios.  These bite ratios shall be included in the Risk Management System.

### 2.  Status

During the fourth quarter of 2004, the CPD had five incidents involving a canine bite.  Four incidents resulted from an on-lead track, while one incident involved an off-leash track of aggravated auto robbery suspect, where a firearm was used in the offense.

Pursuant to paragraph 20, CPD calculates canine bite ratios for its Canine Unit and for each canine/handler team for six month periods.  The bite ratios for the following six-month periods are as follows:

|  | **Deployments** | **Finds** | **Bites** | **Ratio** |
|---|---|---|---|---|
| May 1, 2004 – October 31, 2004 | 304 | 46 | 4 | 8.7% |
| June 1, 2004 – November 30, 2004 | 289 | 38 | 3 | 7.9% |
| July 1, 2004 – December 31, 2004 | 303 | 49 | 8 | 16.3% |

Bite ratios for these periods remain below the 20% unit threshold.

### 3.  Assessment

The CPD's Canine policy meets the requirements of the MOA.

The CPD is also in compliance with paragraph 20(b), limiting off leash deployments to searches of commercial buildings or for suspects wanted for an offense of violence or reasonably suspected of having a weapon, and with paragraph 20(h), relating to a review of handler performance when the bite ratio exceeds 20 percent.  A review of the canine bite investigations, and an evaluation of canine warnings and supervisory authorization will be included in the next quarterly report.

## D.  Beanbag Shotguns and 40 Millimeter Foam Round
   [MOA ¶¶21-23]

There were no beanbag shotgun or 40 millimeter foam round deployments in the fourth quarter of 2004.  The CPD is in compliance with the MOA requirements relating to beanbag shotgun deployment.

### III.    Incident Documentation, Investigation

Documenting and reporting officers' use of force allows CPD supervisors to evaluate the appropriateness of the individual use of force and to track an officer's behavior over time.  It also allows CPD to analyze use of force incidents, trends and patterns to evaluate officer tactics and determine whether any changes in procedure or training are needed.

### A.    Documentation [MOA ¶¶24-25]

#### 1.  Requirements

- All uses of force are to be reported.  The Use of Force form shall indicate each use of force and require evaluation of each use of force. Use of Force Reports will include the supervisor's and officer's narrative description, and the officer's audio-taped statement.

- The CPD will implement an automated data system allowing supervisors access to all use of force information.

- The CPD will implement a Canine Deployment form.

- If the gun pointing requirement is triggered under the Collaborative Agreement, data reported shall be included in the risk management system.

#### 2.  Status

##### a.  Hard Hands and Takedowns without Injury

This issue of supervisors providing a written assessment indicating review and evaluation of the officer's actions was discussed during the fourth quarter in-service training for supervisors.  According to the CPD, there were only three incidents in the fourth quarter of 2004 involving a takedown or use of hard hands, without an injury to the suspect.

##### b.  Hard Hands and Takedowns with Injury

The CPD reports that there were only six incidents in the fourth quarter of 2004 in which an officer used hard hands or a takedown and the suspect was injured (but not a serious enough injury to require hospitalization and an IIS investigation).

### c.  Taser Investigations and Documentation

On March 17, 2005, the Monitor submitted to the City and the DOJ a proposal for Taser investigation and documentation to resolve any disputes related to MOA paragraphs 24-27.  The proposal will be used to reach agreement between the City and the DOJ on Taser investigations and documentation.

### 3.  Assessment

### a.  Hard Hands and Takedowns without Injury (Non-Compliant Suspect Forms – Form 18NC)

This quarter, the Monitor reviewed the three Non-Compliant Suspect/Arrest Report Forms that involved a takedown or use of hard hands, and in which the subject was not injured.  In each of the three reports, the officer provided a narrative and included a description of the events leading up to the use of force, the subject's resistance, and the officer's actions to overcome the resistance.  The forms were reviewed by a supervisor, who provided written comments on the tactics used and the appropriateness of the use of force.  The CPD is in compliance with the requirements applicable to these incidents.

### b.  Hard Hands and Takedowns, with Injury

During the fourth quarter of 2004, there were six takedowns or use of hard hands that resulted in injury to the suspect.

In May 2004, the Department of Justice and the City of Cincinnati accepted a proposal developed by the Monitor to address any disputes relating to documentation and investigation of these incidents.  Interviews of the officers, subject and witnesses were not required to be taped.  The investigative report will include a narrative description of the events leading to the use of force, the subject's resistance, and the force used by the officer.  In addition, the investigation "will include a review and determination of whether the officer's actions in regard to the initial stop or seizure were within CPD policy, and a review and determination of whether the use of force was within CPD policy."

In the Monitor's Sixth Report, we noted that CPD reports hard hands and takedowns with injury on its Injury to Prisoner Report, Form 18I, and that the Form 18I does not have separate questions for documenting the investigating supervisor's or the District/Section Commander's assessment of whether the initial stop or seizure was consistent with CPD policy, or whether the force

used was consistent with CPD policy.[4]  However, we stated that as long as the information was included in the Report, which form is used was a matter for CPD discretion.

In reviewing the six Injury to Prisoner Reports, the Monitor Team finds that the reports do include a narrative description of the events leading to the use of force and the force used.  Also, in one of the reports, the supervisor stated that the officer's "initial stop, decision to arrest, and use of the take down to arrest was in compliance with the Department policy and procedure." (2004-51920.1)  A second report stated that the use of force met CPD policy, but did not address the initial stop (2004-50105.2), while a third stated the decision to initiate the stop and search was within policy, but did not address the appropriateness of the use of force (2004-50574.1).  In a fourth report, the supervisor stated that the officer's "action met the Department's standards and were within policy."  While the supervisor did not distinguish between the use of force and the initial stop, because this was a response on a radio run, the initial stop was not a significant issue (2004-50942.1).  In the fifth report, the investigating supervisor did not assess either the initial stop or the use of force, but the District Commander stated that the officer's initial contact and arrest were in conformance with CPD policy (2004-50084.1).  Finally, there was one report where the investigating supervisor provided a detailed narrative, but neither the investigating supervisor nor the District Commander assessed the initial stop or the use of force.

The six month period for the Monitor's review of the CPD's implementation of the revised reporting requirements was from July 1, 2004 to December 31, 2004.  While the CPD is not yet in compliance with the reporting requirements for these incidents, the Monitor does not believe it is necessary to impose a requirement of taped statements from the subject, involved officers and witnesses.  Instead, the CPD should ensure that supervisors document in their reports their assessment of the involved officer's initial stop or seizure and of the officer's use of force.

### c.  Taser

The City and the DOJ are reviewing the Monitor's proposal for a reporting requirement for Taser incidents.  Implementation of these requirements will be reviewed in the next quarter.

---

[4]  CPD's Use of Force Report, Form 18F, does include these questions.

## B. Investigation [MOA ¶¶26-31]

### 1. Requirements

- Officers to notify supervisor following any use of force, or allegation of excessive force. Supervisor to respond to scene. Incident not to be investigated by officer who used force or who authorized force.

- CPD supervisors will investigate each use of force incident, with evaluation of compliance with CPD policies and tactics, including the basis of any stop or seizure.

- IIS will respond to scene of all "serious uses of force" and all canine bites with serious injuries. Inspections Section will review all investigations of canine bites, beanbags, foam rounds and baton uses.

- Investigators prohibited from asking leading questions. Investigators to consider all relevant evidence and make credibility determinations. No automatic preference for officer's statement over citizen's; statements of witness with connection to complainant should not be discounted. The CPD to resolve material inconsistencies. The CPD will train investigators on factors to consider in investigations.

- Investigators to ensure that all witness officers provide statement. Supervisors will ensure that reports list all officers involved or on scene, and document any medical treatment or refusal of medical care.

- Lieutenant or higher will review each investigation conducted by CPD supervisors and identify any deficiency and require corrections. CPD supervisors to be held accountable for quality of investigations. Appropriate non-disciplinary or disciplinary action will be taken if investigations are not thorough, properly adjudicated, or where appropriate corrective action is not recommended.

### 2. Status

There were no changes in policies or procedures with respect to the investigation of force incidents during this quarter.

In the CPD's latest MOA Status Report, the Monitor Team was invited to "shadow" supervisors as they investigate use of force incidents.  We accepted that invitation and had team members ride in District 1, 2, 3 and 4 during this quarter.  While there were no uses of force during these ride alongs, the shadowing was helpful and informative.  We will continue to do the same in the next quarter.

The Monitor will determine compliance with the MOA investigative provisions in the next quarter based on these ride-alongs and on a review of use of force investigations from the fourth quarter of 2004 and the first quarter of 2005.

**3.  Assessment**

The CPD's policies on investigating Use of Force incidents comply with the MOA.  Review of implementation will be included in our next Report.

In our Eighth Report, the Monitor identified three investigations that we determined to be incomplete, and for which additional investigation was appropriate.  Pursuant to paragraph 102 of the MOA, the Monitor provided the City of Cincinnati with written instructions for completing the investigations.  The CPD has informed the Monitor that these investigations are under consideration by the Chief of Police for a determination of what actions may be appropriate.

**C.     Review of Critical Firearms [MOA ¶¶ 32-34]**

**1.     Requirements**

- Critical Firearms Discharges.  The CPD investigations will account for all shots, and locations of officers discharging their firearm.  The CPD will conduct appropriate ballistics or crime scene analysis, including gunshot residue or bullet trajectory tests.

- A Firearms Discharge Board (FDB) shall review all critical firearms discharges and review IIS and CIS investigation for policy compliance, tactical and training implications.  The FDB will prepare a report to the Chief of Police.  The FDB will determine (a) whether all uses of force during encounter were consistent with CPD policies and training; (b) whether the officer(s) used proper tactics; (c) whether lesser force alternatives reasonably were available.

- The policy for the FDB shall include:  a review within 90 days from the end of the criminal investigation; FDB to act as quality control;

authorize recommendations to the Chief of Police; require annual review for patterns, with findings to the Chief of Police.

## 2. Status

There were no firearm discharges at suspects in the fourth quarter of 2004.  There were five outstanding investigations of firearms discharges from previous quarters.

Their status is as follows:

| Police Investigation Number | Status |
|---|---|
| 04-pi-01 | FDB report was approved by Chief Streicher on January 25, 2005. |
| 04-pi-02 | FDB report was approved by Chief Streicher on January 13, 2005. |
| 04-pi-03 | FDB currently reviewing case. |
| 04-pi-04 | FDB report was approved by Chief Streicher on February 7, 2005. |
| 04-pi-05 | FDB currently reviewing case. |

## 3. Assessment

The CPD's policy on critical firearms discharges complies with the MOA.

The Monitor Team reviewed three FDB Reports that were completed and provided to the Monitor.  The Board in these Reports determined:  (a) that the use of force during the encounter was consistent with CPD policies and training; (b) that the officer used proper tactics; and (c) that lesser force alternatives were not reasonably available.  Because the Monitor does not have the CIS and IIS investigations of these firearms discharges, however, we cannot determine whether the CPD is in compliance with the requirement that the Board review each IIS and CIS investigation, interview the principal CIS and IIS investigators, and include it its report a summary and analysis of all relevant evidence.

The FDB also completed a 2004 summary report for the Chief of Police, in compliance with paragraph 34(f).

**IV.    Citizen Complaint Process**

**A.    Openness of Complaint Process [MOA ¶¶ 35-38]**

    **1.  Requirements**

- Publicity program for complaint process

- Availability of complaint forms, informational brochure

- Complaints may be filed in any form.  Intake officers not to opine on veracity or mental capacity.  Complaint form completed for every complaint

- Every complaint to be resolved in writing

- Each complaint gets a unique identifier that will be provided to the complainant, and each complaint is tracked by the type of complaint

- Copies of allegations filed with the Citizen's Police Review Panel (CPRP), the Office of Municipal Investigations (OMI), Citizen Complaint Authority (CCA), Human Relations Commission referred to IIS within five (5) days

    **2.  Status**

There were no changes in procedures regarding complaint intake during this quarter.  The CPD continued to conduct inspections to ensure that complaint forms and materials were available in police buildings, police vehicles, and the public places outlined in the MOA.

    **3.  Assessment**

The City is in compliance with the MOA requirement that complaint forms and informational material be made available in public buildings such as City Hall, the library and CPD District buildings, and that officers carry forms and materials in their vehicles at all times while on duty.

In our next Report, the Monitor will be reviewing citizen complaint files from the fourth quarter of 2004 and the first quarter of 2004, to determine compliance with the MOA provision prohibiting officers from discouraging any person from making a complaint, and that complaints can be filed in any form, including in writing or verbally, in person or by mail, telephone, fax or e-mail.

**B.    Investigation of Complaints [MOA ¶¶39-50]**

**1.  Requirements**

- Preponderance of evidence standard; City will develop appropriate training

- Officers who used spray or other force, or authorized the conduct at issue, may not investigate the incident

- All relevant evidence to be considered

- No automatic preference of officer's statements.  Investigators will attempt to resolve inconsistencies.  No leading questions.  All officers on the scene are required to provide a statement

- All relevant police activity, including each use of force, will be investigated; searches and seizures will be evaluated. Investigations are not to be closed simply because a complaint has been withdrawn

- Conviction of the complainant will not be used as evidence of the appropriateness of the action of the CPD officer

- Complainant to be kept informed

- IIS to investigate complaints of force, pointing firearms, searches, discrimination

- Citizen Complaint Resolution Process (CCRP) complaints will be fully investigated

- CCRP complaints will be investigated by the chain of command, with report.  District or unit commander will evaluate investigation

For IIS Investigations:
- Interviews at convenient times

- Prohibit group interviews

- Notify supervisors of complaints

- Interview all appropriate CPD officers, including supervisors

- Collect and analyze all appropriate evidence; canvas scene for witnesses; obtain medical records

- Identify material inconsistencies

- Report on investigation to include a summary, proposed findings and analysis

- Investigation to be complete within 90 days, absent exceptional circumstances

**2.  Status**

Review of the data of IIS cases closed during the fourth quarter of 2004 revealed that a total of 86 cases were cleared during this time frame.  Of those 86 cases, 48 exceeded the 90-day investigative requirement.  Review of the data of CCRP cases closed during the fourth quarter of 2004 showed that a total of 71 cases were cleared during this time frame.  Of those 71 cases, 10 exceeded the 90-day investigative requirement.

**3.  Assessment**

Based on the data provided by the CPD, the CPD is not yet in compliance with the requirement that investigations be completed within 90 days of receiving the allegations.

As noted Section IIA above, the Monitor has developed a new investigative template for use in evaluating use of force and citizen complaint investigations.  Complaint investigations from the fourth quarter of 2004 and the first quarter of 2005 will be assessed in the Monitor's next report, using the compliance definitions contained in Appendix A.

Also, as noted in our last Report, the Monitor identified three investigations that we determined to be incomplete, and for which additional investigation was appropriate.  The CPD has informed the Monitor that the Chief of Police is reviewing these cases.

**C.     Adjudication of Complaints [MOA ¶ 44-45]**

**1.  Requirements**

- Every allegation to be resolved with one of four determinations – unfounded, sustained, exonerated, not sustained

- Unit commanders to evaluate each investigation to identify problems and training needs

**2.  Status**

During the fourth quarter of 2004, 86 cases involving 160 allegations were investigated and closed by IIS.  Those cases were closed as follows:

| | |
|---|---|
| Sustained | 36 |
| Sustained Other | 11 |
| Exonerated | 30 |
| Not Sustained | 34 |
| Unfounded | 49 |

During the fourth quarter of 2004, 71 cases were investigated and closed through the CCRP process.  Those cases were closed as follows:

| | |
|---|---|
| Sustained | 15 |
| Sustained Other | 2 |
| Exonerated | 11 |
| Not Sustained | 19 |
| Unfounded | 24 |

**3.  Assessment**

The City is in compliance with the requirement that every complaint be closed with one of four dispositions:  sustained, not sustained, unfounded or exonerated.  ("Sustained-Other" is a sustained disposition for a violation that was not initially alleged in the complaint, but that was identified by the CPD.)

**D.      Investigations by the CCA [MOA ¶¶51-56]**

**1.  Requirements**

- The CCA is to assume all of the responsibilities of the Office of Municipal Investigation (OMI) within 120 days from the date of the Agreement

- Copies of all complaints, no matter with which office they are filed, will be directed to the CCA; the CCA is to have jurisdiction over complaints of excessive force, pointing firearms, unreasonable search or seizure, or discrimination; the CCA shall have sufficient number of investigators, with a minimum of five

- CPD officers must answer CCA questions; CCA director to have access to CPD files and records

- City to develop procedures to coordinate parallel investigations

- City will take appropriate action on CCA completed investigations

- CCA will complete investigations within 90 days; City Manager to take appropriate action within 30 days of CCA completion of investigation

## 2.  Status

In prior quarters, the Monitor raised the concern that there were some cases that were sustained by the CCA and the CCA disposition was agreed to by the City Manager, but no discipline was carried out because the CPD had not sustained a violation.  The City stated that it was developing a mechanism or procedure to ensure that sustained CCA cases are reviewed by the City Manager and, if approved by the City Manager, proper discipline or correction is undertaken by the CPD.

In the current MOA Status Report, the City states that IIS is working in conjunction with CCA to develop a matrix containing the following information:

- CCA#/IIS#
- Complainant Name
- Incident date
- Allegation
- Officer's Name
- CCA Disposition
- IIS Disposition
- CPD Action
- City Manager's Action

At present, the matrix only contains those cases where the CCA and IIS disagree on the disposition.  The actual number of cases falling within that category is estimated to be between eight to ten percent of all cases.  Until the Employee Tracking Solutions system is able to query cases, the matrix information must be tabulated by hand.  The tabulated matrix information has

not yet been provided to the Monitor.  Once the analysis component of ETS is fully operational, this information will be available electronically.

### 3. Assessment

#### a. General Operations

The CCA has a full time executive director who has developed new CCA investigative standards and procedures.  Thus, the City is in compliance with these provisions of the MOA.

#### b. Sample Investigations

The Monitor's next quarterly report will contain our review of CCA investigations and compliance with paragraphs 51-56.

The Monitor has not yet been able to obtain data regarding actions taken after the City Manager has agreed with a sustained determination by the CCA. Thus, the Monitor cannot determine whether the City is in compliance with paragraph 55, requiring the City to take "appropriate action, including imposing discipline and providing for non-disciplinary action where warranted."

## V.  Management and Supervision

## A.  Risk Management [MOA ¶¶ 57-64]

### 1. Requirements

Under the MOA, the CPD is required to enhance and expand its risk management system by creating a new "computerized, relational database." The CPD is to use the data in this system "to promote civil rights and best practices, manage risk and liability, and evaluate the performance of CPD officers."

- The information in the Risk Management System is to include:
  - uses of force
  - canine bite ratio
  - canisters of chemical spray used
  - injuries to prisoners
  - resisting arrest, assault on a police officer, and obstruction charges, where a use of force has occurred
  - critical firearms discharges
  - complaints, dispositions
  - criminal and civil proceedings against officers

31

- vehicle pursuits
- pointing of firearms (if added)
- disciplinary actions

- The CPD must develop a plan for inputting historic data now in existing databases (Data Input Plan)

- The CPD must develop a protocol for using the risk management system, subject to Department of Justice approval

- The protocol will include the following elements:

  - data storage, data retrieval, reporting, data analysis, pattern identification, supervisory assessment, supervisory intervention, documentation, and audit

  - the system will generate monthly reports

  - CPD commanders, managers and supervisors must review, at least quarterly, system reports and analyze officer, supervisor, and unit activity

  - CPD commanders and managers must initiate intervention for officers, supervisors or units, based on appropriate "activity and pattern assessment" of the information in the system

  - intervention options are to include counseling, training, action plans; all interventions must be documented in writing and entered into the system

  - the data in system must be accessible to CPD commanders, managers and supervisors; they must review records of officers transferred into their units

  - Schedule for system development and implementation:  90 days from April 12, 2002:  issuance of RFP, with DOJ approval210 days from RFP:  selection of contractor 12 months from selection of contractor:  beta version ready for testing18 months from selection of contractor:  computer program and hardware to be "operational and fully implemented"

**2. Status**

According to the CPD's MOA Status Report, the ETS system went live on October 1, 2004.  Supervisors began entering data into the new system on that date.

The vendor of the ETS system has been working on the data conversion for all of the old data that is to be imported into the new system.  The CPD initially expected this to be accomplished in November 2004, but the vendor has had to make corrections and modifications to the system.  Once the data conversion has been completed, the CPD expects to complete its first analysis of the data.  This analysis is to use the fourth quarter 2004 data and be considered a test analysis to determine what refinements, if any, are needed to the system before the first official analysis.  The first official analysis will be conducted in the next quarter, with the data collected during the first quarter of 2005.

**Department Risk Management System (DRMS)**

While the ETS system was being developed, the MOA required the CPD to use existing databases to monitor officer behavior.  As we have noted in prior Reports, the CPD maintained a manual risk management system known as the Department Risk Management System (DRMS).  This system uses existing databases and a matrix of risk factors to identify officers who are subject to an administrative review.  Officers who accumulate more than a certain number of points within a 12 month period based on this matrix are identified for review.

The CPD states that the implementation of the ETS has made the DRMS system obsolete.  Once the data conversion is complete and the analysis portion of the ETS system is up and running, ETS will compare the performance of employees assigned to similar organizational and/or peer groups.  When used in conjunction with regularly scheduled reviews, supervisors will be able to use this system to assist in the evaluation of employee performance, in addition to recognizing individual and group patterns which may warrant further review or intervention (based on standard deviations).  The CPD has stated that it expects to have the analysis portion of the ETS software operational in April.

Although this analysis using the ETS system is not yet available, the CPD no longer is using the DRMS for risk management.  Instead, an officer's history can be viewed in ETS, but there are currently no peer comparisons employed.  According to the CPD, supervisors have been advised to review officers' histories in ETS to identify any trends.

33

### 3. Assessment

#### a. ETS

In 2004, the CPD obtained the Department of Justice's approval of the ETS protocol and data input plan.  However, the system is not completely implemented.  A demonstration of the system for the Monitor and the DOJ has been deferred until next quarter when the vendor has completed corrections and modifications to the system.

Although significant progress has been made in putting the ETS system in place, the CPD is not yet in compliance with the MOA provisions for a risk management system.  The Monitor will assess the CPD's use of the ETS system and implementation of the requirements of the ETS protocol in the next quarter.

#### b. Manual Risk Management System

Because the CPD stopped using the manual risk management system before the ETS system was available for evaluation of officer performance (and because the Monitor has not been provided with documentation that supervisors have reviewed officers' performance through ETS data), the CPD is not in compliance with MOA paragraph 65.

### B.      Audit Procedures [MOA ¶¶67-69]

#### 1.      Requirements

•      CPD to develop a protocol for audits

•      Regular audits of the citizen complaint process and Integrity audits of IIS investigations

•      Meetings with prosecutors to identify officer performance issues

#### 2.      Status

The CPD Inspections Section conducted an audit of the CCRP process for the fourth quarter of 2004.  Eighty complaints were filed with the Department from October through December.  A random audit of 19 cases was conducted on the closed investigations.  A summary of the audit was prepared on January 19, 2004.

The Inspections Section reviewed the files for the following criteria:

- The CCRP complaints were entered into the database and the case files were in a secure area.

- The required forms were completed for each CCRP investigation.

- All files contained the appropriate documents, including CAD and MDT printouts, photographs, arrest forms and offense reports.

- The investigating supervisor documented when the complainant was advised of the investigation disposition, even if the complainant chose not to participate in a CCRP meeting.

The audit found that the CCRP investigations reviewed met the criteria set forth above, with the exception of one case reviewed from District One.  The complainant alleged he was never notified of the case disposition by the investigating supervisor.  The CPD states that a follow-up will be done on this case.

The Inspections Section also conducted a semi-annual audit of cases resolved by IIS.  The audit reviewed cases completed between July 1, 2004 and December 31, 2004.  Based on the requirements outlined in the Inspections Section's SOP, the audit found that the cases reviewed were in compliance with the policies, procedure, and standards of the CPD.

The CPD also had conversations with representatives from both the City and County Prosecutor's Offices to discuss individual and/or collective officer performance issues.  According to CPD's February 12 MOA Status Report, both Mr. Ernest McAdams, from the City Prosecutor's Office, and Mr. Karl Kadon, from the Hamilton County Prosecutor's Office, stated that there are currently no areas of concern pertaining to officer, shift, or unit performance

### 3.  Assessment

Improvements in the CCRP audit process included (1) documenting which CCRP cases were reviewed; and (2) Inspections' attempt to contact and follow up with complainants.  Also, the cases were chosen by a random sample.  We believe these improvements move CPD toward compliance with the CCRP audit requirement.

The Inspection Section's IIS audit report states that the documents, taped interviews and final reports of the IIS cases reviewed met the CPD's policies and procedures.  However, the audit report does not provide documentation of the review that was undertaken, such as checklists or an audit protocol.  Therefore, the Monitor cannot determine whether the CPD is in

compliance with the MOA requirement that the audit report "assess the reliability and completeness of IIS's canvassing and interviewing of witnesses, preservation and analysis of the incident scene, and appropriateness of IIS's conclusions.

## C.    Video Cameras [MOA ¶¶70-72]

### 1. Requirements

The MOA requires that all patrol cars be equipped with mobile video recorders (MVR). These MVRs are to be used in the following situations:

- Mandatory activation of MVR for all traffic stops
- Recording of consent to search, deployment of drug sniffing canines, and vehicle searches
- Recording of violent prisoner transport, where possible
- Supervisors to review all tapes where there are injuries to prisoners, uses of force, vehicle pursuits, citizen complaints
- CPD to retain and preserve tapes for 90 days, or as long as investigation is open
- If stop is not recorded, officer to notify shift supervisor
- Periodic random reviews of videotapes for training and integrity purposes; supervisors are to keep a log book of these reviews
- Random surveys of equipment are to be conducted

### 2.    Status

As noted in the prior Report, the CPD received a congressional appropriation of $371,000 to purchase 62 Digital Video Data (DVD) units with the supporting hardware and equipment. These cameras have been purchased and installation is ongoing. According to the CPD, all but 36 of the CPD's 236 marked units are equipped with an MVR. The CPD anticipates fully outfitting all marked vehicles with a camera system during 2005 as funding becomes available.

During this quarter we randomly reviewed MVR tapes from Districts 1 and 2. We were able to review approximately 50 different incidents in these Districts. In both Districts we found that the systems were being maintained, inspected, and managed quite well. On many of the tapes we observed the patrol officer and supervisor conducting the daily inspection of the unit prior to leaving the station.

In previous Reports we noted that while the CPD conducts and documents the required random reviews of videotapes, it was unclear whether these reviews generated any outcomes, in terms of changes in tactics, training,

36

counseling of officers or otherwise.  In response, the CPD notes that it does not currently track the nature of interventions resulting from the random supervisory review of MVR tapes.

### 3.  Assessment

At present, not all police vehicles are outfitted with MVR cameras. According to the CPD's MOA Status Report, there are 36 marked patrol vehicles without MVRs.  Therefore, the CPD is still not yet in full compliance with paragraph 70.

With respect to supervisory reviews of MVR tapes, paragraph 72 states that the CPD should conduct the periodic random reviews "for training and integrity purposes," and that supervisors conducting the reviews should "document their activity in a log book."  One way to record any interventions resulting from the supervisors' random reviews of MVR tapes is by having the supervisors include such interventions in the log books when they document their reviews.  The CPD is in partial compliance with paragraph 72.

## D.  Police Communications Section [MOA ¶¶ 73-74]

There are several CPD Communication Section/IT projects currently underway.

- Radio Replacement – 800 MHz Project.  Motorola estimates completion of the infrastructure in March 2005.  Delays in system activation resulted from FCC permit requirements delaying the construction of necessary towers in Northern Kentucky.  Training on the new radio system will begin during March of 2005, and the system is scheduled to go on line in late April 2005.

- New Communications Facility.  Renovations of the initial building have been completed.  Communications equipment and related phone lines have been installed and are awaiting connection to the 800 MHz system. Emergency Call Service (911 Calls) will be operational during March 2005.  Dispatch functions will be transferred and operational in early May 2005.

- Spinney Building.  Construction related to renovations of the back-up site was completed in 2004.  Training for two classes of new Communications employees have been conducted at the facility. Motorola and the Telecommunications Department continue to install support hardware and software at the facility.

- Computer Aided Dispatch (CAD) Replacement.  The CPD is currently reviewing vendor demonstrations as a result of the RFP for the new CAD and Records Management System (RMS).  The CPD expects to choose the vendor in February 2005 and begin negotiations the following month.

The CPD is in compliance with these provisions.

## E.    Discipline Matrix [MOA ¶¶75-76]

### 1.    Requirements

- CPD to revise disciplinary matrix to increase penalties for serious misconduct violations, such as excessive use of force and discrimination

- CPD will revise the matrix to take into account an officer's violation of different rules, rather than just repeated violations of the same rule

- Where matrix indicates discipline, it should be imposed absent exceptional circumstances.  The CPD shall also consider non-disciplinary corrective action, even where discipline is imposed

### 2.    Status

In 2002, the CPD adopted a revised discipline matrix.  The Department of Justice approved the revised discipline matrix, but stated that compliance would depend on actual implementation of discipline.  In its letter to the City of Cincinnati, the Department of Justice stated:

"For the CPD to satisfy the increased penalty requirement of the MOA also depends on the exercise of considerable discretion.  In response to the requirement to increase penalties for certain types of infractions, the CPD raised the maximum penalty that can be imposed for certain infractions, but has not changed the minimum sanction that can be imposed.  Thus, the CPD will not have actually increased the penalty for these offenses if it habitually imposes the minimum disciplinary action allowed under the matrix."

38

In addition, the CPD added language in the Manual of Rules and Regulations that executives using the discipline matrix "must take into account an officer's violations of different rules within the same section rather than just repeated violations of the same rule."  While this language is consistent with the MOA, the CPD notes that a Peer Review Panel (which an officer can request for discipline involving a written reprimand and/or a suspension of up to three days) "is not required to follow the progressive discipline process for repeat violations of the same section of the matrix."

### 3. Assessment

The CPD has not had the capabilities to track electronically the disciplinary penalties imposed in each case where a violation of policy has been sustained.  Now that the ETS system is in the process of being implemented, however, we expect this data will be available, and the Monitor will be able to assess compliance.

We also raised the concern in prior Reports regarding those cases where the CCA sustained an allegation that was determined by the CPD to be not sustained, exonerated or unfounded.  While the City has stated that the City Manager is now reviewing both sets of investigative files to make her final determination, it is not clear that the City resolved this issue for prior cases with conflicting findings.  Therefore, the City is not yet in full compliance with these MOA provisions.

## VI.   Training

### A.   Use of Force—Management Oversight and Curriculum [MOA ¶¶ 77-81]

#### 1.  Requirements

This section of the MOA requires the CPD to:

- Coordinate and oversee use of force training to ensure that it complies with applicable laws and CPD policies

- Designate the Academy Director with responsibility for:
  - the quality of training
  - the development of the curriculum
  - the selection and training of instructors and trainers
  - establishing evaluation procedures
  - conducting regular (semi-annual) assessments to ensure that the training remains responsive to the organization's needs

- Provide annual use of force training for all recruits, sworn officers, supervisors and managers

- Have the curriculum and policy committee regularly review use of force training and policies to ensure compliance with laws and policies

## 2.  Status

CPD training staff are routinely reviewing and updating training curricula and roll call scenarios to ensure these endeavors remain consistent with relevant law and organizational policies.  The Training Committee met in January to assess their training goals and needs for 2005.  Committee members identified and ranked training topics at that time.

In-service training is presently underway and will continue into the second quarter of the year.  There will also be an in-service training session scheduled for FTOs in May.  These in-service training sessions include dealing with use of force issues and policies.  To ensure that all sworn personnel receive the annual in-service training, the CPD must provide at least 37 two-day training sessions annually.  Eight of these sessions are specifically for management (supervisors and above), as those sessions are tailored to the needs and responsibilities of supervisors.  There are at least 29 sessions scheduled for all other sworn personnel (Police Officers and Police Specialists), and more if make-up sessions are required.

Training staff continue to develop new scenarios for roll-call training purposes.  The CPD's records, along with documentation by the Districts, reflect that these scenarios are being routinely used for discussion and training by District supervisors.  Many of these scenarios (especially those dealing with issues such as use of force, foot pursuits, and policy considerations) are based on CPD incidents.

## 3.  Assessment

Academy staff and the Training Committee are meeting their responsibilities to develop course curricula and ensure the training is consistent with Department policy and state law.  The CPD is in compliance with the MOA in this area.

**B.    Handling Citizen Complaints [MOA ¶82]**

**1.    Requirements**

The MOA requires the CPD to provide training on the handling of citizen complaints for all officers charged with accepting these complaints.  The training must emphasize interpersonal skills so that citizen concerns and fears are treated seriously and respectfully.  This training must address the roles of the CCRP, IIS, CCA and CPRP so that complaint takers know how and where to make referrals.  For the supervisors who investigate and determine outcomes of citizen complaints, their training must include how to establish appropriate burdens of proof and evaluate factors related to establishing complainant and witness credibility.  The objective is to ensure that their recommendations regarding the disposition of complaints are unbiased, uniform, and legally appropriate.

**2.    Status**

Nothing to report this quarter.

**3.  Assessment**

The Monitor will observe and assess in-service training in this area in future quarters.

**C.    Leadership/Command Accountability [MOA ¶83]**

**1.    Requirements**

The MOA requires that CPD Supervisors will continue to receive training in leadership, command accountability and techniques designed to promote proper police practices.  Within 30 days of assuming supervisory responsibilities, all CPD sergeants are to receive this training, and it will be made part of the annual in-service training.  This requirement acknowledges the important role leaders at all supervisory levels play in ensuring that an appropriate demeanor, behaviors, and tactics are used in the operations of the agency.

**2.    Status**

A supervisors' course administered by the Training staff is provided prior to or at the time new supervisors are promoted.  The curriculum for that course is updated as necessary, based on changes in policy or law, but has remained relatively consistent.  As noted in Section A (above), the curriculum for the in-service training sessions for supervisors and managers has been

41

tailored to address their roles and responsibilities in meeting organizational expectations and policy requirements.  Anticipating the appointment of a number of new sergeants, the CPD has scheduled a new supervisory course for the second quarter of 2005.  It is anticipated that this course will once again be approximately 80 hours in duration.

In addition to the in-service training sessions that are tailored to the needs and responsibilities of supervisors and managers, the CPD utilizes internal and external training courses to meet the requirements of this provision of the MOA.  This includes having managers attend various outside courses used for executive development purposes.  These include the FBI National Academy (a 10 week course), the Southern Police Institute (SPI) at the University of Louisville (a 10 week course), and the Police Executive Leadership College (PELC) that is sponsored by the Police Foundation of Ohio (one week per month for 3 months).  Additionally, the CPD has also sent managers to the Senior Management Institute, a program sponsored by the Police Executive Research Forum.  Approximately 3-5 managers (Lieutenants and above) have been participating in these outside training opportunities each year.  One Lieutenant completed the PELC program in the last quarter and another Lieutenant and one Sergeant graduated from the SPI Administrative Officer's Course during that time.

### 3.  Assessment

The CPD is in compliance with this provision.

## D.  Canine Training [MOA ¶84]

### 1.  Requirements

The MOA requires the CPD to modify and augment its training program.  This includes the complete development and implementation of a canine training curricula and lesson plans that identify goals, objectives and the mission of the Canine Unit specified in the MOA.  Formal training on an annual basis for all canines, handlers, and supervisors is also required, as is annual re-certification and periodic refresher training with de-certification resulting when the requirements are not met.  Within 180 days of the MOA, the CPD was required to certify all in-house canine trainers.

### 2.  Status

Ten officers and their canine partners completed Canine Refresher Training during this quarter.

### 3.  Assessment

The CPD remains in compliance with this provision

## E.  Scenario Based Training [MOA ¶ 85]

### 1.  Requirements

The CPD is required to ensure that training instructors and supervisors engage recruits and officers in meaningful dialogue regarding particular scenarios, preferably taken from actual incidents involving CPD officers.  The goal is to educate the officers regarding legal and tactical issues raised by the scenarios.

### 2.  Status

As noted in Section A above, the Training Academy staff continue to develop and provide scenarios that are used during roll call sessions.  However, roll call training is not limited to training of this nature.  A total of almost 1700 hours of training was provided during roll call sessions during the fourth quarter of 2004.  In addition to scenarios covering use of force, search and seizure and foot pursuits, other training that was covered during roll call sessions included the Quick Action Deployment Strategy (QUAD), dealing with the mentally ill and potential suicides (Procedure 12.110), responses to armed robberies (Procedure 12.136), Tasers, and dealing with hostage or downed officers situations.

During this past quarter, the scenarios most often dealt with search and seizure issues, use of force incidents and considerations, foot pursuits, and application of policy as well as judgment factors.  As noted in past reports, these updates include written guidelines to be followed by the supervisors who are presenting the case to ensure there is consistency in the presentation and during the discussions that follow.

### 3.  Assessment

The CPD is in compliance with this provision.

## F.  Revised Training Based on Review of Civil Lawsuits Pertaining to Officer Misconduct [MOA ¶ 86]

### 1.  Requirements

The MOA requires that the CPD periodically meet with the Solicitor's Office to glean information from the conclusion of civil lawsuits alleging officer

misconduct with the purpose of using the information to develop or revise training. This requirement is related to Paragraph 85.

**2.    Status**

The quarterly meeting between the CPD and the City Solicitor's Office occurred in January. The topics of discussion during that meeting included:

- Discussion regarding legal issues covered during the in-service training sessions

- Efforts by the Law Department to create a litigation group to focus on police issues, including ways to improve communications with the CPD regarding legal updates, prevention issues and avoidance of potential lawsuits

- Providing updates on court cases involving the CPD

**3.    Assessment**

The CPD is in compliance with this provision.

**G.    Orientation to the MOA [MOA ¶87]**

**1.    Requirements**

The MOA requires the City and the CPD to:

- Provide copies of the MOA and explain it to all CPD and relevant City employees

- Provide training for employees affected by the MOA within 120 days of each provision's implementation

- Continue to provide training to meet this requirement during subsequent in-service training

**2.    Status**

The CPD continues to ensure all newly hired personnel are receiving this information during their academy training. Additionally, the annual in-service training that was provided in the final quarter of 2004 and the first quarter of 2005 included an instruction block on the status of the MOA and the CA.

**3.    Assessment**

The City remains in compliance with this provision.

**H.    FTO Program [MOA ¶ 88-89]**

**1.    Requirements**

The MOA requires the CPD to develop a protocol to enhance the FTO program to include:

- The criteria and method for selecting FTOs

- Setting standards that require appropriate assessment of an officer's past complaint and disciplinary history prior to selection

- Procedures for reappointment and termination of FTOs at the Training Academy Director's discretion

- Reviewing FTOs at least bi-annually with recertification dependent on satisfactory prior performance and feedback from the Training Academy

**2.    Status**

The FTO Panel met in December to discuss the selection criteria for new FTOs.  Training staff are coordinating with the Districts on this and reviewed the procedures to be used when considering individuals for appointment to the position of FTO.  Consistent with changes that were undertaken last year, these procedures include a review of IIS records to ensure the panel is aware of any pending investigations prior to recommending new candidates.  The panel also discussed and updated the FTO application and will be providing additional information for the panel members to review and comment on.

There is an FTO in-service training session scheduled for May 2nd and a new FTO course is scheduled for the week of May 23rd.

**3.    Assessment**

The CPD is in compliance with this provision.

## I.  Firearms Training [MOA ¶¶ 90-91]

### 1.  Requirements

The MOA requires all CPD sworn personnel to complete mandatory annual re-qualification firearms training to include: satisfactorily completing all re-qualification courses plus achieving a passing score on the target shooting trials, professional night training and stress training to prepare for real-life scenarios.  The CPD is required to revoke the police powers of those officers who fail to satisfactorily complete the re-certification.

The MOA also requires firearms instructors to critically observe students and provide corrective instruction regarding deficient firearm techniques and failure to utilize safe gun handling procedures at all times.  CPD is required to create and implement an evaluation criteria checklist to determine satisfactory completion of recruit and in-service firearms training.  For each student, the firearms instructors will complete and sign a checklist verifying satisfactory review of the evaluation criteria.

### 2.  Status

Annual firearms qualification continued throughout the fourth quarter of 2004.  During that training, the participants also were engaged in a review of the Use of Force and Shots Fired policies. They also had to demonstrate their proficiency with the less-than-lethal force options, such as the beanbag shotgun, pepperball launcher, Taser, etc.

A total of 466 personnel attended the firearms qualification training during the fourth quarter of 2004 and 926 personnel completed this training for the year.

The firearms familiarization training takes place every year during the first half of the year.  This is followed by the firearms qualifications in the latter half of the year.  The familiarization course for 2005 is scheduled to take place between March and July.

### 3.  Assessment

CPD remains in compliance the provisions in ¶¶ 90-91 of the MOA.

**CHAPTER THREE.  COLLABORATIVE AGREEMENT**

Problem solving is at the center of the Collaborative Agreement, and each CA requirement is a building block in shaping a police agency into a community problem oriented policing (CPOP) organization.  As noted in paragraph 16 of the CA:  "The City of Cincinnati, the plaintiffs and the FOP, shall adopt problem solving as the principal strategy for addressing crime and disorder problems."   This fundamental approach grew from a jointly signed Agreement that seeks a positive, collaborative path for Cincinnatians towards improved police-community relations, organized around more effective policing.  Progress on CPOP and Cincinnati Police Department reform is reported below.

**I.      Implementation of CPOP [CA ¶ 29]**

   **1.  Requirement 29(a)**

The City, in consultation with the Parties, shall develop and implement a plan to coordinate the work of City departments in the delivery of services under CPOP.

   **2.  Status**

In the second quarter of 2003, the Parties formally adopted a CPOP coordination plan, entitled the "City of Cincinnati Plan for Community Problem-Oriented Policing."  Since then, liaisons from the Departments of Buildings and Inspections, Public Services, Community Development and Planning and Health, Parks and Recreation, Fire, Water Works, and Metropolitan Sewer District received training on their roles and responsibilities as resources to the Problem Coordinators (the CPD member or Partnering Center outreach worker assigned to a CPOP team).

In December, the City reported that it will move towards Community Problem-Oriented Government.  "To this end, CPOP is viewed as part of a whole and not a stand-alone program, as citizens will have several ways to access services.  Each access point will lead to a comprehensive, timely service response."

The City Manager's office created a CPOP Integration Team comprised of City departments who will review CPOP actions and improvements that can support the CPD.  The City states that it is considering combining CPOP electronic files into an existing electronic database that tracks service requests, permits and code violations.  This can provide "real-time" data on cases and access to citizens for updates.

In our last Report we noted that "while Community Problem-Oriented Government makes great sense, and other cities have adopted this approach, we want to ensure that CPOP requests do not lose priority (except when appropriately trumped).  We also want to ensure that the service request system does not replace a CPOP tracking system."

This quarter, the City developed a guide containing information on different City agencies and gave it to neighborhood sergeants. The guide will be available to Cincinnati residents and other City staff as well. Also, the City's Code Enforcement Task Force is developing a Citizen's Guide to Community Action: Addressing Nuisance Complaints and Neighborhood Blight. The Partnering Center Executive Director sits on the Code Enforcement Task Force.

Also of great importance is that in February 2005, the Parties met and agreed upon a final definition for CPOP.  In the latest CA Status Report, the Parties state that they believe the CPOP definition will "inform an updated structure for the City department participation in CPOP."  At the same time, the Parties have also agreed to continue discussions to develop and implement mechanism for tracking and documenting CPOP projects.

### 3.  Assessment

As discussions proceed, the Parties should keep in mind that a service request tracking system cannot by itself replace a CPOP tracking system.  The CPOP tracking system must contain sufficient detail about each CPOP case so that others in the organization and the community can see how the problem was identified, the dimensions of the problem, analysis undertaken and what was learned from it, what solutions were drawn from the analysis, if and when the solutions were implemented, and to what extent the interventions reduced the problem.

Given the uncertainty about the form the inter-agency service delivery system will take, we recommend the City keep the Parties involved in any proposed changes to the system, as they will be the consumers of it.

While the City and the Parties have made significant progress on these issues, because this provision requires the "implementation" as well as the "development" of a "plan to coordinate the work of City departments in the delivery of services under CPOP," the Monitor's assessment of compliance requires documentation of the City's implementation of its coordination plan. This will be made much easier once the Parties agree on a CPOP tracking system.  The City thus remains in partial compliance.

1.  **Requirement 29(b)**

The Parties will develop a system for regularly researching and making publicly available a comprehensive library of best practices related to CPOP.

2.  **Status**

The CPOP website at http://cagisperm.hamilton-co.org/cpop/default.aspx contains nearly 30 publications about crime, disorder, partnerships, problem-solving, and community policing under a "best practices" tab. In addition, the website contains links to more than 30 problem-oriented guides for police on specific crime and safety problems. In this and the last quarter, the CPOP website included a "problem-oriented policing best practices" tab, housing reports on crime control practices and community engagement strategies.  The website now also contains contact information for the Partnering Center.

The Partnering Center provided the County library with some of these publications.  Also, it will post some of the information on its website in April as part of a public campaign to provide resource information to citizens interested in neighborhood problem-solving around crime and disorder.

3.  **Assessment**

The Parties have been in compliance with this section for three consecutive quarters.

1.  **Requirement 29(c)**

The City, in consultation with the Parties shall:

- Develop a continuous learning process through the CPD

- Document and disseminate experiences with problem-solving efforts in the field throughout the CPD

- Make available to the public experiences with problem-solving efforts

- Emphasize problem-solving in (but not limited to) academy training, in-service training, and field officer training

**2. Status**

Each of the elements of this section is discussed below.

Continuous Learning Process in the CPD:  A 50-minute CPOP training presentation was included in the Department's annual management training in December 2004 and January 2005.  The presentation by the CPD CPOP coordinator emphasized the goals of the CA, described differences between community and problem-oriented policing, and emphasized the core elements of CPOP, including adoption of the CPOP philosophy organization-wide.

Experiences with problem-solving efforts in the field will be documented and disseminated throughout the CPD:  The CPOP website contains efforts begun earlier, although it is not clear whether CPD officers are accessing and using the website. Design improvements are in the works for the site and tracking system, which are intended to improve the quality of the descriptions of the problem solving efforts.

Experiences with problem solving efforts in the field shall be made available to the public:  Problem solving efforts are on the CPOP website within the tracking system and are accessible to the public by internet. As noted above, the Parties are in discussion about design improvements for the website and tracking system.

Problem solving will continue to be emphasized in (but not be limited to) academy training, in-service training, and field officer training: This quarter, the CPD did not report on problem solving training in the academy (other than training re: mental health), nor the inclusion of problem solving and CPOP in the in-service or field officer training, or any other training, other than the CPOP presentation for managers.  The Partnering Center and the CPD did offer a two-day training seminar in March 2005 for Partnering Center outreach workers and CPD officers. The training focused on the application of problem-oriented policing, situational crime prevention and crime prevention through environmental design principles.  Gary Cordner and Greg Saville, national experts on these subjects, presented.  Sixteen CPD officers attended the training seminar.

**3. Assessment**

We applaud the efforts described above and see them as first steps in the adoption of problem solving as an organization-wide philosophy of the CPD. The 50 minute management training contained many key points about CPOP, and the Partnering Center training offered CPD employees a 2-day training; the extra training time allows for greater detail on CPOP-related subjects.  This CA

section calls for the City to consult with the Parties on the CPD's problem solving training.  To the extent the Parties were consulted on the CPOP training for CPD managers, this would be a very positive step.

With respect to documenting and disseminating problem solving experiences in the field throughout the CPD, we believe more work is needed to achieve compliance.  The CPOP tracking system is currently under design review, but the Department may also want to consider additional ways of crafting and disseminating descriptions of problem solving experiences to CPD members.

As we have noted in prior Reports, the CPOP website contains some problem-solving efforts and is available to the public via internet.  While we believe the form and the format for these descriptions will change, the CPD is in compliance with the public dissemination requirements of this subsection.

On emphasizing problem solving in the Academy, in-service and FTO training, and other training, a sufficient emphasis has not been documented at this point.  We believe, however, that this can be easily remedied.  We hope to see greater progress, in consultation with the Parties, in the coming quarters.  The Partnering Center can also contribute a great deal, if desired, in helping craft appropriate training for different segments of the CPD.  For purposes of clarity, it also would be helpful if future CPD training includes what is expected from each rank/assignment as a result of the new orientation towards problem solving, so that roles and responsibilities are clear and can more easily be reinforced by performance evaluations.

Of the four subparts to this subparagraph, the Parties are in compliance with the public dissemination requirement, and progress on the other elements of this CA section is required.  The Parties are in partial compliance with this section of the CA.

### 1.  Requirement 29(d)

The Parties will research information about how problem-solving is conducted in other police agencies and disseminate research and best practices on successful and unsuccessful methods for tackling problems.  The Parties will also disseminate information on analogous problem-solving processes used by other professions.

### 2.  Status

The Parties refer the Monitor to their response in 29(b) regarding progress in this quarter on this section.

51

### 3. Assessment

As the Monitor Team has noted, 29(b), 29(c) and 29(d) are closely tied, and these and other CA sections are meant as ways to ensure that the CPD adopts problem solving as its principal strategy to reduce crime and disorder in Cincinnati. For this subparagraph, compliance mirrors the requirements of 29(b) and 29(c).

As we noted in 29(b), the Parties have established a CPOP "best practices" library and included research publications and guides on the CPOP website and at City libraries.  We have found the Parties in compliance with the public dissemination requirements of 29(b) and 29(c).  However, because problem solving is to be adopted as the "principal strategy for addressing crime and disorder problems," dissemination of problem solving "throughout the CPD" to CPD members requires more than the inclusion of problem solving research on the CPOP website.  We have determined that the City is not yet in compliance with the requirements of 29 (c) for training and dissemination to CPD members.

### 1. Requirement 29(e)

The Parties, through the Community Police Partnering Center, will conduct CPOP training for the community and jointly promote CPOP.

### 2. Status

This quarter, one of the Partnering Center outreach workers co-trained community members in Pendleton with one of the District 1 sergeants.[5]

The Parties report that there are 23 active CPOP teams and 31 neighborhoods trained.  The Partnering Center drafted a training schedule for the spring.  The schedule begins in April with plans for upwards of 20 trainings in different Cincinnati communities (covering parts of neighborhoods that already received training, but also many new neighborhoods). Introductory CPOP training will be offered, as well as tailored training on topics including open-air drug markets, prostitution, disorder, and graffiti.

The first of these tailored trainings, one specifically devoted to citizen response to open-air drug markets, was jointly presented in February by the District 2 Captain and a Partnering Center outreach worker at the Third Annual Neighborhood Summit at Xavier University.  The Summit also included

---

[5] Since then, the Pendleton group met again to discuss the traffic barrier, which blocks street and exiting freeway traffic from entering 13th street at Reading Road. The community sought the traffic barrier to reduce drug trafficking and drug traffic on the block.

a CPOP "best practices" forum, highlighting efforts by the Northside and Bond Hill CPOP teams. A panel of five citizens and a Partnering Center moderator shared their efforts with an audience of approximately 50 Cincinnatians.

### 3.  Assessment

While this quarter featured just two trainings, the upcoming spring and summer training schedule appears quite full.  Moreover, the two trainings conducted in this quarter were very constructive. We see tremendous added value from the additional training developed around specific crime/disorder problems, as it gives those communities expressing an interest even more detailed access to information about problems that may be acute in their particular community. One can imagine a training menu from which communities can pick different topics of interest based on their communities' needs: open-air markets; graffiti; speeding in residential areas; drug dealing in apartment complexes; street prostitution; drag racing; landlord training, etc.

The Parties are in compliance with this section of the CA.

### 1.  Requirement 29(f)

The Parties shall coordinate efforts through the Community Police Partnering Center to establish ongoing community dialogue and structured involvement by the CPD with segments of the community, including youth, property owners, businesses, tenants, community and faith-based organizations, motorists, low income residents, and other city residents on the purposes and practices of CPOP.

### 2.  Status

The CA Status Report states that the Plaintiffs have accepted the lead for implementing actions necessary for compliance with this section. This quarter did not see any joint community dialogue efforts.

### 3.  Assessment

Given the court-related developments on the CA this quarter, it is not surprising that the Parties did not jointly coordinate any efforts at community dialogue.  We hope that this will be remedied in the next quarter. We believe the efforts described under 29(e) at Xavier University, planned by the CPPC, can form the beginning of joint forums on progress and plans for the future of the CA.

The Parties are in partial compliance with this section of the CA.

### 1.  Requirement 29(g)

The Parties shall establish an annual award recognizing CPOP efforts of citizens, police, and other public officials.

### 2.  Status

The Awards Committee met in February and decided to hire an event planner for an awards ceremony. At this point, the Parties anticipate a September 2005 ceremony (previously the Parties had planned for May 2005). The funds for the event planner and for the ceremony are not yet in place, however. Fliers announcing the CPOP awards were included in packets distributed to attendees at the Xavier University Neighborhood Summit in February.

### 3.  Assessment

Currently, the Parties are not in compliance with this section of the CA. However, as we noted in prior Reports, the rolling out of joint CPOP training took precedence over the awards process, so the Parties and communities will have the skills to address problems.  With approximately 19 active CPOP neighborhood teams, an awards ceremony will be a timely addition by recognizing the committed efforts of those engaged in problem-solving.

Towards that end, the Partnering Center's newly hired community analyst is reviewing CPOP project data (calls for service, citizen surveys, environmental surveys) to check post-project data against project baseline data.  Those CPOP teams whose projects appear to have had the greatest impact will be encouraged to submit award applications.

### 1.  Requirement 29(h)

The City, in consultation with the Parties, shall develop and implement a communications system for informing the public about police policies and procedures.  In addition, the City will conduct a communications audit and develop and implement a plan for improved internal and external communications.  The National Conference for Community and Justice (NCCJ) will fund the communications audit.

### 2.  Status

This CA section has two parts: (1) informing the public about CPD policies and procedures, and (2) conducting a communications audit and developing and implementing a plan for improving internal and external communications.  With respect to the first, CPD policies and procedures are

accessible from the City website.  On the second, the communications audit was conducted in 2002.  The Parties intended to develop a communications plan in Spring 2004 through the CPOP Committee, although a plan has not yet been developed.

In December, the CPD reported that it had accepted (and the City Council approved) the NCCJ's offer of a loaned executive to help the CPD implement aspects of the communications audit.  A scope of services was developed in December, but is still under review.  The CPD hopes that the contract will be finalized this quarter and will provide a finalized job description once the contract is signed.  The "loaned executive" will serve as the CPD's Community Relations Coordinator and become the primary liaison between CPD and the community for purposes of implementing portions of the communications audit.  The December Status Report listed at least 19 separate first year activities for the Coordinator, including developing a strategic communications plan, developing a "new relationship initiative between the CPD leadership and community, business and political leaders," and establishing community relations activities to raise the visibility of CPOP, Citizens' Police Academy, Youth Services and other CPD Initiatives.

### 3.  Assessment

Concerning the first part of this CA section, accessibility to policies and procedures, they remain available to the public on the CPD's website, http://www.cincinnati-oh.gov/cpd. The City is in compliance with this part of paragraph 29(h).  We also believe it would be helpful to have a link in the City's CPOP website (http://cagisperm.hamilton-co.org/cpop/) to the policies and procedures, so that those community members most engaged with the police and who have access to the internet can easily review any policy or procedure on the CPOP website.

For the second part of this CA section, the City conducted a communications audit, but has not yet implemented a plan for improved internal and external communications. The City is in partial compliance with this component of paragraph 29(h).

### 1.  Requirement 29(i)

The CPD will create and staff a Community Relations Office to coordinate the CPD's CA implementation.

### 2.  Status

The CPD created a Community Relations Unit (CRU) in 2003.  The CRU is a division of the Police Relations Section.  Initially, the CRU Manager reported to the Executive Manager of Police Relations and assisted in

coordinating the implementation of the CA.  In early 2004, the CRU Manager was transferred to the Records Division to achieve budget savings.  The CPD states that the CRU manager will be allocating half her time to assisting RAND (the CA evaluator) by providing documentation and records needed to conduct its evaluation of the Parties' progress with the CA.  In the Fall, the CPD assigned an officer to the CRU. She is tasked with redefining the CPD's quarterly Unit Commander CPOP reporting process, making recommendations about the CPD's current problem tracking system, and assisting with implementing aspects of the communications audit. She will also assist with the implementation and reporting requirements of the Agreement. As stated in our last Report, this is a very positive development.

This quarter, the CRU officer revised the CPOP Problem Solving Worksheet[6], parts of the CPOP website, and is working on aspects of the communications audit.

### 3.  Assessment

Again, we note that the addition of an officer to CRU is a positive development and we look forward to working with her.  The City is in compliance with this CA requirement.

### 1.     Requirement 29(j)

The Parties shall describe the current status of problem solving throughout the CPD through an annual report.  Each Party shall provide information detailing its contribution to CPOP implementation.

### 2.     Status

The CPD submitted its CPOP Annual Report for 2003 in September 2003. The Parties submitted their 2004 CPOP Annual Report in September 2004. Milestones documented in the 2004 Report included:

- The establishment of the Community Police Partnering Center
- Development of joint CPOP training delivered by CPD and the Partnering Center outreach staff
- Delivery of joint training to numerous Cincinnati communities

---

[6] We discuss the problem-solving worksheet under section 29(k).

### 3. Assessment

The Parties have been in compliance with this section of the CA for two consecutive annual deadlines.

### 1. Requirement 29(k)

The CPD District Commanders and Special Unit Commanders or officials at comparable levels shall prepare quarterly reports detailing problem-solving activities, including specific problems addressed, steps towards their resolution, obstacles faced and recommendations for future improvements.

### 2. Status

The CPD provided descriptions of activities conducted by different bureaus and programs: Patrol, Investigations, Youth Services, Training Bureaus, False Alarm Unit, Citizens on Patrol Program, and Violent Crimes. Other Unit Commander reports have not been submitted.

Patrol Bureau.  Many of the efforts center on drug markets in various neighborhoods, although citizens have also engaged officers on other types of problems, including panhandling, robberies, garage and business burglaries.

We recount here a sample of the descriptions from the Patrol Bureau report and the CPOP cases in the CPOP website. The City is revising its commander reports with the assistance of the officer assigned to the CPD's Community Relations Unit to capture additional information about problem-solving projects.

- 1400 Walnut (District 1) CPOP Case #CPOP040022.  *From Prior Reports:*  Milk crates and chairs blocking sidewalk and facilitating drug sales. *This Quarter's Update:*  Residents successfully asked to get involved and take ownership of the corner.

- 547 Findlay Street (District 1).  Noted increase in drug sales, prostitution, loitering; lot is overgrown with weeds and litter masking criminal activity; owner of lot, as well as media contacted; others contacted including West End Business Community Council, Dayton Street Association, Urban Forestry, Hamilton County Juvenile Work Detail; no action yet taken by Urban Forestry on trimming trees in lot.

- 5810 Madison Road (District 2).  *From Prior Reports:*  Drug sales and use, public drinking, disorderly conduct; higher visibility

patrol by officers and Madisonville Citizens on Patrol to dissuade illegal business. *This Quarter's Update:* "No loitering" signs proposed and a trespassing letter drafted.

- 660 Neave Street (District 3). *From Prior Reports:* Several complaints of persons loitering and blocking the sidewalk; neighborhood officer is meeting with the community council to develop a strategy to deal with the problem. *This Quarter's Update:* Directed patrol and neighborhood walk.

- 4916 Reading Road (District 4). *From Prior Reports:* Drug activity and loitering; officers working with community council and Cinergy to improve lighting and trim hedges and trees. *This Quarter's Update:* "No Trespassing" signs posted; shrubs cut; lighting not yet in place.

- Mt. Auburn Burglaries and Thefts from Auto (District 4). *From Prior Reports:* Neighborhood Watch walks in area to discourage crime and identify crime safety issues; officers held safety talks on home security and established covert surveillance. *This Quarter's Update:* Crime prevention surveys distributed.

- Hartwell Garage Burglaries (District 4). *From Prior Reports:* Police advise residents to secure their garages; covert surveillance established. *This Quarter's Update:* Project currently being assessed.

- 7750 Stillwell Drug Sales (District 4). *From Prior Reports:* loitering, drug sales, intimidation of residents. *This Quarter's Update:* Officer worked with Health and Buildings departments and had building condemned.

- 1618 – 1650 Cresthill Drug Sales (District 4) CPOP case #CPOP040035. *From Prior Reports:* Loitering and graffiti at four unit apartment buildings. *This Quarter's Update:* CPOP website states that case is resolved although it is unclear what has been put in place.

- Fergus and Apjones Street (District 5). *From Prior Report:* Vacant and abandoned buildings and loitering; drug dealing; CPOP team organized street clean up; tree trimmings; and neighborhood walks. *This Quarter's Update:* Additional street cleaning; block "meet and greet" set; letter to property owners drafted (intended for those residing on the street as well as absentee owners) inviting their participation in improving the block.

Investigations:  Several of this quarter's efforts include:

- Off The Streets Team.  *From Prior Report:*  The CPD provided the Monitor with a report developed by the Hamilton County Municipal Court describing a court-initiated project exploring alternative sanctions for prostitutes.  Current sanctions are inadequate.  In April, jail overcrowding caused Hamilton County's Sheriff to cease housing women arrestees unless charged with violent and serious felonies.  The arrestees are simply fingerprinted, photographed, given a court date and released.  Last year, the CPD made over 1,000 prostitution arrests.  The project team, consisting of numerous agencies, organizations and groups, commissioned a review of the research on prostitution and alternative programs.[7] Captain Vince Demasi, a CPD unit commander, is on the project's planning team, which met on October 22, 2004.  The team sought and received a planning grant from the Health Foundation of Greater Cincinnati to assist it in its undertaking.  The project is entitled the Off the Streets Planning Project and is meeting to develop an alternative plan to address aspects of the prostitution problem in Cincinnati since arrested prostitutes will only be fingerprinted and released.  *This Quarter's Update:*  The team has scheduled a March visit from San Francisco's Standing Against Global Exploitation (SAGE) Program. SAGE, created by survivors, works with street women to help end commercial sexual exploitation.

- The CPD Community Response Team (CRT):  Conducted a two-day sweep on January 25th and 26th in response to community complaints and a review of crime analysis data. Most complaints involved drug and prostitution activity.  The operations resulted in arrests and seizure of drugs and currency.

- Robbery Task Force (RTF):  Operations concluded January 8, 2005, after a seven-week operation. The RTF is an annual task force formed to address holiday season robberies. Trends are examined to determine RTF deployment, including prior year's patterns, current intelligence reports, and time of day, day of week, and neighborhood patterns. Of significance is that five neighborhoods accounted for nearly half of recorded robberies: Over-the-Rhine; Avondale; Westwood; Downtown Business District;

---

[7] This Hamilton County collaboration includes: Probation, Mental Health, Pretrial Services, Court Clinic, Alcohol Drug Addiction Services, Prosecutor's Office, Tender Mercies, First Step Home, Court of Common Pleas, Municipal Court, Talbert House, Hamilton County Courts, and neighborhood groups and local businesses.

and East Price Hill. Comparing ten-week pre-RTF deployment data to the seven-week RTF deployment period, robbery rates decreased slightly, and burglary, aggravated assault, auto theft and theft saw larger reductions.

<u>Youth Services and DARE Unit</u>:  Several of this quarter's efforts include:

- Gang and drug use presentation at school program hosted by Xavier University students

- Drug use and abuse presentation to group of nurses

<u>Alarm Reduction Unit</u>:

- In 2003, Cincinnati 911 received 30,000 false burglar alarm calls, diverting resources from other police emergencies. The CPD created a False Alarm Unit to deal with the false calls.  In 2004, the Alarm Unit reduced calls by 6,427 calls or 22.15%.  The CPD reports continued decreases in January 2005.

**3.  Assessment**

The purpose of Unit Commander quarterly reports is to detail problem-solving efforts.  Some of the efforts described above are highly consistent with problem solving; others are less so.  As well, some unit commanders have yet to submit quarterly reports.

In addition, this quarter, the Community Relations Unit revised the problem-solving report sheet and gained Partnering Center approval of it.  It was introduced into the Department in the January 25, 2005 Staff Notes. While the current commander quarterly reports do not use the new reporting worksheet (CPD reports that its use in quarterly reports is expected in June 2005), the new form was included in Appendix 16 of the Parties' CA Status Report for the Monitor's review. The CPD Staff Notes states that the revised form is to be used immediately.

We agree with the CPD that the reporting form required revision. Additional changes or additions may be necessary to ensure that reports document problem solving.  While the revised reporting format is improved, it still provides opportunities for vague or generic answers.  As well, the measurement of impact under the assessment portion of the form focuses only on measures of police activity, rather than measures of the impact of the problem solving effort (e.g., calls for service, crime rates, complaints, or other data measures).  Second, it would be helpful if the form described the extent of

the impact, or degree of success, rather than a check box that the problem was eliminated, reduced, or moved to a new location.  In February and March, the Parties met to discuss, among other things, problem solving reporting, and additional discussions are planned.  We hope that the Parties will also discuss the revised form. We are available and willing to provide suggestions or participate in these discussions.

The CPD is in partial compliance with this section of the CA.

### 1.  Requirement 29(l)

The Parties will review and identify additional courses for recruits, officers and supervisors about the urban environment in which they are working.

### 2.  Status

In March 2004, the Parties proposed a timeline beginning in May 2004 for review of Academy courses and implementation of additional courses. Plaintiffs and the FOP agreed to meet with District Commanders and audit CPD training to recommend changes or additions.  However, the Plaintiffs and the FOP reported in the June and September 2004 Status Reports that they had not yet done this.  In the last quarter, the City denied Plaintiffs access to training and ride alongs.

This quarter, the CPD provided the Plaintiffs with the new Academy training schedule.  Also this quarter, the FOP suggested in the CA Status Report several areas for potential training and data collection. They are listed below.

1.  With respect to training for the entire department, as well as recruits, more emphasis should be placed on informing members of the CPD of the liabilities they face when they are named as defendants in their individual capacities, as well as their right to legal representation from outside the City Solicitor's office. This training should be conducted by attorneys who are not city employees in order to assure that matters of conflict of interest are fully disclosed.

2.  If there should be any changes made to the current procedure involving the use of Tasers, there should be full training on those changes before the new procedure goes into effect. Again, there should be training in the risks involved in the use of the Taser in a manner contrary to the new procedure, which should include legal liability. The legal aspect of the training should be conducted by attorneys who are not city employees.

3.      With respect to data collection and analysis, surveys of police officers and the community should include questions relating to both satisfaction and dissatisfaction with the Citizen Complaint Authority investigations. It is not appropriate to conduct surveys relating solely to investigations by the CPD. Officers and citizens alike should be permitted to express their opinions relative to all investigative agencies.

4.      More training should be directed toward search and seizure, as well as when it is appropriate to charge a person with Disorderly Conduct and Obstruction of Official Business. The number of lawsuits against the police with respect to improper investigations and arrests involving those three areas reflect a need for more specialized training.

**3.  Assessment**

This quarter, the City provided the Plaintiffs with the Academy training schedule and has reinstituted Plaintiffs' access to training. Given this development, we hope that the Plaintiffs and the FOP will be able to meet with District Commanders and audit one or two CPD trainings to recommend changes or additions if needed to help CPD officers police in an urban environment.

The FOP's current suggestions for training should help officers police an urban environment.  Officers should be made aware of their liability for certain actions and the types of actions most likely to draw individual liability (as suggested in recommendation 1).  If Taser procedures are modified, officers should receive timely training, including training concerning the risks involved if the Taser is used contrary to any modified procedures (recommendation 2). As for recommendation 3, because it is a data collection and survey issue, this recommendation is more appropriately addressed in a later section of the CA report, under Section IV. Regarding recommendation 4, search and seizure training and the appropriate charging of disorderly conduct and obstruction of official business are very sound training recommendations.  If not addressed well, these issues can lead to citizen mistrust of the police if police decisions in searching and charging decisions are perceived to be overreaching.

The Parties are in partial compliance with this section of the CA.

**1.  Requirement 29(m)**

The Parties, in conjunction with the Monitor, shall develop and implement a problem tracking system for problem-solving efforts.

**2. Status**

The CPD recognizes that its problem tracking system requires improvements and has tasked its Community Relations Unit to improve the system. In the Parties' last reports, the CPD stated that it had reviewed previous Monitor reports and prepared a draft document for review by neighborhood area sergeants.  This quarter, the Parties met several times about the problem tracking system and reached agreement on the following items, which they shared with Judge Merz and the Monitor at the March 10th facilitated meeting:

    1. The Parties will work on a mechanism for posting items on the CPOP website.

    2. The Parties will develop an analysis process that captures and provides more detail in the problem tracking process.

    3. The Parties will modify the tracking process as a result of items 1 and 2 above.

    4. The Parties will reach consensus on problems to be posted on the CPOP website – i.e., District Commanders (neighborhood officers), and Partnering Center staff will have joint approval and shared responsibility to coordinate and share information about the problems to be posted as CPOP on the website.

We already notice some improvements in the website and tracking system.  The website contains contact information for the Partnering Center, and within the tracking system, one is able to move from one SARA element to another in a CPOP case without going back each time to the main screen.  Another useful modification, changing the "Comments" section in each section to "Give Specifics" may have the effect of increasing the level of detail officers include in each project.  As for identifying the names of property owners of problem properties in CPOP reports, in the Status Report the CPD states that it "poses privacy and protection issues for those involved."[8]

---

[8]  On the issue of adding property owner names in the CPOP tracking system when addressing a problem property, property owner information is public record and the value of naming these property owners in a CPD database, even one open to the public, is that it allows the CPD *and the community* over time to see if there is a pattern to the property owners, for instance, do some own multiple problem properties in different parts of the city and are slumlords?  Some of the responses considered against an owner of multiple problem properties (in different districts) may be different than those considered against an owner who has only one problem property.  This also suggests that it would be helpful to be able to search the tracking system for certain types of patterns, such as by landlord.

### 3. Assessment

Improvements to the problem tracking system will be a positive advance. In our prior Reports, we commented on some of the missing pieces in the system and that the system needed to provide enough case information so that a person unfamiliar with a CPOP case could read one and understand what was learned about a particular problem and how the responses selected were tailored to what was learned.  A CPOP case description should contain more exact information about what was done to fix the problem, when it was done, and by whom. Also, measures of impact should be precise if possible; for example the level or extent of  reduction in calls for service for a given time period, the types of calls that are now less frequent and more specific measures of increased community satisfaction. As the Parties collaborate on this improvement, we recommend that they share drafts for an improved tracking system with the Monitor.  Because the Parties are in the process of revising and improving the problem tracking system, the Monitor will defer our compliance determination.

Also, we commend the CPD for the changes made this quarter in adding Partnering Center information, making it easier to move between SARA elements in the tracking system, and adding "Give Specifics" boxes.  At the end of the revision process, officers and supervisors will require new training.  In addition, it will be important that supervisors understand their role in ensuring that the information officers input is accurate, detailed, and kept up-to-date. Sample problems using the screens can illustrate for officers and supervisors the kind and detail of information required.

### 1. Requirement 29(n)

The City shall periodically review staffing in light of CPOP.  The CA requires ongoing review of staffing rather than a review by a certain deadline.

### 2. Status

The CPD has stated that it regularly reviews staffing to match workload requirements with resources.  On numerous occasions (starting with our Third Report in October 2003), the Monitor requested the CPD's staffing formula and a description of how the CPD applies it. The CPD provided a description, including the formula used, in September 2004.

Plaintiffs suggest that the description the CPD provided of its staffing approach supplies the "mechanics of its staffing plan," but has not changed "in light of its commitment under CPOP" and the CA requirement that problem solving become the CPD's principal approach to crime and disorder.  In addition, since crime analysis is key to problem solving, Plaintiffs suggest that

the City should have proposed substantial budget increases for crime analysis capacity within the CPD.

Currently, the CPD has 1.5 analysts for just over 1,000 sworn officers.

The CPD states that its patrol plan allows patrol officers 30 percent of their average tour of duty for problem-solving and other discretionary and proactive activity.  Further it states:  "The City of Cincinnati and the CPD are committed to achieving the adopted goals for the CA through implementation of CPOP as a principle philosophy which drives all activities."  In addition, CPD states that its officers "consider all requests for service, all crime and disorder, and all community needs as opportunities to use the SARA methodology, to combine City resources, to partner with the community, and to engage in collaboration and problem-solving."

Finally, the CPD indicates that its crime analysis capacity of 1.5 people is sufficient for a Department with 1,000 officers, where every officer sees all requests for service as opportunities for problem-solving.  According to the CPD, the Crime Analysis Unit "provides data and analysis to all of the CPD districts, sections, and units, and to the community, to enhance problem-solving and law enforcement."

The Parties have returned to discussing the integration of CPOP operationally throughout the Department.

### 3.  Assessment

The Monitor looks forward to the results of further discussion between the Parties.  If, as CPD suggests, patrol officers have 30 percent of their time to analytically problem solve, and the crime analysis capacity of the Department is robust, the Monitor anticipates seeing greater evidence of the analytic problem solving efforts of patrol officers and other sworn personnel in the Department.

With respect to crime analysis, as the number and complexity of projects undertaken by the Department increases, greater expertise in measuring impact is typically required.  The University of Cincinnati report (contained in Appendix 2 of the Parties' CA Status Report) by two UC graduate students is an example of the kind of work that can be done by crime analysts in a problem solving department.[9]  The value of in-house, robust crime analysis is that it

---

[9]  The analysis examined if crime decreased in Pendleton and on the 500 block of 13th Street after a traffic barricade. The students also examined if crime displacement occurred, and if so, how much and to where. The information contained in the report would be worthwhile to share with any CPOP team considering barricades. It is easy to see that an analysis such as this would be of value to the CPD in examining whether the robbery task force, which is annually

informs operations, making police work more effective, efficient, and financially less costly.[10]

The City is not yet in compliance with this section of the CA.

### 1. Requirement 29(o)

The City shall review, and where appropriate, revise police department policies, procedures, organizational plans, job descriptions, and performance evaluation standards consistent with CPOP.

### 2. Status

In late 2004, the City and the Civil Service Commission approved new police job descriptions and performance review standards.[11]

In our last Report, we determined that the revisions did not meet the requirements of this CA paragraph. We restate our reasons below:

"The CPD uses ten categories to evaluate all officers' performance and then approximately eight additional categories based on assignment and rank. Of the initial ten categories by which all sworn personnel are rated, two are changed in the new evaluation form: *problem solving* substitutes for *maintaining equipment* and *community interaction* substitutes for *meeting and dealing with the public*. The eight remaining categories for all CPD members are:

- quality of work
- judgment
- attendance and punctuality
- completion of assignment
- grooming and dress
- physical conditioning
- attitude towards department policy
- developing and assisting other officers

---

constituted by the Department, has the desired impact or if other approaches might be equally or more effective.

[10] For more information about other types of analysis crime analysts can do, see Become a Problem-Solving Crime Analyst by Ron Clarke and John Eck (2004), Jill Dando Institute of Crime Science.

[11] CPD's Staff Notes for November 2, 2004 at http://www.cincinnati-oh.gov/police/downloads/police_pdf9579.pdf.  CPD's December 21, 2004 Staff Notes indicate that performance ratings under this new system are due on or before January 22, 2005: http://www.cincinnati-oh.gov/police/downloads/police_pdf9856.pdf.

As noted, the additional eight categories depend upon rank and assignment.  For patrol officers, the eight additional rated categories are:

- investigation and case preparation
- handling stressful situations
- preventive patrol
- quantity of work
- teamwork
- gathering of criminal intelligence information
- writing police reports
- processing evidence

The Rating Manual contains the criteria qualifying an officer for one of six performance ratings (outstanding, excellent, very good, satisfactory, improvement needed, unsatisfactory) for each of 18 rated categories. Each performance rating has a point value: outstanding = 25 points; excellent = 20 points; satisfactory = 15 points; improvement needed = 10 points; and unsatisfactory = 5 points. For instance, the Problem Solving category reads as follows:

Outstanding
Is the one highest achiever in this category ever encountered by the rater.

Excellent - Has an exceptional ability to identify potential or existing problems.  Shows unusual initiative and innovation in seeking appropriate solutions.

Very Good - Displays considerable ability in identifying potential or existing problems through use of the SARA problem-solving method. Shows initiative and innovation in seeking appropriate solutions.

Satisfactory - Has a broad understanding of the SARA problem-solving method and utilizes it in making decisions to assist the public.

Improvement Needed - Consistently fails to identify problems, either potential or existing. Somewhat understands the SARA problem-solving methodology for consistent application in CPOP teams.

Unsatisfactory - Unable to identify a problem or utilize the SARA problem-solving process.

We have several concerns with this first section. First, while SARA is mentioned (the police problem solving acronym representing Scanning, Analysis, Response, Assessment) only two of its elements are highlighted in the

67

rating description: problem identification and solutions (response). The absence of analysis and assessment may describe a type of police problem solving that ultimately is less than called for by the CA.  Analysis and assessment are key to the form of CPOP the CPD is to adopt.[12]  Second, the *improvement needed* rating mentions CPOP teams.  Under the CA, problem solving is to become the principal strategy to fight crime and disorder in Cincinnati, not just for the CPOP teams.

        We are also concerned about aspects of the category *Community Interaction*.  The ratings in that category are as follows:

        Outstanding - Is the one highest achiever in this category ever encountered by the rater.

        Excellent - Handles all dealings with the public in an extremely professional manner.  Is highly receptive to individual problems and makes a special effort to provide assistance. Builds effective working relationships with residents and businesses through utilization of Community Problem Oriented Policing methods.

        Very Good - Consistently friendly and courteous to the public and fellow employees. Is highly receptive to problems of individual citizens and makes an effort to provide assistance through Community Oriented Policing methods.

        Satisfactory - Has a working knowledge of Community Problem Oriented Policing and projects a competent and efficient image when dealing with the public and fellow employees.

        Improvement Needed - Is frequently rude or indifferent in almost all dealings with the public and fellow employees.

        Unsatisfactory - Refuses to deal with the public and/or fellow employees and always acts rude or indifferent toward them.

        For "improvement needed," an officer must be rude or indifferent "in almost all dealings with the public and fellow employees."  Certainly an officer who is frequently rude or frequently indifferent to the public needs improvement, even if it is with only a portion of his dealings with the public.

---

[12] It appears that the CPD took language from a rating category used in its previous evaluation rating system -- the Civil Service approved version from 1978. The category called *Problem Identification and Resolution* in that version applies only to staff officers, and is identical in the current rating system as well (see page 29 of current system).  The *Problem Identification and Resolution* section is 26 years old.  Problem solving language in the personnel evaluation rating system should be updated to reflect the way it is used in the Collaborative Agreement.

Overall, the Monitor believes that the revisions fail to place problem-solving as the CPD's central approach. Officers, supervisors, and managers can receive a good rating in other categories and be eligible for promotion without doing well in problem solving and community engagement. Moreover, the other categories in the rating system are virtually identical to the 1978 Civil Service approved CPD evaluation rating system, suggesting that problem-solving is simply an add-on.  This can signal to employees that very little has changed.

In our January 2005 Report, we recommended that the Parties meet to discuss these issues, with the CA as the guide.

In the current CA Status Report, the CPD states that it has revised its job descriptions, procedures and plans where appropriate and that it "believes that it is in full and substantial compliance with this provision." CPD completed training on the changes, adding:

> It is through the training and implementation process that the priority of problem-solving is established. The CPD is actively engaged in the performance evaluation process as its managers and supervisors rate personnel on their 2004 performance.  The CPD will be reviewing the ratings and will assess the effectiveness of the written materials and the training in order to evaluate the success of implementation.

### 3.  Assessment

The Parties are currently in discussions regarding the standards to be applied to this provision.  The Monitor believes that the Department has not yet embarked upon training all Department personnel in CPOP and in the type of problem solving in which the CA asks them to be engaged. Many in the Department may not be aware of the difference between problem identification and resolution (which are measured in the performance review system) and the type of problem solving required by the Agreement (Scanning, Analyzing, Responding, Assessing).  Also, as we noted in our prior Report, the performance evaluations are not adequate for compliance under this section.

The City is not yet in compliance with this section of the CA.

### 1.  Requirement 29(p)

The City shall design and implement a system to easily retrieve and routinely search (consistent with Ohio law) information on repeat victims, repeat locations, and repeat offenders.  The system also shall include information necessary to comply with nondiscrimination in policing and early warning requirements.

**2. Status**

As noted in our prior Reports, the City expects to meet this requirement through the acquisition of a new Records Management System (RMS) and Computer Aided Dispatch (CAD) system. The City contracted with Gartner Consulting and in late 2003 began reviewing design specifications for a Request for Proposal (RFP). The City's Purchasing Department released an RFP for the CAD and RMS project on June 22, 2004. Five vendors submitted proposals by the August 20, 2004 due date. The Department narrowed the number of bidders in late 2004 and in January 2005, the three remaining vendors each provided three days of product demonstration. Vendors addressed CAD, RMS, systems integration, and product security issues, and follow up concerns about their products and services. A full time project manager, a sworn lieutenant, is now assigned to minimize delays, cost overruns and ensure project success.[13] In February and March, the City will conduct vendor reference checks, select a vendor, and begin contract negotiations.

**3. Assessment**

The City is not yet in compliance with this CA provision.

**1. Requirement 29(q)**

The City shall secure appropriate information technology so that police and City personnel can access timely, useful information to problem-solve (detect, analyze, respond, and assess) effectively. The CA established February 5, 2003, as the deadline for development of a procurement plan, April 5, 2003, to secure funding, August 5, 2003, to procure systems, and August 2004 to implement any new purchases.

**2. Status**

The Parties believe that the new RMS system will also meet the requirements of this section of the CA.

**3. Assessment**

The City has not met the deadlines in the CA for compliance with this requirement as of yet, but hope to select a vendor by the end of March 2005. The City is not in compliance with this section of the CA.

---

[13] Lt. Carmichael helped develop and implement the CPD's Employee Tracking System.

## II. Evaluation Protocol [CA ¶¶30-46]

### 1. Requirements

The CA calls for a system of evaluation to track attainment of CA goals. This tracking serves as a "mutual accountability plan." According to the CA, "[t]he term 'mutual accountability plan' is defined as a plan that ensures that the conduct of the City, the police administration, members of the Cincinnati Police Department and members of the general public [is] closely monitored so that the favorable and unfavorable conduct of all is fully documented and thereby available as a tool for improving police-community relations under the Agreement."

The Evaluation Protocol must include the following components:

• Surveys

- of citizens, for satisfaction and attitudes
- of citizens with police encounters (neighborhood meetings, stops, arrests, problem-solving interactions), for responsiveness, effectiveness, demeanor
- of officers and families, for perceptions and attitudes
- of officers and citizens in complaint process, on fairness and satisfaction with complaint process

- Periodic observations of meetings, problem-solving projects, complaint process; with description of activity and effectiveness

- Periodic reporting of data to public, without individual ID, but by age, race, gender, rank, assignment and other characteristics. The data, to be compiled by the City's 52 neighborhoods, are to include arrests; crimes; citations; stops; use of force; positive interactions; reports of unfavorable interactions; injuries to citizens; complaints

- Sampling of in-car camera and audio recordings; database of sampled recordings; study of how people are treated by police

- Examination of hiring, promotion and transfer process

- Periodic reports that answer a number of questions, including:

  • Is use of force declining, and is it distributed equally?
  • Is the complaint process fair?
  • Do officers feel supported?

• Is problem solving successful?
• Are police-community relations improving?
• Is progress being made on issues of respect, equity and safety?
• Is safety improving?

## 2. Status

The RAND Corporation was selected by the Parties to be the Evaluator and to implement the Evaluation Protocol, and RAND entered into a contract with the City of Cincinnati to accomplish these tasks.  A kick-off meeting was held on September 1, 2004, between the RAND project team and CPD personnel.  On December 15, 2004, RAND prepared its first quarterly report under the City contract, describing its progress on the Evaluation Protocol.

In February 2005, members of the RAND team came to Cincinnati to meet with the Monitor Team and Party representatives, and to begin their evaluation efforts.

• On February 23, the Parties discussed with RAND the four separate survey instruments that will be pilot tested in March and then fielded later in the spring of 2005.  These draft surveys accompanied the quarterly report and were then revised based on the comments of the Parties and the Monitor.  The surveys of community residents, citizens who have interacted with the police, and police officers in the field will be repeated in 2007.  The surveys of citizens and officers involved in the complaint process will be conducted on an ongoing basis.

• At the All-Parties meeting on February 24, RAND presented its recommendations for developing multiple benchmarks on how to assess bias-free policing, including traffic stop data collection and analysis.

• During RAND's February site visit to Cincinnati, members of the project team attended community meetings and CPOP meetings to pilot test the observations forms and surveys that it has developed for its review of community meetings and problem solving projects.

• RAND expects to sample approximately 300 incidents per year that are captured on video and audiotape (police vehicle MVRs).  These MVR tapes are among the significant amount of data that RAND has requested from the CPD and the City of Cincinnati.  Much of the data has now been provided, although additional data and materials will continue to be needed.

72

### 3.  Assessment

While the components of the Evaluation Protocol are still being implemented by RAND and the Parties, a significant amount of work has been accomplished.  The Monitor will work closely with the Parties and RAND to begin the process of evaluating whether the goals of the CA are being achieved.

The Parties are in compliance with the CA provisions requiring the development of a system of evaluation, and a protocol for accomplishing this evaluation.  Because the components of the Evaluation Protocol have not yet been implemented, the Parties are not yet in compliance with implementation or with the requirement of public reporting of the results of the Evaluation Protocol.  However, we are hopeful that RAND's work on the evaluation project will proceed apace and that implementation will be accomplished.

## III.  Pointing Firearms Complaints [CA ¶48]

The investigations of complaints of improper pointing of firearms from March 2000 to November 2002 were forwarded to the Conciliator, Judge Michael Merz, in July 2003.  The Parties also submitted supplementary materials to Judge Merz for his review in making his decision under Paragraph 48.  On November 14, 2003, Judge Merz issued his decision.  Judge Merz determined that there has not been a pattern of improper pointing of firearms by CPD officers.  Therefore, CPD officers will not be required to complete a report when they point their weapon at a person.  The Parties are in compliance with the provisions of Paragraph 48.

## IV.  Fair, Equitable and Courteous Treatment

The CA requires the Parties to collaborate in ensuring fair, equitable and courteous treatment for all, and the implementation of bias-free policing.  Data collection and analysis are pivotal to tracking compliance, and training is essential to inculcate bias-free policing throughout the ranks of the CPD.  The Monitor, in consultation with the Parties, is required to include detailed information regarding bias-free policing in all public reports.  The collection and analysis of data to allow reporting on bias-free policing is to be part of an Evaluation Protocol developed with the advice of expert consultants.

**A.  Data Collection and Analysis [CA ¶¶38-41, 51, 53]**

    **1.  Requirements**

        As part of the Evaluation Protocol, the CPD is required to compile the following data to be analyzed, by percentage attributable to each of the City's fifty-two neighborhoods:

- Arrests
- Reported crimes and drug complaints
- Citations of vehicles and pedestrians
- Stops of vehicles and pedestrians without arrest or issuance of citation
- Use of force
- Citizen reports of positive interaction with members of the CPD by assignments, location, and nature of circumstance
- Reports by members of the CPD of unfavorable conduct by citizens in encounters with the police
- Injuries to officers during police interventions
- Injuries to citizens during arrests and while in police custody
- Citizen complaints against members of the CPD

        Paragraph 40 requires that the City provide to the Monitor incident-based data so that the nature, circumstances and results of the events can be examined.

        Paragraph 51 references Ordinance 88-2001, which identifies required data to be reported and analyzed to measure whether there is any racial disparity present in motor vehicle stops by the CPD.  The local ordinance requires the following information be gathered:

- The number of vehicle occupants
- Characteristics of race, color, ethnicity, gender and age of such persons (based on the officer's perception)
- Nature of the stop
- Location of the stop
- If an arrest was made and crime charged
- Search, consent to search, probable cause for the search; if property was searched, the duration of search
- Contraband and type found
- Any additional information

Paragraph 53 of the Collaborative Agreement requires the Monitor, in consultation with the Parties, to include in all public reports, detailed information of the following:

- Racial composition of those persons stopped (whether in a motor vehicle or not), detained, searched, arrested, or involved in a use of force with a member of the CPD

- Racial composition of the officers stopping these persons

## 2. Status

### a. Traffic Stop Data

CPD officers continue to collect traffic stop data on Contact Cards. The CPD reports that it has prioritized the entry of data from the Contact Cards submitted in 2003. The 2003 data have been forwarded to RAND for analysis. The December 2004 RAND Quarterly Report describes the traffic stop analysis it will conduct as part of the evaluation protocol, the data requests it has made to the CPD, the data it has received, and the status of its analysis. RAND is at the beginning stages of analysis, with no products to report at this stage.

### b. Pedestrian Stop Data

The CPD has revised its Investigatory Stops Policy, Procedure 12.554, to require a Contact Card be filled out for (1) all vehicle stops, and for (2) any vehicle passenger detention that meets the definition of a Terry stop.[14] For consensual citizen contacts, the policy states that an officer **may** complete a Contact Card, if the officer believes the card will provide intelligence information and the information is provided voluntarily. However, the procedure is silent on whether officers are required to complete Contact Cards for Terry stops stemming from pedestrian encounters. Current practice leaves this up to the discretion of the officer.

The City states that the CPD and the Plaintiffs view officer completion of Contact Cards after pedestrian stops as problematic – they believe there are legal constraints, and collection may cause community relations problems. The City believes that data collection on pedestrian stops can be gathered from other sources, including existing CPD reports:

- FIR Cards
- Form 527 Arrest Reports
- Adult and Juvenile Notice to Appear Citations

---

[14] A Terry stop is one where the officer has reasonable suspicion to believe the person is committing or has committed a crime.

- Adult and Juvenile MUTT Citations
- Form 316 Aided Case Reports
- Warning Citations for Pedestrian Violations

The City states that the CPD and RAND will work together to extract this information.  The December 2004 RAND Quarterly Report indicates it will request statistical compilations from the City in January 2005.  However, the Report did not describe any analysis of pedestrian stop data.

### c.  Use of Force Racial Data

The December 2004 Rand Quarterly Report indicates it will request statistical compilations from the City in January 2005.  The Report did not describe any analysis of use of force data.

### d.  Data on Positive Police-Citizen Interaction

The Parties have agreed to a Report of Favorable Police Conduct form, which has been printed and disseminated.  During the fourth quarter of 2004, the CPD received 45 reports of favorable officer conduct.  The reports are widely available to citizens, they are at all CPD and public facilities, on the CPD website, and each CPD vehicle contains a supply.  The CPD has initiated inspection of some of these places to ensure an adequate supply of reports, including CPD facilities, CPD neighborhood stations, designated public facilities (libraries, recreation centers, etc.) and designated CPD vehicles.  The inspections are completed either monthly or quarterly.

### e.  Data on Unfavorable Citizen Interactions

The Parties have developed a protocol for the reporting and tracking of unfavorable citizen interactions.  The Parties to the CA agree that:

- Rude and discourteous conduct by citizens toward police is a problem that can be addressed by community problem-oriented policing

- The conduct at issue is typically not criminal and is normally protected by the federal and state constitutions

- A protocol for tracking rude and discourteous conduct by citizens toward the police can be developed through problem-solving while respecting the constitutional rights of all citizens

76

The Parties developed a protocol for reporting and tracking such conduct, and permitting the evaluation team (RAND) to perform statistical compilations and prepare required reports of such conduct to the Parties, pursuant to paragraphs 38, 39, 40, 44, 45 and 46 of the CA.  The protocol has been entered by Judge Dlott as "Protective Order Re: Mutual Accountability Reports of Unfavorable Conduct by Citizens During Implementation of the Collaborative Agreement."  The FOP is taking steps to see that appropriate sealed containers are located in all police districts and units of assignment, and that the Mutual Accountability Form 1 (MA-1) is printed in sufficient numbers.  The FOP is working with the CPD to ensure the form is made available to all CPD officers.

### 3.  Assessment

#### a.  Traffic Stop Data Collection

The CPD is collecting traffic stop data on Contact Cards, which are now being sent to RAND for analysis.  RAND is checking quality and consistency of the data fields, and will be preparing its analysis of the data in the next quarter.  Because the traffic stop analysis will now be undertaken, the Monitor has determined that the Parties are in compliance with this CA requirement.  For continued compliance, the CPD's Records Section will need to continue to input the Contact Cards into its database and provide the data to RAND.

#### b.  Data Collection on Pedestrian Stops

RAND has requested statistical compilations produced by the City for this data.  The Parties are not yet fully in compliance with this requirement.

#### c.  Use of Force Racial Data

RAND has requested statistical compilations produced by the City for this data.  The Parties are not yet fully in compliance with this requirement.

#### d.  Favorable Interactions

The Parties are in compliance with this CA requirement.

#### e.  Unfavorable Interactions

The Parties have developed a protocol for reporting unfavorable interaction by CPD officers with citizens.  The protocol has been approved and entered by the Court as "Protective Order Re:  Mutual Accountability Reports of Unfavorable Conduct by Citizens During Implementation of the Collaborative Agreement."  Mutual Accountability Forms have been developed and are being made available at all police districts and units of assignment.  The Parties are in compliance with this CA requirement.

## B.  Training and Dissemination of Information [CA ¶ 52]

### 1.  Requirement

The Collaborative Agreement requires that all Parties cooperate in the ongoing training and dissemination of information regarding the Professional Traffic Stops/Bias-Free Policing Training Program.

### 2.  Status

The Parties did not report any update relating to this provision in the last quarter.  No progress is reported on the Parties cooperating in ongoing training and dissemination of information regarding Professional Traffic Stops/Bias-Free Policing Training.

### 3.  Assessment

As we noted in our two Reports, the Monitor has not seen evidence that the Parties are cooperating in ongoing bias-free policing training.  Therefore, we cannot find compliance at this time.

## C.  Professional Conduct [CA ¶ 54]

### 1.  Requirement

Paragraph 54 of the CA requires that when providing police services, officers conduct themselves in a professional, courteous manner, consistent with professional standards.  Except in exigent circumstances, when a citizen is stopped or detained and then released as a part of an investigation, the officer must explain to the citizen in a professional, courteous manner why he or she was stopped or detained.  An officer must always display his/her badge on request and must never retaliate or express disapproval if a citizen seeks to record an officer's badge number.  These provisions are to be incorporated into written CPD policies.

### 2.  Status

This provision has now been incorporated into procedures 12.205 and 12.554, and put into effect.  The CPD's Manual of Rules and Regulations also generally mandates courteous, fair treatment of all.

During this quarter, a member of the Monitor Team randomly reviewed MVR tapes from Districts 1 and 2.  We were able to review approximately 50 different incidents in these Districts.  During each of the traffic stops we observed we could hear the officer, upon approaching the vehicle, identify

78

himself and explain to the citizen why they had been stopped. Additionally, we heard the officer explain the options the citizen had as it related to the ticket. Even on those stops where arrests were made the officers handled themselves well. We found that the officers in both of these Districts were polite and informative on the traffic stops.

Starting next quarter, the RAND team will also be reviewing MVR tapes.

### 3. Assessment

From the Monitor's review of MVR tapes, we determined that the officers involved in those interactions conducted themselves in a professional and courteous manner, consistent with professional standards. The City is in compliance with this provision.

## V. Citizen Complaint Authority

## A. Establishment of CCA and CCA Board [CA ¶ 55-64]

### 1. Requirements

- The City will establish the Citizen Complaint Authority

- The CCA will replace the CPRP and investigative functions of the OMI. The CCA will investigate serious interventions by police including shots fired, deaths in custody, major uses of force; and will review and resolve citizen complaints

- The CCA Board will consist of seven citizens; the CCA will be run by an Executive Director and have a minimum of five professional investigators; the Board must be diverse

- The Board and Executive Director to develop standards for board members, and training program, including Academy session and ride-along

- The Board and Executive Director will develop procedures for the CCA

- The CCA will examine complaint patterns

- The CCA will develop a complaint brochure, as well as information plan to explain CCA workings to officers and public

- The CCA will issue annual reports

79

- The City Council will allocate sufficient funds for the CCA

**2.  Status**

The CCA has been operating and investigating complaints since January 6, 2003.  A CCA Board of seven members is in place, having undergone a training program before beginning work and reviewing complaints.  The CCA has also established procedures for its Board meetings, appeal hearings, and its investigations.  The CCA Board has chosen Board member Richard Siegel as the new chairperson of the CCA.  Also, in 2004, the CCA issued an annual report for its work in 2003.  A 2004 annual report should be developed next quarter.

**3.  Assessment**

The City is in compliance with the provisions relating to establishing the CCA and the CCA Board.

**B.  Executive Director and Staff [CA ¶¶65-67]**

**1.  Status**

**a.  Executive Director**

As noted in earlier Reports, Mr. Wendell France was selected to be the new Executive Director of CCA and started in April 2004.

**b.  Investigator Position**

The CCA hired a fifth investigator who started work in the first quarter of 2004.  The City now has the minimum number of investigators required by the Agreements.

In 2004, the CPD invited the CCA investigators to participate in an Internal Affairs training school run by a professional police training center.  Three CCA investigators participated in this 40-hour block of instruction and attended jointly with the CPD.

**2.  Assessment**

The Parties are now in compliance with these provisions of the CA.

## C.  CCA Investigations and Findings [CA ¶¶68-89]

### 1.  Requirements

Each citizen complaint, excluding criminal matters, is to be directed to the CCA, regardless of where it is initially filed.  Where a complaint is to be investigated by CCA, an investigator will be assigned within 48 hours.  The decisions of the CCA shall be forwarded to the City Manager, and the City Manager and the Police Chief "will refrain from making a final decision on discipline until after the receipt of the CCA report."  The City Manager shall agree, disagree or agree in part with the CCA's findings and recommendations.

Also, paragraph 80 requires the CCA and the CPD to develop a shared database to track all citizen complaints, the manner in which they are handled, and their disposition.

In addition to the review of individual complaints, paragraph 83 of the CA calls on the CCA to examine complaint patterns that might provide opportunities for the CPD and the community to reduce complaints.  Following the identification of such patterns, the CCA and the CPD are to jointly undertake a problem-solving project to address the issues raised.

### 2.  Status

Paragraph 74 requires that the Chief of Police and the CCA Executive Director develop written procedures that will assure the timely exchange of information and the efficient coordination of CCA and CPD investigations.  While there may be an implied understanding of this process, CCA has recommended that a written procedure be developed to ensure that each party is aware of the process.  A set of written procedures or a protocol will also assist the City in complying with the requirements of paragraph 71 that "the CPD shall not interfere with the ability of the CCA investigator to monitor the work of the CPD at the scene and to monitor all interviews conducted by the CPD."

During this period, the CCA has identified the following investigations which were not received from the CPD in a timely manner:

**CPD-CCA Referrals**

| CCA # | Incident Date | Closed CPD | Received at CCA |
|-------|---------------|------------|-----------------|
| 04509 | 12-01-03 | 11-03-04 | 11-15-04 |
| 04520 | 06-26-04 | 11-09-04 | 11-22-04 |
| 04521 | 10-03-04 | 10-22-04 | 11-22-04 |
| 04523 | 10-15-04 | 11-02-04 | 11-22-04 |
| 04524 | 06-05-04 | 11-17-04 | 11-22-04 |
| 04525 | 10-05-04 | 10-19-04 | 11-22-04 |
| 04539 | 08-26-02 | 12-01-04 | 12-02-04 |
| 04540 | 11-17-03 | 12-01-04 | 12-02-04 |
| 04541 | 04-04-03 | 11-19-04 | 12-02-04 |
| 04551 | 09-04-04 | 12-02-04 | 12-09-04 |
| 05008 | 08-21-04 | 12-30-04 | 01-10-04 |
| 05009 | 07-17-03 | 01-05-04 | 01-10-05 |
| 05010 | 07-21-04 | 12-29-04 | 01-10-05 |

Paragraph 80 requires the CCA and the CPD to develop a shared database to track all citizen complaints, the manner in which they are handled and their disposition.  Currently, the CCA does not have access to a shared database.  However, the City has stated that the CCA will have access to the ETS system.  In the past quarter, the CCA solicited bids to develop a database that is capable of interfacing with the CPD's ETS to obtain limited officer information and read-only access to IIS case files.  The CCA agreed to the CPD's request to suspend the acquisition of the CCA interface due to issues related to the performance of the ETS vendor.  However, the CCA has stated that this delay has adversely impacted its ability to move forward and to meet this objective. The CCA plans discussions with the vendor and it will attempt to develop an interface supported by the CPD's ETS system.

The CCA and the CPD revisited the timely exchange of information related to the review of completed CCA cases forwarded for the City Manager's action.  A systemic review of these cases has been developed and provides the City Manager with a comprehensive evaluation of cases presented for review. As part of this review, the CCA Executive Director and the IIS Commander meet before submitting cases to the City Manager to discuss any differences in the agencies' resolutions.

### 3. Assessment

The CCA and the CPD have not yet developed written procedures for the timely exchange of information and the efficient coordination of CCA and CPD investigations.  Therefore, the City is not yet in compliance with paragraph 74.  Also, without these procedures in place, it appears that the City is not in compliance with paragraph 71, requiring that the CPD not interfere with the ability of the CCA to monitor the work of the CPD at the scene, and monitor CPD interviews.

On paragraph 80, the CCA currently does not have access to a shared database, and the City is not in compliance with this provision.

Another area of concern is whether the City is taking appropriate action on CCA findings where the City Manager agrees with those findings.  As we noted in Chapter 2, Section IV.D, the City has not provided documentation of the actions taken by the CPD where the City Manager agrees with the CCA findings that are different from the findings of the CPD.

With respect to paragraph 83, the CCA prepared an analysis that was reviewed by the Police Chief and the CCA Board.  Paragraph 83 now calls for the CCA and the CPD to jointly "undertake a problem-solving project to determine the reason(s) for the pattern and whether there are opportunities to eliminate or reduce root causes.  Where feasible, this project should involve both affected officers and the community."

**APPENDIX A**

**BENCHMARKS AND STANDARDS FOR DEFINING MOA COMPLIANCE** DRAFT

| MOA ¶ | MOA PROVISION | MOA REQUIREMENTS, ACTIVITIES TO BE MONITORED | DEFINITION OF COMPLIANCE | DOCUMENTS AND SOURCES |
|---|---|---|---|---|
| | Mental Health Response Team (MHRT) | | | |
| 10 | 1.  CPD to create a cadre of specially trained officers available at all times to respond to incidents involving mentally ill persons.<br><br>2.  MHRT officers will assume primary responsibility for responding to incidents involving mentally ill; will be called to scene of any incident unless need for fast action makes this impossible; will respond to radio runs.<br><br>3.  MHRT officers shall receive multi-disciplinary intervention training with emphasis on de-escalation, | 1. Development and distribution of appropriate policies.<br>2.  Proper training on policy and MHRT role.<br>3.  Creation of MHRT cadre and proper implementation of MHRT in actual practice.<br>4.  Development and implementation of partnership with mental health care providers. | 1.  CPD policy meets the MOA provision:  incidents involving the mentally ill will be handled by MHRT officers.<br>2.  MHRT training is multi-disciplinary; it involves and has been reviewed by experts in various disciplines (mental health professionals, psychiatrists, alcohol and substance abuse, social workers, use of force experts, legal) as well as other constituencies (mental health consumers, families); the training emphasizes de-escalation. There is in-service training as well as initial training.  CPD dispatchers are also trained on MHRT policy and role.<br><br>3.  Trained MHRT officers are available during all shifts. The CPD dispatches MHRT officers from another District to MHRT | 1.  CPD Procedure on incidents involving the mentally ill.<br>2.  MHRT curriculum, lesson plan and other training materials, including dispatcher training; documentation of training instructors, MHRT officers and dispatchers; observation of training.<br>3. MHRT Deployment Summary, and tracking by District, shift, and date; CAD deployment records; Form 18 Reports reflecting mental illness of subjects; audits of reports underlying MHRT deployment summary, especially designation of "MHRT officer disregarded" and "MHRT cancelled" to determine whether CPD response was appropriate; interviews and meeting with CPD officials, mental health care professionals, and the consumer community; survey of MHRT officers.<br>4.  Descriptions of MCU, partnership plan; interviews of officers and mental |

| MOA ¶ | MOA PROVISION | MOA REQUIREMENTS, ACTIVITIES TO BE MONITORED | DEFINITION OF COMPLIANCE | DOCUMENTS AND SOURCES |
|---|---|---|---|---|
| | including instruction from mental health practitioners, alcohol and drug abuse counselors.<br><br>4.  CPD will implement a partnership with mental health care professionals that makes such professionals available to assist CPD onsite with interactions with mentally ill persons. | | calls in Districts that do not have an MHRT officer working at the time.   There is an appropriate response by CPD to MHRT calls in greater than 94% of MHRT incidents. An appropriate response either means response by an MHRT officer, or a legitimate reason for not dispatching an MHRT officer.<br><br>4.  CPD partners with mental health care professionals for on-site assistance. The Monitor Team will make a qualitative judgment regarding whether the Mobile Crisis Team is being used. | health professionals; records of MCU/CPD response. |
| | Foot Pursuit | | | |
| 11 | CPD will develop foot pursuit policy; the policy will require officers to consider particular factors in determining whether a foot pursuit is appropriate. The policy will emphasize alternatives to foot pursuits. | 1. Development and distribution of appropriate policies<br><br>2.  Proper training on policy<br><br>3.  Proper implementation in actual practice | 1.  CPD procedures meet the MOA policy requirement.<br><br>2.  Training on the foot pursuit policy is included in recruit and in-service training.<br><br>3. For incidents involving foot pursuits, there is documentation of either (a) the appropriateness of the pursuit and the presence of the factors stated in the MOA, or (b) a review by a supervisor of the soundness of the pursuit, and, | Procedure 12.536; Procedure 12.545; training materials [Patrol Guide; curricula and lesson plans for in-service and recruit training; roll call scenarios]; incident reports and investigations of incidents involving foot pursuits. |

| MOA ¶ | MOA PROVISION | MOA REQUIREMENTS, ACTIVITIES TO BE MONITORED | DEFINITION OF COMPLIANCE | DOCUMENTS AND SOURCES |
|---|---|---|---|---|
| | | | where unsound, appropriate counseling or other corrective action was taken by supervisor. | |
| | **Use of Force Policy** | | | |
| 12 | CPD will adopt a Use of Force Procedure that complies with seven subparts: clearly defined terms; defines force as defined in MOA; incorporates a use of force model relating officer's force options to suspect's actions; reinforces that individuals should be given opportunity to surrender; advises that excessive force will subject officers to discipline; prohibits choke holds except where deadly force is authorized; and removes the term "restraining force" from CPD Procedures. | 1. Development and distribution of appropriate policies<br><br>2. Proper training on policy<br><br>3. Proper implementation in actual practice | 1. CPD policy meets the MOA requirements.<br><br>2. Training on policy in both recruit and in-service training (compliance with the training aspect of this paragraph generally will be evaluated as part of paragraphs 80-81).<br><br>3. Qualitative assessment of compliance with policy in the field (e.g., that officers use force options that are reasonably related to the subject's conduct and level of resistance; that officers allow individuals to submit to arrest before force is used; chokeholds and carotid holds are not used except in deadly force situations). Appropriate supervision in field and corrective action taken for noncompliance with policy. | CPD Procedure 12.545; curricula, lesson plans, roll call scenarios and other use of force training materials; observation of training; Use of Force Reports and investigative files of use of force incidents and citizen complaints involving use of force. |
| | **Dissemination of Policy** | | | |

| MOA ¶ | MOA PROVISION | MOA REQUIREMENTS, ACTIVITIES TO BE MONITORED | DEFINITION OF COMPLIANCE | DOCUMENTS AND SOURCES |
|---|---|---|---|---|
| 13 | CPD will make available proposed policy revisions to the Community Councils and other community groups, for review, comment and education.  Policy revisions will be published on CPD's website to allow comments to be provided directly to the CPD. | Dissemination of proposed policies and public access to policy revisions. | All new policies are posted on the CPD website. Major policy revisions are shared publicly in proposed form for review and comment. | CPD website. |
| | Chemical Spray | | | |
| 14 | CPD will adopt a chemical spray policy that (a) clearly defines terms; (b) limits use of spray to cases where force is necessary to protect persons from physical harm or necessary to effect arrest of actively resisting subject, or to prevent escape of subject; (c) requires that spray can be used only where verbal commands are | 1. Development and distribution of appropriate policies<br><br>2.  Proper training on policy<br><br>3.  Proper implementation in actual practice | 1.  CPD policy contains the elements required by ¶14.<br><br>2.  Academy and in-service training fairly, accurately, and appropriately summarizes the principles of the chemical spray policy.<br><br>3.  Quantitative measure (greater than 94%) for subparts 14b, c, e, f, g and h. Qualitative review of subparts 14d, i, j and k.<br><br>For provision where there are a limited number of incidents [(d) crowd deployment, (i) medical response, (j) officer not to keep | CPD Procedure 12.545; training materials; sample of Use of Force Reports and investigations of use of force incidents and citizen complaints involving use of chemical spray.<br><br>For chemical spray investigations, the Monitor will:<br><br>(b, c) calculate rate of appropriate uses of chemical spray (number of investigations where spray is appropriately used/number of investigations reviewed).<br><br>(e) calculate "warning rate" (number of incidents in which a warning was |

| MOA ¶ | MOA PROVISION | MOA REQUIREMENTS, ACTIVITIES TO BE MONITORED | DEFINITION OF COMPLIANCE | DOCUMENTS AND SOURCES |
|---|---|---|---|---|
| | ineffective; (d) requires supervisory approval for use of chemical spray against crowd; (e) verbal warning is necessary unless it would present danger, and time for complying with warning is provided; (f) requires officers to aim spray at target's face and upper torso; (g) provides guidance on proper duration and distance; (h) requires decontamination; (i) requires medical response in certain circumstances; (j) provides that officers not keep subject in face down position any longer than necessary; (k) provides that chemical spray may be used on a restrained individual only when the | | subject in face down position] we will examine the individual incidents for compliance. | given or there is documentation of exigent circumstances/ number of incidents reviewed)<br><br>(f, g) calculate rate of appropriate targeting, duration and distance (number of uses where officers aim at target's face or upper torso/number of investigations)<br><br>(h) calculate decontamination rate (number of incidents where decontamination is offered/total number of incidents; subjects who refuse decontamination will be counted as being offered decontamination) |

| MOA ¶ | MOA PROVISION | MOA REQUIREMENTS, ACTIVITIES TO BE MONITORED | DEFINITION OF COMPLIANCE | DOCUMENTS AND SOURCES |
|---|---|---|---|---|
| | subject, or another, is likely to suffer injury or escape. | | | |
| | **Investigations of Spray on Restrained Persons** | | | |
| 15 | 1.  Sprays against restrained person will be investigated by a supervisor, who must take taped statements of all witnesses.<br><br>2.  These investigations will be reviewed and signed by Inspections. | 1. Development and distribution of appropriate policies<br><br>2.  Proper training on policy<br><br>3.  Proper implementation in actual practice | CPD policy requires supervisory investigation, with tapes, and requires Inspections review. Training on supervisory investigations is conducted. Investigations of chemical spray on restrained persons are investigated by supervisors, with taped statements, and reviewed and signed by Inspections. | CPD Procedure 12.545; Inspections SOPs; training materials regarding force investigations; sample of investigations of chemical sprays on restrained persons. |
| | **Restraint Equipment** | | | |
| 16 | CPD will have sufficient equipment in their police cars to properly restrain subjects, and train officers to use the equipment. | | Greater than 94% of police vehicles have working seat belts and lap bars. CPD training includes training on the use the restraining equipment. Qualitative assessment of incidents in which violent prisoners were transported; supervisors should document the use of restraints (e.g., seat belt and/or lap bar) or review the reasons why the restraints were not used. | Documentation of car equipment. Training materials from recruit and in-service training. Sample of use of force and complaint investigations. |
| | **Training on Chemical Spray** | | | |

| MOA ¶ | MOA PROVISION | MOA REQUIREMENTS, ACTIVITIES TO BE MONITORED | DEFINITION OF COMPLIANCE | DOCUMENTS AND SOURCES |
|---|---|---|---|---|
| 17 | CPD will provide regular in-service training on proper amount of spray to use, how to deliver spray effectively, and the proper targets for chemical spray | Appropriate in-service training on use of chemical spray. | Training fairly, accurately, and appropriately summarizes the principles of the chemical spray policy, and the required content of ¶17 (identical to the requirements of ¶81). Training is provided to officers at least annually during in-service use of force training. | Training curriculum and lesson plans; observation of in-service training. |
| | Chemical Spray Canisters | | | |
| 18 | CPD will maintain an accounting of the number of CS canisters annually distributed to and used by each officer. | | In over 94% of cases, CPD maintains a record for each CS canister used and replaced. (Review and assessment will be combined with ETS assessment, ¶57.) | CPD equipment records, canister replacement summary table; data contained in the ETS system. |
| | Research on Chemical Spray | | | |
| 19 | CPD will periodically review current research regarding the choice of chemical spray and consider the effectiveness and risk of injury to subjects in determining the optimal chemical spray for CPD usages. | | Research review undertaken at least every 18 months. Qualitative assessment of whether review identified current research and evaluated CPD experience with existing chemical spray. | Documentation of CPD research efforts. Discussions with Inspections Section or others. |
| | Canines | | | |

| MOA ¶ | MOA PROVISION | MOA REQUIREMENTS, ACTIVITIES TO BE MONITORED | DEFINITION OF COMPLIANCE | DOCUMENTS AND SOURCES |
|---|---|---|---|---|
| 20 | CPD will revise its Canine policies and procedures:<br><br>(a) CPD will improve its canine operations by introducing an improved handler-controlled alert curriculum and the use of new canines. The canine policy will be approved by DOJ.<br><br>(b) Off leash deployments and other instances where there is a significant risk of canine bite shall be limited to searches of commercial buildings or instances in which the suspect is wanted for an offense of violence or reasonably is suspected to have a weapon<br><br>(c) Supervisor's approval is necessary for deployment<br><br>(d) Loud and clear canine announcement | 1. Development and distribution of appropriate policies<br><br>2. Proper training on policy<br><br>3. Proper implementation in actual practice | (a) DOJ approval of policy; canine training that is consistent with the policy and emphasizes handler control of and contact with the canine to ensure that the canine is not allowed to bite a suspect without legal justification (see ¶84); use of canines trained under the "improved handler-controlled alert curriculum."<br><br>(b) greater than 94% of off-leash deployments meet the MOA criteria.<br><br>(c) greater than 94% of all deployments were authorized by a supervisor.<br><br>(d) greater than 94% of all deployments had a canine announcement, or documentation for why a canine announcement was not made.<br><br>(e) qualitative review of canine bite investigations to determine whether canine bite was consistent with policy; canine bites only when the subject posed a risk of harm, was actively resisting or escaping (as stated in | Canine Procedure 12.140; canine training curriculum, lesson plans and materials; observation of canine training, and ride-alongs. Canine deployment forms; canine-bite investigations; bite ratio statistics; ETS system data; interviews of canine team supervisor and members. |

| MOA ¶ | MOA PROVISION | MOA REQUIREMENTS, ACTIVITIES TO BE MONITORED | DEFINITION OF COMPLIANCE | DOCUMENTS AND SOURCES |
|---|---|---|---|---|
| | required; interval between announcement and deployment required to allow suspect to surrender<br><br>(e) Handlers will not allow canine to bite a suspect except where suspect poses imminent risk of danger or is actively resisting or escaping<br><br>(f) Handler will call off dog at first possible moment the canine can safely be released. Policy will prohibit nonresistant suspects from being bitten. Immediate medical treatment for any injuries must be provided.<br><br>(g) CPD shall track canine deployments and canine apprehensions and calculate bite ratios on a monthly basis for the canine unit and | | Procedure 12. 140, in cases of concealment, handlers will not allow their canine to engage a suspect by biting if a lower level of force could reasonably be expected to control the suspect or allow for the apprehension)<br><br>(f) qualitative review of bite investigations for consistency with policy.<br><br>(g) Monthly statistics are calculated by CPD and provided to Monitor each quarter.<br><br>(h) The ETS system incorporates bite ratios for canine teams and the entire unit. Bite ratios over 20% trigger a review by the canine supervisor of the canine team's performance. | |

| MOA ¶ | MOA PROVISION | MOA REQUIREMENTS, ACTIVITIES TO BE MONITORED | DEFINITION OF COMPLIANCE | DOCUMENTS AND SOURCES |
|---|---|---|---|---|
| | canine teams.<br><br>(h) CPD shall include canine bite ratios in the risk management system and review the performance of handlers or the canine unit when the bite ratio is over 20 percent. | | | |
| | Beanbag Shotguns | | | |
| 21 | CPD will revise its beanbag shotgun and 40 millimeter foam rounds policy:  (a) clearly define terms; (b) weapons may be used only to subdue or incapacitate a subject to prevent imminent physical harm; (c) prohibit use of weapon to prevent theft or vandalism; (d) prohibit use of weapon against crowd, absent ability to specifically target individual posing an imminent threat of harm; (e) provide that use of the weapon can be inappropriate even if | 1. Development and distribution of appropriate policies<br><br>2.  Proper training on policy<br><br>3.  Proper implementation in actual practice | Procedure 12.545 meets the MOA requirements. Academy and in-service training fairly, accurately, and appropriately summarizes the principles of the beanbag shotgun and foam round policy. Quantitative review of incident investigations to assess compliance with requirements. | CPD Procedure 12.545; beanbag weapon training materials; use of force and citizen complaint investigations involving beanbag shotguns or 40 millimeter foam rounds. |

| MOA ¶ | MOA PROVISION | MOA REQUIREMENTS, ACTIVITIES TO BE MONITORED | DEFINITION OF COMPLIANCE | DOCUMENTS AND SOURCES |
|---|---|---|---|---|
| | the alternative is to let the subject escape require that a supervisor approve use of weapon in a crowd situation, absent exigent circumstances. | | | |
| | Simultaneous Beanbag Rounds | | | |
| 22 | CPD will limit simultaneous beanbag shotgun and 40 mm foam rounds against a single individual. Use of Force reports for beanbag shotgun and 40 mm foam rounds will include the distance between the officer and the subject. | Same as ¶21. | CPD policy meets MOA requirements. Qualitative evaluation of beanbag shotgun or 40 mm foam round incidents. | Procedure 12.545; Use of Force Reports (Form 18TBFP) and use of force investigations and citizen complaints involving beanbag or foam rounds. |
| | Warning of Beanbag Rounds | | | |
| 23 | Absent exigent circumstances, verbal warnings will be given before a beanbag shotgun or foam round is used. | Same as ¶21. | CPD policy meets MOA requirements; qualitative review of incidents. | Procedure 12.545; Use of force and citizen complaint investigations involving beanbag or foam rounds. |
| | Documentation of Use of Force | | | |

94

| MOA ¶ | MOA PROVISION | MOA REQUIREMENTS, ACTIVITIES TO BE MONITORED | DEFINITION OF COMPLIANCE | DOCUMENTS AND SOURCES |
|---|---|---|---|---|
| 24 | Uses of force will be reported as follows (except for hard hands without injury):<br><br>1.  Use of force report will indicate each and every type of force used, and require the evaluation of each use of force<br><br>2.  Use of force reports will include a narrative description of the use of force and events preceding it, and the officer(s)' audiotaped statement. [Hard hands and takedowns with injury not requiring hospitalization do not require audiotaped interviews.]<br><br>3.  CPD will implement an automated system to allow supervisors to access use of force information, by multiple variables. | 1. Development and distribution of appropriate policies<br><br>2.  Proper training on policy<br><br>3.  Proper implementation in actual practice | CPD policies meet the requirements of the MOA.<br><br>1.  Greater than 94% of use of force reports indicate each and every type of force used and include an evaluation of the use of force.<br><br>2. Greater than 94% of force reports include narrative description and the officer's taped statements (except takedowns with injury).<br><br>3.  Use of force information is entered into the ETS System; the ETS system allows supervisors to access use of force information.<br><br>4.  Greater than 94% of canine deployments result in completed forms, and forms include narrative description, and are reviewed and evaluated by the canine supervisor. | Procedure 12.545; training curricula and materials on use of force reporting; Use of Force Reports; sample of use of force and complaint investigations; canine deployment forms; review of ETS system. |

95

| MOA ¶ | MOA PROVISION | MOA REQUIREMENTS, ACTIVITIES TO BE MONITORED | DEFINITION OF COMPLIANCE | DOCUMENTS AND SOURCES |
|---|---|---|---|---|
| | 4. For canine deployments that do not result in a bite, the handler will complete a deployment form providing a narrative. The canine supervisor will review the narrative and evaluate whether the handler complied with CPD policy and used proper tactics and control. | | | |
| 24 (Modi -fied) | For hard hands and takedowns without injury: (1) Officer notifies supervisor of use of force; (2) officer completes a Non-Compliant Suspect Form (18NC), with a description of the events leading to the use of force and each and every type of force used; (3) a supervisor reviews the form and evaluates whether the use of force was within policy and | Same as ¶24 above. | Greater than 94% of Non-Compliant Suspect forms include a description of the events and all uses of force, include written comments by a supervisor evaluating the officer's tactics and use of force, and reflect a review by Inspections Section. | Sample of Non-Compliant Suspect Forms, with any associated reports; training curriculum and materials on officer reporting of hard hands and takedowns without injury. |

96

| MOA ¶ | MOA PROVISION | MOA REQUIREMENTS, ACTIVITIES TO BE MONITORED | DEFINITION OF COMPLIANCE | DOCUMENTS AND SOURCES |
|---|---|---|---|---|
| | whether the officer used appropriate tactics;(4) Inspections Section reviews the form for tactical errors, and legal, policy, and training issues. | | | |
| | Use of Force Investigation | | | |
| 26 | For any use of force or allegation of excessive force:<br><br>(1) officer will notify supervisor, and supervisor will respond to scene; (2) supervisor will ensure medical attention is called if needed (3) incidents will not be investigated by supervisor who used force or authorized use of force, or whose conduct led to the reportable incident. | 1. Development and distribution of appropriate policies<br><br>2.  Proper training on policy<br><br>3.  Proper implementation in actual practice | A supervisor responds to scene in over 94% of incidents. In over 94% of the incidents, the supervisor who investigates and completes the use of force report was not involved in the use of force incident. Qualitative assessment for medical attention. | Procedure 12.545; training curriculum and materials on use of use of force investigations; Use of Force Reports and use of force and citizen complaint investigations; CAD reports from use of force incidents. |
| | Supervisory Investigation | | | |
| 27 | 1.  Supervisors will investigate, evaluate | Same as ¶26 above. | 1.  In over 94% of investigations sampled, supervisors evaluate and | Same as ¶26 above. |

| MOA ¶ | MOA PROVISION | MOA REQUIREMENTS, ACTIVITIES TO BE MONITORED | DEFINITION OF COMPLIANCE | DOCUMENTS AND SOURCES |
|---|---|---|---|---|
| | and document each incident giving rise to a use of force and injury to prisoner for compliance with CPD policy and evaluate the tactics of the officer. The documentation will consist of a precise description of the facts and circumstances that either justify or fail to justify the officer's conduct.<br><br>2. As part of the investigation, the supervisor will review the basis for the initial stop or seizure and determine whether the officer's actions were within CPD policy. | | document their review of the officer's use of force and the officer's tactics for compliance with CPD policies. The supervisor's review and evaluation of the officer's use of force, tactics and basis for the stop or seizure is based on the facts and circumstances that either justify or fail to justify the officer's conduct.<br><br>2. In over 94% of investigations sampled, supervisors evaluate and document their review of the officer's initial stop or seizure for compliance with CPD policies. | |
| | IIS Response | | | |
| 28 | 1. IIS will respond to scene of, and investigate, all serious uses of force and all canine bites which cause serious injury or hospitalization. | | Qualitative review of (1) and (2). | Use of Force reports, use of force and citizen complaint investigations; Inspections Section's critical review reports; Inspections Section SOPs. |

| MOA ¶ | MOA PROVISION | MOA REQUIREMENTS, ACTIVITIES TO BE MONITORED | DEFINITION OF COMPLIANCE | DOCUMENTS AND SOURCES |
|---|---|---|---|---|
| | 2.  Inspections will review and evaluate in writing investigations of canine bites, beanbag shotgun, foam rounds or baton. | | | |
| | Use of Force Investigation | | | |
| 29 | 1.  CPD will prohibit investigators from asking leading questions that improperly suggest legal justifications for officer's conduct.<br><br>2.  CPD will consider all relevant evidence, as appropriate, and make credibility determinations.<br><br>3.  No automatic preference for officers' statements over witnesses' statements. CPD will not disregard statement of interested witnesses.<br><br>4.  CPD will make efforts to resolve material inconsistencies between | Same as ¶26 above. | From a sample of investigations, Monitor Team will make a qualitative assessment of whether investigators considered all relevant evidence, did not use improper leading questions, did not improperly discount the statements of witnesses, and made efforts to resolve inconsistencies between witness statements. | Same as ¶26 above. |

| MOA ¶ | MOA PROVISION | MOA REQUIREMENTS, ACTIVITIES TO BE MONITORED | DEFINITION OF COMPLIANCE | DOCUMENTS AND SOURCES |
|---|---|---|---|---|
| | witness statements, and will train supervisors on factors to consider when evaluating witness or complainant credibility. | | | |
| | Force Investigations | | | |
| 30 | 1. All officers witnessing a use of force or injury to prisoner shall provide a statement.<br><br>2. Use of Force Reports identify all officers involved in the incident or on the scene when it occurred.<br><br>3. All Use of Force Reports will document whether medical care was provided, and whether the subject refused medical treatment. | Same as ¶26 above | In over 94% of the cases in a sample of investigations, all officers involved in or at the scene of a use of force are identified on the Use of Force Report, and all officers witnessing the use of force provide a statement. Whether medical care is provided or refused is documented in over 94% of the Use of Force Reports sampled. | Procedure 12.545; Use of Force Reports; sample of use of force and citizen complaint investigations involving uses of force. |
| | Review of Force Investigations | | | |
| 31 | 1. A supervisor at the rank of lieutenants or higher will review each investigation, identify | Same as ¶26 above. | 1. Over 94% of sample use of force investigations reflect review by lieutenant or higher. | Sample of use of force investigations and citizen complaints involving use of force. |

| MOA ¶ | MOA PROVISION | MOA REQUIREMENTS, ACTIVITIES TO BE MONITORED | DEFINITION OF COMPLIANCE | DOCUMENTS AND SOURCES |
|---|---|---|---|---|
| | any deficiencies, and require that any deficiencies be corrected.<br><br>2. Supervisors will be held accountable for the quality of their investigations. Non-disciplinary corrective action and/or discipline will be taken when a supervisor fails to conduct a thorough investigation, make an appropriate determination, or take appropriate corrective action. | | 2. Qualitative review of investigations and actions taken by CPD in cases where the supervisor failed to conduct a thorough investigation. | |
| | Firearms Discharge Investigations | | | |
| 32 | Firearms discharge investigations will account for all shots, locations of officers, to the extent possible. CPD will conduct appropriate ballistics or crime scene analysis, including gunshot residue or ballistics trajectory | | Qualitative assessment of investigations. | Firearms discharge investigations; Firearms Discharge Board Reports. |

| MOA ¶ | MOA PROVISION | MOA REQUIREMENTS, ACTIVITIES TO BE MONITORED | DEFINITION OF COMPLIANCE | DOCUMENTS AND SOURCES |
|---|---|---|---|---|
| | tests. | | | |
| | Firearms Discharge Board | | | |
| 33 | A Firearms Discharge Board will review the IIS and CIS investigation of a critical firearms discharge for compliance with CPD policy, as well as for tactical and training implications. The Board will prepare a report that includes a description of the incident, a summary and analysis of all relevant evidence, proposed findings and analysis to support those findings. The board will determine: (a) whether the uses of force were consistent with CPD policy and training; (b) whether the officer used proper tactics; and (c) whether lesser force alternatives reasonably were available. The FDB will | 1.  Creation of FDB.<br><br>2.  FBD review of IIS and CIS investigations.<br><br>3.  FDB reports. | Creation and membership of Board are consistent with MOA provision; FDB reports contain the required documentation and information, as specified in this MOA paragraph; qualitative review of FDB reports. | Procedure 12.550; listing of members of Firearms Discharge Board; reports of FDB relating to shooting incidents, and IIS and CIS investigations of firearms discharges.  Monitor Team observation of Firearms Discharge Board meetings is another possible source. |

| MOA ¶ | MOA PROVISION | MOA REQUIREMENTS, ACTIVITIES TO BE MONITORED | DEFINITION OF COMPLIANCE | DOCUMENTS AND SOURCES |
|---|---|---|---|---|
| | include at least a member of CPD command staff, a Training Academy representative, the affected Bureau Commander and an attorney from the Solicitor's Office. | | | |
| | FDB Policy | | | |
| 34 | CPD policy on the FDB will:<br><br>a.  require review of firearms discharge within 90 days of end of all criminal reviews of incident;<br><br>b.  set out membership of Board;<br><br>c.  authorize the Board to recommend policy changes to the Chief;<br><br>d.  require the Board to act as a quality control mechanism for shooting investigations, returning incomplete investigations for | 1.  Development of FDB policy.<br><br>2.  FDB acts in conformity with requirements, including<br>• Performing timely reviews<br>• Serving quality control function<br><br>3.  FDB conducts annual review of all critical firearms discharges. | Policy conforms to MOA provision. Firearms discharges are reviewed within 90 days of the end of all criminal reviews of the incident. Qualitative assessment of FDB reports, including whether Board acts as "quality control mechanism" and returns incomplete investigations for additional work.  Board conducts an annual review of firearms discharges, and reports its findings and recommendations to the Chief. | Procedure 12.550; annual report of Firearms Discharge Board; FDB reports. |

103

| MOA ¶ | MOA PROVISION | MOA REQUIREMENTS, ACTIVITIES TO BE MONITORED | DEFINITION OF COMPLIANCE | DOCUMENTS AND SOURCES |
|---|---|---|---|---|
| | additional work;<br><br>e. authorize the Board to recommend to the Chief investigative protocols and standards for all critical firearms discharge investigations<br><br>f. require the Board to annually review each critical firearms discharge to detect patterns and/or problems and report its findings and recommendations to the Chief. | | | |
| | Citizen Complaints | | | |
| 35 | The City and CPD will implement a program to inform persons that they may file complaints regarding the performance of CPD officers. The program will include distribution of complaint forms, fact sheets, informational posters and PSAs. | Development of information campaign on filing citizen complaints. | Qualitative review of public information campaign; availability of complaint forms and information in police districts. | Complaint forms, PSAs, posters, description of public information campaign. |
| | Complaint Availability | | | |

| MOA ¶ | MOA PROVISION | MOA REQUIREMENTS, ACTIVITIES TO BE MONITORED | DEFINITION OF COMPLIANCE | DOCUMENTS AND SOURCES |
|---|---|---|---|---|
| 36 | 1.  City will make complaint forms and material available at districts, libraries other public locations, and over the internet. Officers will carry forms and brochures in their vehicles at all times.<br><br>2.  If a citizen objects to an officer's conduct, that officer will inform citizen of the right to make a complaint. Officers will not discourage any person from making a complaint. | 1. Development and distribution of appropriate policies<br><br>2.  Proper training on policy<br><br>3.  Proper implementation in actual practice | 1.  Based on CPD audits, more than 94% of police vehicles have complaint forms. Police Districts and libraries have complaint forms when checked by Monitor team.<br><br>2.  Qualitative assessment by Monitor team of whether citizen complaint files indicate any discouragement of complaint. | Complaint forms and brochures; Procedure 15.100; audits and inspections records of police facilities and police vehicles.<br>Training curricula and materials regarding citizen complaints.<br><br>Sample of citizen complaint investigations; possible complaint audits (conducted by CPD or others). |
|  | Openness of the Complaint Process |  |  |  |
| 37 | 1.  Complaints may be made in writing or verbally, in person or by mail, telephone, fax, or e-mail.<br><br>2.  Front desk duty officers will be authorized to take complaints, including | Same as ¶36 above. | 1.  Procedures are consistent with the MOA provision, and complaints are not rejected because of the form of the complaint.<br><br>2.  Officers are trained and policy is reviewed regarding accepting complaints.<br><br>3.  Over 94% of complaints result | Procedure 15.100; training curricula and materials regarding citizen complaints; complaint forms; sample of citizen complaint investigations. |

| MOA ¶ | MOA PROVISION | MOA REQUIREMENTS, ACTIVITIES TO BE MONITORED | DEFINITION OF COMPLIANCE | DOCUMENTS AND SOURCES |
|---|---|---|---|---|
| | third party complaints. Officers taking complaint may describe facts that bear on complainant's demeanor and physical condition, but may not express opinions regarding complainant's mental competency or veracity.<br><br>3. A complaint form will be completed each time a person attempts to file a complaint, except if person is only contending they are innocent of a charge. Each complaint will be assigned a unique identifier, which will be provided to the complainant.<br><br>4. Each complaint will be resolved in writing. | | in a written complaint form being completed and the complaint number is provided to the complainant.<br><br>4. Over 94% of citizen complaints are resolved in writing. | |
| | Process of Complaint | | | |
| 38 | Complaints filed with the CCRP, OMI, CCA or Cincinnati Human Relations Commission will be forwarded to IIS | | Over 94% of complaints filed in other offices are forwarded to IIS within five business days. | Citizen complaint files; IIS complaint records. |

| MOA ¶ | MOA PROVISION | MOA REQUIREMENTS, ACTIVITIES TO BE MONITORED | DEFINITION OF COMPLIANCE | DOCUMENTS AND SOURCES |
|---|---|---|---|---|
| | within five business days. | | | |
| | Investigating Officer | | | |
| 40 | An officer using force, authorizing force, or whose conduct led to a use of force shall be prohibited from investigating the use of force. | | In over 94% of use of force incidents, officer investigating incident was not involved in, nor authorized, the use of force. | Procedure 15.100; Procedure 12.545; Use of Force Reports, sample of investigations of use of force and citizen complaints involving force (including CCRPs). |
| | Complaint Investigation | | | |
| 41 | 1. CPD and CCA will consider all relevant evidence, including circumstantial, direct and physical evidence, as appropriate, and make credibility determinations.<br><br>2.  There will be no automatic preference for an officer's statement over a non-officer's statement, nor will CCA or CPD disregard a witness's statement because the witness has a connection to the complainant. | 1. Development and distribution of appropriate policies<br><br>2.  Proper training on policy<br><br>3.  Proper implementation in actual practice | From a sample of investigations, the Monitor Team will make a qualitative assessment of whether investigators considered all relevant evidence, did not use improper leading questions, did not improperly discount the statements of witnesses or improperly credit the statements of officers, and made efforts to resolve inconsistencies between witness statements. Qualitative review of CPD and CCA training for investigators, including training on making credibility assessments. | Procedure 15.100; training curriculum and other training materials for investigators; observation of training; sample of CCA and IIS citizen complaint investigations, including taped statements of witnesses. |

| MOA ¶ | MOA PROVISION | MOA REQUIREMENTS, ACTIVITIES TO BE MONITORED | DEFINITION OF COMPLIANCE | DOCUMENTS AND SOURCES |
|---|---|---|---|---|
| | 3.  CCA and CPD will make efforts to resolve material inconsistencies between witness statements. CPD and CCA will train their investigators on factors to consider when evaluating credibility.

4.  The CPD and CCA will prohibit investigators from asking improper leading questions.

5.  CPD investigators will ensure that all officers on the scene of an incident provide a statement regarding the incident. | | | |
| | Complaint Investigations | | | |
| 42 | 1.  All relevant police activity, including each use of force, will be investigated.

2.  The investigation will also evaluate any searches or seizures | | Qualitative assessment of investigations:  investigations follow the procedures specified in ¶42. | Procedure 15.100; citizen complaint investigations; training curriculum and materials. |

| MOA ¶ | MOA PROVISION | MOA REQUIREMENTS, ACTIVITIES TO BE MONITORED | DEFINITION OF COMPLIANCE | DOCUMENTS AND SOURCES |
|---|---|---|---|---|
| | that occurred.<br><br>3.  CCA and CPD will not close investigation simply because complaint is withdrawn or alleged victim unable to provide medical records. The fact that a complainant pled guilty or was found guilty of an offense will not be considered as evidence that a CPD officer did or did not use force, nor will it justify discontinuing an investigation. | | | |
| | Complaint Investigations | | | |
| 43 | Complainant will be kept informed of the status of the investigation; upon completion of the investigation, the complainant will be notified of its outcome, including an appropriate statement concerning whether any | | Over 94% of complaint files document notification to the complainant. | Complaint investigations; notification letters to complainants. |

| MOA ¶ | MOA PROVISION | MOA REQUIREMENTS, ACTIVITIES TO BE MONITORED | DEFINITION OF COMPLIANCE | DOCUMENTS AND SOURCES |
|---|---|---|---|---|
| | corrective or disciplinary action was taken. | | | |
| | Complaint Dispositions | | | |
| 44 | Each allegation will be resolved by making one of the following dispositions: unfounded, sustained (including "sustained-other"), not sustained, exonerated. | | Over 94% of complaints are resolved using one of the four dispositions. | CCA and CPD complaint investigations (including CCRPs). |
| | Commander Recommendations | | | |
| 45 | Unit Commanders will evaluate each investigation of an incident under their command to identify underlying problems and training needs.  Any such problems or needs will be relayed in the form of a recommendation to the appropriate CPD entity. | | Underlying problems that are identified by Unit Commanders are relayed to appropriate CPD entities with a recommendation. | Sample of investigations; recommendations from Unit Commanders. |
| | IIS Jurisdiction | | | |
| 46 | IIS will investigate all complaints regarding use of force, the | | Over 94% of investigations are investigated by the appropriate | Documentation of citizen complaints and the CPD entity investigating the |

| MOA ¶ | MOA PROVISION | MOA REQUIREMENTS, ACTIVITIES TO BE MONITORED | DEFINITION OF COMPLIANCE | DOCUMENTS AND SOURCES |
|---|---|---|---|---|
| | pointing of firearms at persons, searches or seizures, and discrimination.  Only complaints not falling within the jurisdiction of IIS will be eligible for the CCRP. | | CPD entity. | complaint; sample of investigations. |
| **CCRP Investigations** | | | | |
| 47 | Complaints handled through the CCRP will be fully investigated and adjudicated prior to a complaint resolution meeting.  The willingness of the complainant to participate in a resolution meeting and the outcome of the meeting will have no bearing on the investigation or adjudication of the complaint. | | Over 94% of CCRP complaints are fully investigated and adjudicated before the resolution meeting.

Qualitative determination that participation or not in the resolution meeting did not have a bearing on the investigation or the adjudication. | CCRP investigations; CCRP resolution documents; Inspections audit of CCRP files. |
| 48 | CCRP complaints will be investigated by the chain of command.

(1) The investigator will | | 1.  Over 94% of CCRP investigations include a report containing the items required by this paragraph. | Same as ¶47 |

| MOA ¶ | MOA PROVISION | MOA REQUIREMENTS, ACTIVITIES TO BE MONITORED | DEFINITION OF COMPLIANCE | DOCUMENTS AND SOURCES |
|---|---|---|---|---|
| | prepare a report that will include: a description of the incident; a summary and analysis of all relevant evidence gathered during the investigation; proposed findings regarding whether the conduct comports with CPD policy and analysis supporting the findings.<br><br>(2) The District or Unit Commander will review the investigation to ensure that it is complete and that the findings are supported by the evidence.  The District or Unit Commander will order additional investigation when appropriate. | | 2.  In over 94% of the CCRP investigations, the District or Unit Commander reviews the investigation to ensure that it is complete and that the findings are supported by the evidence.  The District or Unit Commanders order additional investigation where appropriate. | |
| | IIS Investigations | | | |
| 49 | In conducting investigations, IIS will (a) tape or videotape interviews of complainants, involved | | Over 94% of the IIS investigations follow the procedures specified in ¶49(a)-(g) | IIS investigative files |

| MOA ¶ | MOA PROVISION | MOA REQUIREMENTS, ACTIVITIES TO BE MONITORED | DEFINITION OF COMPLIANCE | DOCUMENTS AND SOURCES |
|---|---|---|---|---|
| | officers, and witnesses; where practical and appropriate conduct interviews at times and at places convenient for complainants and witnesses; (c) prohibit group interviews; (d) notify the involved officer(s)' supervisor of the investigation; (e) interview all appropriate CPD officers, including supervisors; (f) collect, preserve and analyze all appropriate evidence, including canvassing the scene, obtaining medical records; (g) identify and report in writing all material inconsistencies in officer and witness interview statements. | | | |
| 50 | (1) The investigator will prepare a report that will include: a description of the alleged misconduct and any other misconduct | | 1.  Over 94% of IIS investigations include an investigator's report that includes the items contained in ¶50, including other misconduct issues not alleged in the complaint but which were | |

| MOA ¶ | MOA PROVISION | MOA REQUIREMENTS, ACTIVITIES TO BE MONITORED | DEFINITION OF COMPLIANCE | DOCUMENTS AND SOURCES |
|---|---|---|---|---|
| | issues identified during the course of the investigation; a summary and analysis of all relevant evidence gathered during the investigation; proposed findings and analysis supporting the findings.<br><br>(2) Absent exceptional circumstances, IIS will complete investigations within 90 days after receiving the allegations. | | identified in the investigation.<br><br>2.  Over 94% of IIS investigations are completed within 90 days of receiving the allegations, or if not, IIS has obtained and documented an extension of time, based on exceptional circumstances. | |
| | CCA Investigations | | | |
| 51 | Within 120 days of the Agreement, CCA will assume all responsibilities specified for it and OMI in the Agreement. | | CCA is responsible for accepting and investigating citizen complaints and other responsibilities under this Agreement. | CCA and CCA Board procedures and documents, including minutes of CCA Board meetings. |
| 52 | (1) Each complaint (excluding criminal investigations) will be directed to the CCA regardless of where it initially is filed.<br><br>(2) CCA will have jurisdiction, at a | | 1.  100% of complaints, excluding criminal complaints) are directed to the CCA.<br><br>2.  CCA's jurisdiction includes excessive force, improper pointing of firearms, unreasonable search and seizure and discrimination complaints. | CCA procedures and policies; CCA case lists and matrices of complaints received and investigated; CCA staff figures. |

| MOA ¶ | MOA PROVISION | MOA REQUIREMENTS, ACTIVITIES TO BE MONITORED | DEFINITION OF COMPLIANCE | DOCUMENTS AND SOURCES |
|---|---|---|---|---|
| | minimum, over all complaints alleging excessive force, the improper pointing of firearms, unreasonable searches and seizures, and discrimination.<br><br>(3) All allegations within its jurisdiction will be actually investigated by CCA. CCA will accept complaints on behalf of third parties.<br><br>(4) The CCA will have sufficient number of professional investigators to achieve timely completion of all investigations. | | 3. CCA investigates over 94% of complaints allegations within the jurisdictional categories described in ¶52.<br><br>4. CCA has at least five professional investigators. | |
| 53 | CPD officers and City employees are required to submit to administrative questions from the CCA. The CCA Executive Director will have reasonable access to city records, documents and employees, including personnel records and | | City officials and CPD officers submit to administrative questions from the CCA.<br><br>The Executive Director has reasonable access to city records, documents and employees. | CCA investigative files; CPD procedures and SOPs; interview with CCA Executive Director. |

| MOA ¶ | MOA PROVISION | MOA REQUIREMENTS, ACTIVITIES TO BE MONITORED | DEFINITION OF COMPLIANCE | DOCUMENTS AND SOURCES |
|---|---|---|---|---|
| | departmental investigation files and reports. | | | |
| 54 | The City will develop formal procedures regarding timing, notification and the interviewing of witnesses to ensure that parallel investigations conducted by CCA and IIS do not impair the effective investigation of incidents. | The City develops and adopts formal procedure regarding timing, notification and interviewing of witnesses for parallel investigations conducted by the CCA and IIS. | Formal procedures are developed, adopted and implemented to ensure that parallel investigations of the CCA and IIS are conducted effectively. | CCA procedures; CPD procedures; joint procedures, MOU, or other documents describing the procedures to ensure effective parallel investigations. |
| 55 | The City will take appropriate action, including imposing discipline and providing for non-disciplinary corrective action where warranted, in regard to each investigation completed by CCA. | | In cases where CCA has determined that a complaint allegation has been sustained, and the City Manager agrees with the CCA determination, CPD takes appropriate corrective action, including discipline and non-disciplinary corrective action where warranted. | CPD discipline records, CCA investigative files; documentation of City Manager decisions on CCA cases. |
| 56 | (1) The CCA will complete its investigation within 90 days of the filing of the complaint, provided that the Executive Director may extend an investigation after consultation with the | | 1.  Over 94% of CCA investigations are completed within 90 days of the filing of the complaint, or if not, the CCA determined an extension of time was necessary and consulted the CCA Board.

2.  The City Manager takes action | CCA case lists and matrices; sample CCA investigative files; documentation of the City Manager's actions. |

| MOA ¶ | MOA PROVISION | MOA REQUIREMENTS, ACTIVITIES TO BE MONITORED | DEFINITION OF COMPLIANCE | DOCUMENTS AND SOURCES |
|---|---|---|---|---|
|  | CCA Board.<br><br>(2) The City Manager will take appropriate action within 30 days of the completion of CCA's investigation. |  | on a CCA investigation within 30 days of the completion of the investigation and the review of the investigation by the CCA Board. |  |
|  | Risk Management System |  |  |  |
| 57 | The CPD will enhance and expand its risk management system to include a new computerized relational database for maintaining, integrating, and retrieving data necessary for supervision and management of the CPD.  The CPD will use this data to promote civil rights and best police practices; to manage risk and liability; and to evaluate the performance of CPD officers across all ranks, units and shifts. |  | Compliance with ¶58-66 will constitute compliance with ¶57. |  |

117

| MOA ¶ | MOA PROVISION | MOA REQUIREMENTS, ACTIVITIES TO BE MONITORED | DEFINITION OF COMPLIANCE | DOCUMENTS AND SOURCES |
|---|---|---|---|---|
| 58 | The new risk management system will collect and record the following information: (a.) All uses of force; (b.) Canine bite ratios; (c.) Number of canisters of chemical spray used by officers; (d.) All injuries to prisoners; (e.) All instances where force is used and subject is charged with assault on a police officer, disorderly conduct, or obstruction of justice; (f.) All critical firearms discharges, on-duty and off-duty; (g.) All complaints and their dispositions; (h.) All criminal proceedings initiated and civil and administrative claims | | 1. The data required by ¶58(a)-(k) are correctly entered into the risk management system with a level of accuracy and completeness greater than 94%. | Data listed in ¶58(a)-(k); documents, records and data contained in and generated by the risk management system. |

| MOA ¶ | MOA PROVISION | MOA REQUIREMENTS, ACTIVITIES TO BE MONITORED | DEFINITION OF COMPLIANCE | DOCUMENTS AND SOURCES |
|---|---|---|---|---|
| | filed from CPD operations; <br><br> (i.)  All vehicle pursuits; <br><br> (j.)  All incidents involving the pointing of a firearm; <br><br> (k.)  All disciplinary actions taken against officers. | | | |
| 59 | The risk management system will include, for incidents included in the database, appropriate identifying information for each involved officer and civilian. | | Appropriate additional information regarding involved officers and civilians are recorded in risk management system with a level of accuracy and completeness greater than 94%. | Same as ¶58. |
| 60 | The CPD will prepare, for the review and approval of DOJ, a plan for including appropriate fields and values of new and historic data into the risk management system ("Data Input Plan").  The Data Input Plan will identify the data to be included and | | CPD develops a Data Input Plan that identifies the data and information required by this paragraph and obtains approval for the Data Input Plan from the DOJ.  The data is entered into the system in accordance with the Data Input Plan, including meeting the deadlines for entry of data. | Data Input Plan; training regarding input of data; documentation of the implementation of the Data Input Plan. |

| MOA ¶ | MOA PROVISION | MOA REQUIREMENTS, ACTIVITIES TO BE MONITORED | DEFINITION OF COMPLIANCE | DOCUMENTS AND SOURCES |
|---|---|---|---|---|
| | the means for inputting such data, the specific fields to be included, the time periods for the data, and the deadlines and responsibility for the input of the data. | | | |
| 61 | The CPD will prepare for the review and approval of DOJ and then implement a protocol for using the risk management system. The City will submit for review and approval of DOJ all proposed modifications to the protocol prior to implementing such modification. | | CPD has developed and DOJ approved a risk management system protocol.

CPD submits for DOJ approval all proposed modifications to the protocol prior to implementing such modifications. | Risk management system protocol; documentation of DOJ approval. |
| 62 | The protocol for using the risk management system will include:

(a) The following elements: data storage, data retrieval, reporting, data analysis, pattern identification, supervisory assessment, supervisory | 1.  Development of the risk management protocol.

2.  Appropriate training on the protocol, and the use of the risk management system.

3.  Implementation of | 1.)  The protocol contains the elements listed in ¶62(a).

2. The risk management system is able to, and is used to, search and | ETS Protocol; training materials and directives for ETS; observation of ETS training, including for supervisors and managers; reports related to quarterly reviews for at-risk behavior or significant patterns; documentation of supervisory review of transferred officers; documentation of any intervention actions; intervention action plans; personnel files; quarterly |

| MOA ¶ | MOA PROVISION | MOA REQUIREMENTS, ACTIVITIES TO BE MONITORED | DEFINITION OF COMPLIANCE | DOCUMENTS AND SOURCES |
|---|---|---|---|---|
| | intervention, documentation, and audit; <br><br> (b) The protocol will require the system to analyze data to meet the following criteria (i) number of incidents for each data category by individual officer and by officers in a unit; (ii) average level of activity for each data category by individual officer and by officers in a unit; and (iii) identification of patterns of activity for each data category by individual officer and by all officers in a unit. <br><br> (c) Reports will be generated on a monthly basis describing the data and data analysis, and identifying individual and unit patterns. <br><br> (d) CPD commanders, managers, and supervisors will review | the system consistent with the protocol. | retrieve data to analyze the number of incidents in each category by officer and by officers in a unit, the average level of activity for each data category, and to identify patterns of activity by individual officers and by officers in a unit. <br><br> 3.  The system generates quarterly reports describing the data and data analysis, and identifying any individual officer or unit patterns. <br><br> 4.  Over 94% of CPD commanders, managers and supervisors are reviewing system reports at least quarterly, and are evaluating officer, supervisor and unit activity. <br><br> 5.  CPD commanders, managers and supervisors initiate intervention when appropriate based on assessment of information in the system. | audits of the risk management system. |

| MOA ¶ | MOA PROVISION | MOA REQUIREMENTS, ACTIVITIES TO BE MONITORED | DEFINITION OF COMPLIANCE | DOCUMENTS AND SOURCES |
|---|---|---|---|---|
| | on a regular basis, but not less than quarterly, system reports, and will evaluate individual officer, supervisor, and unit activity.<br><br>(e) CPD commanders, managers, and supervisors will initiate intervention for officers, supervisors or units based on appropriate activity and pattern assessment of the information in the system.<br><br>(f) Intervention options will include discussion by commanders, supervisors and officers; counseling; training; and supervised, monitored and documented action plans and strategies designed to modify activity.  All interventions will be documented in writing and entered into the | | 6.  Over 94% of interventions are documented in writing and entered into the system. Intervention options that are considered include discussions with supervisors and commanders, training, counseling, and documented action plans.<br><br>7.  Actions taken will reflect consideration of all relevant and appropriate information and not solely on the system data.<br><br>8.  The system's data is accessible to CPD commanders, managers and supervisors.  CPD commanders, managers and supervisors promptly review records of transferred officers in | |

| MOA ¶ | MOA PROVISION | MOA REQUIREMENTS, ACTIVITIES TO BE MONITORED | DEFINITION OF COMPLIANCE | DOCUMENTS AND SOURCES |
|---|---|---|---|---|
| | system. | | over 94% of the cases. | |
| | (g) Actions taken as a result of information from the system will be based on all relevant and appropriate information (including crime trends and problems, and the officer's assignment), and not solely on the number or percentages of incidents in any category of information recorded in the system. | | 9.  Evaluation of the performance of CPD commanders, managers and supervisors include consideration of their performance in implementing the risk management system. | |
| | | | 10.  The system is managed by the Inspections Unit.  The Inspections Unit conducts quarterly reports of the system. | |
| | (h) The system's data shall be accessible to CPD commanders, managers and supervisors. Commanders, managers and supervisors will promptly review records of all officers recently transferred to their sections and units. | | 11.  Quarterly reviews of officer and unit behavior are conducted, and the findings from those reviews, including any significant patterns or series of incidents, are documented. | |
| | (i) CPD commanders, managers and supervisors shall be evaluated on their | | | |

| MOA ¶ | MOA PROVISION | MOA REQUIREMENTS, ACTIVITIES TO BE MONITORED | DEFINITION OF COMPLIANCE | DOCUMENTS AND SOURCES |
|---|---|---|---|---|
| | ability to use the risk management system to enhance effectiveness and reduce risk. | | | |
| | (j) The system shall be managed and administered by the Inspections Unit. The Inspections Unit will conduct quarterly audits of the system to ensure appropriate actions are taken. | | | |
| | (k) The protocol will require regular reviews, at no less than quarterly intervals, by appropriate managers of all relevant risk management system information to evaluate officer performance city wide, and to evaluate and make appropriate comparisons regarding the performance of all CPD units in order to identify any significant patterns or series of incidents. | | | |

| MOA ¶ | MOA PROVISION | MOA REQUIREMENTS, ACTIVITIES TO BE MONITORED | DEFINITION OF COMPLIANCE | DOCUMENTS AND SOURCES |
|---|---|---|---|---|
| 63 | The City will maintain all personally identifiable information about an officer in the system during the officer's CPD employment and for at least for five years. Aggregate statistics will be kept indefinitely. CPD will enter information in the risk management system in a timely, accurate and complete manner, and maintain the data in a secure and confidential manner | 1.  Officer information is contained in the system for the required time period.<br><br>2.  Information is entered in a timely, accurate and complete manner. | 1.  Personally identifiable information is maintained during the officer's employment and for at least five years thereafter.<br><br>2.  Information will be entered into the system with at least a 94% level of completeness and accuracy.<br><br>3.  Information will be entered into the ETS system within 10 days of its availability. | ETS data; personnel files; investigative and disciplinary files. |
| 64 | The risk management system will be developed and implemented on the following schedule: (a) RFP within 90 days of effective date of agreement; (b) selection of a contractor/vendor within 210 days of the RFP; (c) CPD will develop and submit to DOJ a protocol for use of the system within 90 | 1.  Issuance of RFP<br><br>2.  Selection of a contractor.<br><br>3.  Development, implementation and operation of the system | CPD develops the RFP, selects the vendor, and implements the system meeting the schedule set out in ¶64. | System RFP; ETS contract; demonstration of ETS operations. |

| MOA ¶ | MOA PROVISION | MOA REQUIREMENTS, ACTIVITIES TO BE MONITORED | DEFINITION OF COMPLIANCE | DOCUMENTS AND SOURCES |
|---|---|---|---|---|
| | days of effective date; (d) a beta test version of the system will be available within 12 months of selecting the contractor; (e) the system hardware and program will be operational and fully implemented within 18 months of selecting the contractor. | | | |
| 64 | Prior to implementation of the new risk management system, the CPD will use existing databases and resources to the fullest extent possible, to identify patterns of conduct by CPD officers or groups of officers. | | 1. Until the ETS system is fully operational, CPD uses its current databases and resources to identify patterns of conduct by CPD officers or groups of officers. | Department Risk Management System (DRMS) matrix, reports and memoranda. |
| 66. | CPD may propose to modify the risk management system as the experience and availability of new technology may warrant. The CPD will submit all such proposals for review and approval by DOJ before | | Any proposed modification of the ETS system is submitted to DOJ for approval. | |

| MOA ¶ | MOA PROVISION | MOA REQUIREMENTS, ACTIVITIES TO BE MONITORED | DEFINITION OF COMPLIANCE | DOCUMENTS AND SOURCES |
|---|---|---|---|---|
| | implementation. | | | |
| | Oversight | | | |
| 67 | The CPD will develop a protocol for conducting audits. The protocol will be used by each officer or supervisor charged with conducting audits. The protocol will establish a fixed schedule and cover all five CPD Districts. | | CPD's audit protocol establishes a regular and fixed schedule for audits and covers all five CPD Districts. It is used by all CPD members conducting audits. | Audit protocol; documentation of audits; audit records. |
| 68 | The CPD will conduct the following audits:<br><br>(a) regularly scheduled quarterly audits, covering all five Districts, to examine citizen complaints processed through the CCRP, including auditing sample complaints and contacting complainants to evaluate whether the actions and views of the citizen were captured correctly in the CCRP report, and examining | 1. Development of IIS and CCRP audit protocols and schedules.<br><br>2. CPD conducts regularly scheduled audits. | 1. CPD conducts quarterly audits of complaints processed through the CCRP. The audits will include a review of randomly sampled investigative files, or a stratified random sample of files. Inspections will attempt to contact complainants to evaluate whether the CCRP report accurately captures the actions and views of the citizens, and the results of those contacts will be documented. The audits will be consistent with professional standards for police profession audits.<br><br>2. CPD conducts semiannual | Inspections Section SOPs and audit protocols; audit reports; documentation of audits, audit results, and any actions taken as a result of the conclusions of the audits. |

| MOA ¶ | MOA PROVISION | MOA REQUIREMENTS, ACTIVITIES TO BE MONITORED | DEFINITION OF COMPLIANCE | DOCUMENTS AND SOURCES |
|---|---|---|---|---|
| | consistency across Districts. CCRP audits will be reviewed by District Commanders, and disciplinary or non-disciplinary corrective action will be taken if appropriate.<br><br>(b) semiannual integrity audits on the investigations conducted by IIS. The audit report will evaluate IIS's investigation of selected use of force and citizen complaints, assessing the reliability and completeness of IIS's canvassing and interviewing of witnesses, preservation and analysis of incident scene, and the appropriateness of IIS's conclusion. | | audits on IIS investigations. The audits will include a review of randomly sampled use of force or citizen complaint investigative files, or a stratified random sample of files. The audit reports will assess the reliability and completeness of IIS's canvassing and interviewing of witnesses, preservations and analysis of the incident scene, and the appropriateness of IIS's conclusions. The audits will be consistent with professional standards for police profession audits. | |
| 69 | The CPD will ensure regular meetings with local prosecutors to identify issues in officer, | | CPD meets at least once per quarter with local prosecutors to discuss any issues in officer, shift or unit performance. | Minutes or other records of meetings. |

| MOA ¶ | MOA PROVISION | MOA REQUIREMENTS, ACTIVITIES TO BE MONITORED | DEFINITION OF COMPLIANCE | DOCUMENTS AND SOURCES |
|---|---|---|---|---|
| | shift or unit performance. | | | |
| 70 | CPD policy on video cameras will require:<br><br>(a) mandatory activation for all traffic stops and pursuits that continues until the motor vehicle stop is completed and the stopped vehicle departs, or until the officer's participation in the motor vehicle stop ends;<br><br>(b) to the extent practical, the recording of requests for consent to search a vehicle, deployment of drug sniffing canines, and vehicle searches;<br><br>(c) to the extent practical, manual activation for incidents in which the prisoner being transported is violent; | 1.  Development of MVR policy<br><br>2.  Training of CPD members on policy<br><br>3.  Equipping cars with MVRs<br><br>4.  Implementation of MVR policy. | 1.  Every police vehicle that may be used for any traffic stops or pursuits is equipped with an MVR.<br><br>2.  In greater than 94% of traffic stops and pursuits, the MVR and officer audio is activated.<br><br>3.  To the extent practical, MVRs are used by officers when they engage in a request for consent to search, vehicle search, canine drug sniff, or transportation of a prisoner who is violent.<br><br>4.  Supervisors review MVR tapes in greater than 94% of incidents involving injuries to prisoners, uses of force, vehicle pursuits, and citizen complaints.<br><br>5.  The CPD retains tapes for at least 90 days, or longer if necessary for incidents subject to investigation. | MVR tapes; records of vehicle equipment; supervisors' reports listing whether an MVR was used and whether the tape was reviewed (e.g., Form 18F). |

| MOA ¶ | MOA PROVISION | MOA REQUIREMENTS, ACTIVITIES TO BE MONITORED | DEFINITION OF COMPLIANCE | DOCUMENTS AND SOURCES |
|---|---|---|---|---|
| | (d) supervisors to review the tapes in all cars of officers listed in any CPD report regarding any incident involving injuries to prisoners, uses of force, vehicle pursuits, and citizen complaints; and

(e) that the CPD retain and preserve tapes for at least 90 days, or as long as necessary for incidents subject to investigation. | | | |
| 71 | If an officer participates in a motor vehicle stop and is aware that the motor vehicle stop was not recorded by the MVR, the officer will notify the shift supervisor of the reason the stop was not recorded | | Officers who know that stops are not recorded, notify the shift supervisor of the reason the stop was not recorded. | Records of notification of supervisor |
| 72 | CPD will conduct periodic random reviews of MVR tapes for | | 1.  Supervisors in each District will conduct random reviews of MVR tapes for training and | Log books; MVRs; records of results of reviews and surveys. |

| MOA ¶ | MOA PROVISION | MOA REQUIREMENTS, ACTIVITIES TO BE MONITORED | DEFINITION OF COMPLIANCE | DOCUMENTS AND SOURCES |
|---|---|---|---|---|
| | training and integrity purposes. Supervisors conducting these reviews will document their activities in a log book.  Periodic random surveys will be conducted to confirm the MVRs are in working order. | | integrity purposes.  Any actions based on these reviews will be documented in the log books along with the review.<br><br>2.  Periodic random surveys are conducted to confirm the MVRs are in working order. | |
| | Police Communications Section | | | |
| 73 | The City will provide CPD with sufficient staff, funds, and resources (consistent with available resources) to continue to upgrade its PCS communications technology to meet current standards. | | 1.  The City provides CPD with staff, funding and resources to obtain CAD system and communications technology upgrades. | |
| 74 | The CPD will maintain a written protocol or checklists that guide PCS operators on how to respond to specific situations, and how to elicit relevant information. | | The CPD has a written protocol or checklist for PCS operators on responding to calls. | PCS protocol or checklist. |

| MOA ¶ | MOA PROVISION | MOA REQUIREMENTS, ACTIVITIES TO BE MONITORED | DEFINITION OF COMPLIANCE | DOCUMENTS AND SOURCES |
|---|---|---|---|---|
| | Discipline | | | |
| 75 | The CPD will revise its disciplinary matrix to take account of an officer's violations of different rules, rather than just repeated violations of the same rule.  The CPD will also revise the matrix to increase penalties for uses of excessive force, improper searches and seizures, discrimination, or dishonesty, to reflect the seriousness of those infractions.  CPD will have discretion to impose appropriate punishment when the CPD believes the officer's misconduct exhibits a lack f fitness for duty.  The matrix will be subject to DOJ approval. | | 1.  The DOJ approves the revised disciplinary matrix.  2.  The matrix will be implemented to take account of an officer's violation of different rules, not just repeated violations of the same rule.  3. The CPD will impose penalties for uses of excessive force, improper searches and seizures, discrimination, or dishonesty using the matrix, to reflect the seriousness of those infractions. | Revised matrix; investigative files, discipline records and data; DOJ approval. |
| 76 | The CPD will not limit its actions to only non-disciplinary corrective action in cases in which | | Where the disciplinary matrix calls for a disciplinary penalty, CPD will not take only non-disciplinary corrective action, | Revised matrix; investigative files, discipline records and data. |

132

| MOA ¶ | MOA PROVISION | MOA REQUIREMENTS, ACTIVITIES TO BE MONITORED | DEFINITION OF COMPLIANCE | DOCUMENTS AND SOURCES |
|---|---|---|---|---|
| | the disciplinary matrix indicates the imposition of discipline. | | except in exceptional circumstances. | |
| | Training – Management and Oversight | | | |
| 77 | The CPD will coordinate and review all use of force policy and training to ensure quality, consistency, and compliance with applicable law and CPD policy. The CPD will conduct regular subsequent reviews, at least semi-annually | | Semi-annual reviews are performed by CPD of all use of force policy and training, to ensure quality, consistency, and compliance with applicable law and policy. | Records and documentation of CPD review of training, and training materials; training curricula and other materials; observation of training; ride-alongs with FTOs. |
| 78 | The Director of the Training Academy or his designee, consistent with Ohio law and the Ohio Peace Officer Training Academy standards, will: (a) ensure the quality of all use of force training; (b) develop and implement use of force training curricula; (c) select and train CPD officer trainers; | | 1. Staffing of Director of Training Academy, or a designee. 2. Training Academy Director or his/her designee: (a) reviews and ensures the quality of use of force training; (b) develops and implements use of force training curricula; (c) selects and trains CPD officer trainers; (d) develops, implements, approves and oversees all in-service training and roll call curricula; (e) establishes procedures for evaluating training | | Records prepared and maintained by the Director of the Training Academy, or his designee; policies, general orders, directives and procedures regarding the operations and duties of the Training Director, or his designee; records of review of use of force training, and development and implementation of use of force training; records regarding training instructor selection, training, certification, assignments; documentation of needs assessments; observation of training. |

| MOA ¶ | MOA PROVISION | MOA REQUIREMENTS, ACTIVITIES TO BE MONITORED | DEFINITION OF COMPLIANCE | DOCUMENTS AND SOURCES |
|---|---|---|---|---|
| | (d)  develop, implement, approve and oversee all in-service training and roll call curricula; (e)  establish procedures for evaluating all training curricula and procedures; and (f)  conduct regular needs assessments to ensure that use of force training is responsive to the knowledge, skills, and abilities of the officers being trained. | | curricula and procedures; and conducts needs assessments on an annual basis.  3.  The Monitor will make a qualitative assessment of the above requirements. | |
| 79 | The CPD will provide training consistent with CPD policy, law, and proper police practices and ensure that only mandated objectives and approved lesson plans are taught by instructors. | | 1.  CPD Training is consistent with CPD policy, law and proper police practices.  2.  Training instructors teach only mandated objectives and use approved lessons plans. | Approved training lesson plans; documentation of training taught by instructors; observation of training. |
| | Training – Curriculum | | | |
| 80 | The CPD curriculum and policy committee will review all use of force training and use of force policies on a | | 1.  CPD establishes or continues a curriculum and policy committee, that includes core Academy Training staff, a cross section of field personnel, including | Roster of CPD curriculum and policy committee; records of committee reviews. |

| MOA ¶ | MOA PROVISION | MOA REQUIREMENTS, ACTIVITIES TO BE MONITORED | DEFINITION OF COMPLIANCE | DOCUMENTS AND SOURCES |
|---|---|---|---|---|
| | regular basis to ensure compliance with applicable laws and CPD policy. The committee will include core Training Academy staff, a broad cross section of field personnel, including CPD command staff, and a representative of the City Solicitor's office. | | Command staff and a representative of the City Solicitor's Office.<br><br>2.  The CPD curriculum and policy committee conducts regular reviews of use of force policy and training, on at least a semi-annual basis. | |
| 81 | The CPD will continue to provide all CPD recruits, officers, supervisors and managers with annual training on use of force. Such training will include and address the following topics:<br><br>(a)  the CPD's use of force model described in this Agreement;<br><br>(b)  proper use of force decision making;<br><br>(c)  the CPD's use of force reporting requirements; | | Greater than 94 %of active CPD recruits, officers, supervisors and managers attend annual training on use of force that includes and addresses the issues identified in ¶81(a)-81(l). | Use of force related training curricula, lesson plans and other training materials; training records; training class rosters; observation of training. |

| MOA ¶ | MOA PROVISION | MOA REQUIREMENTS, ACTIVITIES TO BE MONITORED | DEFINITION OF COMPLIANCE | DOCUMENTS AND SOURCES |
|---|---|---|---|---|
| | (d)  the Fourth Amendment and other constitutional requirements;<br><br>(e)  examples of scenarios faced by CPD officers that illustrate proper use of force decision making;<br><br>(f)  interactive exercises that emphasize proper use of force decision making;<br><br>(g)  the proper amount of chemical spray to use, how to deliver spray effectively, and the proper anatomical targets for chemical spray;<br><br>(h)  de-escalation techniques that allow officers to effect arrests without using force, and instruction that disengagement, area containment, surveillance, waiting out a subject, summoning reinforcements, calling | | | |

| MOA ¶ | MOA PROVISION | MOA REQUIREMENTS, ACTIVITIES TO BE MONITORED | DEFINITION OF COMPLIANCE | DOCUMENTS AND SOURCES |
|---|---|---|---|---|
| | in specialized units, or even letting a subject temporarily evade arrest may be the appropriate response to a situation even when the use of force would be legally justified; (i)  additional training to its officers on alternate safe techniques for extracting subjects from stationary vehicles and disabling such vehicles; (j)  threat assessment; (k)  additional training on interacting with people with mental illnesses; and (l)  factors to consider in initiating or continuing a pursuit (pursuant to the CPD's new policy, required by this Agreement). | | | |
| 82 | The CPD will provide all officers charged with accepting citizen complaints with | | 1.  Greater than 94 %of CPD officers responsible for accepting citizen complaints attend annual training on handling citizen | |

| MOA ¶ | MOA PROVISION | MOA REQUIREMENTS, ACTIVITIES TO BE MONITORED | DEFINITION OF COMPLIANCE | DOCUMENTS AND SOURCES |
|---|---|---|---|---|
| | appropriate training on handling citizen complaints with an emphasis on interpersonal skills. The CPD will provide training on the CPD citizen complaint process, including the role of CCRP, IIS, CCA and CPRP in the process, to all new recruits and as part of annual in-service training. The CPD will provide training on appropriate burdens of proof to all supervisors who are responsible for investigating and determining the outcomes of citizen complaints, as well as the factors to consider when evaluating complainant or witness credibility (to ensure that their recommendations regarding dispositions are unbiased, uniform and legally appropriate). | | complaints, with an emphasis on interpersonal skills.

2. Greater than 94 %of CPD officers and recruits attend recruit or annual in-service training on the CPD citizen complaint process.

3. Supervisors responsible for investigating and determining the outcome of citizen complaints will attend training on appropriate burdens of proof, and the factors to consider when evaluating credibility. | |

| MOA ¶ | MOA PROVISION | MOA REQUIREMENTS, ACTIVITIES TO BE MONITORED | DEFINITION OF COMPLIANCE | DOCUMENTS AND SOURCES |
|---|---|---|---|---|
| 83 | The CPD supervisors will continue to receive leadership and command accountability training, and learn techniques designed to promote proper police practices. This training will be provided to all CPD sergeants promoted to supervisory rank within 30 days of assuming supervisory responsibilities, and will be made part of annual in-service training. | | 1.  Greater than 94% of sergeants promoted to supervisory rank receive management training within 30 days of assuming supervisory responsibilities.<br><br>2.  Greater than 94% of CPD supervisors attend annual in-service management training.<br><br>3.  CPD management training will include leadership and command accountability training, including techniques designed to promote proper police practices. | Training curricula, lesson plans, and other materials for leadership and command accountability training. Training records for supervisors, and dates of training and supervisory promotion. |
| 84 | The CPD will modify and augment its canine training as follows:<br><br>(a)  The CPD will complete development and implementation of a comprehensive canine training curriculum and lesson plans which specifically identify goals, objectives and the mission of the Canine Unit, consistent with its canine policy, as | | 1.  CPD has developed and implemented a comprehensive canine curriculum and lesson plans consistent with its canine policy, as amended by the MOA. The curriculum identifies goals, objectives and mission of the Canine unit.<br><br>2.  100% of canines are professionally bred.<br><br>3.  CPD canines, handlers and supervisors are formally trained in the CPD canine policy. | Canine training curricula, lesson plans, and other training materials; canine training records and certification records; observation and review of canine training. |

| MOA ¶ | MOA PROVISION | MOA REQUIREMENTS, ACTIVITIES TO BE MONITORED | DEFINITION OF COMPLIANCE | DOCUMENTS AND SOURCES |
|---|---|---|---|---|
| | amended by this Agreement.<br><br>(b)  The CPD will continue to purchase only professionally-bred canines. The CPD will ensure that all canines, handlers and supervisors are formally trained in the CPD canine policy as revised by this Agreement, and are able to carry out the policy's requirements.<br><br>(c)  The CPD will ensure that the canines receive annual re-certification and periodic refresher training. Deviations from certification or training requirements will result in the retraining of the handlers and/or removal of the canine from service until such requirements are fulfilled.<br><br>(d)  The CPD will continue to ensure that | | 4.  CPD canines receive annual recertification and periodic refresher training.<br><br>5.  CPD ensures that canine handlers are physically capable of implementing and maintaining the CPD's canine policy.<br><br>6.  100 %of CPD's in house canine trainers are certified canine instructors. | |

| MOA ¶ | MOA PROVISION | MOA REQUIREMENTS, ACTIVITIES TO BE MONITORED | DEFINITION OF COMPLIANCE | DOCUMENTS AND SOURCES |
|---|---|---|---|---|
| | canine handlers are physically capable of implementing and maintaining the CPD's canine policy, as modified by this Agreement. Handlers should be able to maintain control of, and contact with the canine to ensure that the canine is not allowed to bite a suspect without a legal justification.<br><br>(e)  Within 180 days, the CPD will require that all of its in-house canine trainers are certified canine instructors. | | | |
| 85 | The CPD will ensure that training instructors engage students in meaningful dialogue regarding particular scenarios, preferably taken from actual incidents involving CPD officers, with the goal of educating students regarding the legal and | | CPD training engages students in dialogue in "real life" experiences, including examples from CPD incidents. | Training curricula and lesson plans; observation of training.. |

| MOA ¶ | MOA PROVISION | MOA REQUIREMENTS, ACTIVITIES TO BE MONITORED | DEFINITION OF COMPLIANCE | DOCUMENTS AND SOURCES |
|---|---|---|---|---|
| | tactical issues raised by the scenarios. | | | |
| 86 | The CPD periodically will meet with the City Solicitor's Office concerning the conclusion of civil lawsuits alleging officer misconduct. Information gleaned from this process will be used by CPD staff to develop or revise training. | | CPD officials will meet with the City Solicitors Office quarterly concerning the conclusion of lawsuits alleging officer misconduct.  Information from these meetings will be used by CPD for training purposes. | Documentation of CPD meetings with City Solicitor's Office, and of the results of the meetings, including ant development of or revision to training. |
| 87 | The City and the CPD will provide copies and explain this Agreement to all CPD and all relevant City employees. The City and the CPD will provide initial training on this Agreement to all City and CPD employees whose job responsibilities are affected by this Agreement within 120 days of each provision's implementation. Thereafter, the CPD will | | 1.  Relevant City employees and all CPD members were provided a copy of the MOA<br>2. CPD training on the MOA is provided to all recruits, and to CPD members during annual in-service training | Training curricula, lesson plans, and other materials; training records; documentation that all CPD members and relevant City employees were provided with copies of the MOA. |

| MOA ¶ | MOA PROVISION | MOA REQUIREMENTS, ACTIVITIES TO BE MONITORED | DEFINITION OF COMPLIANCE | DOCUMENTS AND SOURCES |
|---|---|---|---|---|
|  | provide training during in-service training. |  |  |  |
|  | Field Training Officer Program |  |  |  |
| 88 | The CPD will develop a protocol to enhance the FTO program. The protocol will address the criteria and method for selecting FTOs, and set standards that require the appropriate assessment of an officer's past complaint and disciplinary history before an officer is selected to serve as an FTO. FTO appointments will be subject to review for reappointment at the Training Academy Director's discretion. District commanders will also have discretion, upon consultation with the Training Academy staff, to remove an officer from the FTO program. |  | 1.  CPD develops in a timely manner a protocol for enhancing its FTO program.  The protocol addresses the requirement in ¶88.<br><br>2.  FTO enhancements, including standards and criteria for selection of FTO's and reappointment of FTO's, are implemented by CPD. | Records of FTO program development; criteria for FTO selection and reappointment; records of FTO selection and reappointment; observation of FTO program. |

| MOA ¶ | MOA PROVISION | MOA REQUIREMENTS, ACTIVITIES TO BE MONITORED | DEFINITION OF COMPLIANCE | DOCUMENTS AND SOURCES |
|---|---|---|---|---|
| 89 | FTOs will be reviewed at least bi-annually, with re-certification dependant on satisfactory prior performance and feedback from the Training Academy. | | CPD reviews FTOs bi-annually, with recertification dependant on satisfactory prior performance, and feedback from the Training Academy. | Records of FTO review. |
| | Firearms Training | | | |
| 90 | The CPD will continue to ensure that all officers, supervisors and managers complete mandatory annual re-qualification firearms training. The CPD will provide its officers with increased in-service firearms training which will consist of satisfactorily completing all re-qualification courses in addition to achieving a passing score on the target shooting trials. The CPD will also include professional night training and stress | | 1.  Greater than 94% of CPD officers, supervisors and managers complete annual re-qualification firearms training.  2.  CPD increases in-service firearms training, and requires satisfactory completion of re-qualification courses and passing scores on target shooting trials. The training also includes night training and stress training.  3.  100% of officers failing re-certification have their police powers revoked. | Firearms training and recertification records; firearms training recordkeeping and tracking system; personnel files; observation of firearms training. |

| MOA ¶ | MOA PROVISION | MOA REQUIREMENTS, ACTIVITIES TO BE MONITORED | DEFINITION OF COMPLIANCE | DOCUMENTS AND SOURCES |
|---|---|---|---|---|
| | training (*i.e.*, training in using a firearm after undergoing physical exertion) in its annual in-service training program with the goal of adequately preparing officers for real life situations. Consistent with State law and standards, the CPD will revoke the police powers of those officers who fail to satisfactorily complete re-certification. | | | |
| 91 | The CPD will ensure that firearm instructors critically observe students and provide corrective instruction regarding deficient firearm techniques and failure to utilize safe gun handling procedures at all times. The CPD will create and implement a checklist identifying evaluation criteria to determine satisfactory completion | | 1.  Firearms instructor training includes training on critical observation of students and the provisions of corrective action.<br><br>2.  Evaluation of instructor proficiency includes critical observation of students and corrective instruction.<br><br>3.  CPD has developed a firearms training checklist, meeting the requirements of ¶91, and instructors are trained on using it.<br><br>4. A checklist is completed for | Evaluations and records of firearms instructors; observation of firearms training |

| MOA ¶ | MOA PROVISION | MOA REQUIREMENTS, ACTIVITIES TO BE MONITORED | DEFINITION OF COMPLIANCE | DOCUMENTS AND SOURCES |
|---|---|---|---|---|
| | of recruit and in-service firearms training. Such checklists will be completed for each student officer by a firearms instructor, who will sign the checklist indicating that these criteria have been satisfactorily reviewed during training. The checklist will include, but not be limited to:<br><br>(a)  maintains finger off trigger unless justified and ready to fire;<br><br>(b)  maintains proper hold of firearm and proper stance; and<br><br>(c)  uses proper use of force decision making. | | greater than 94% of  officers receiving firearms training. | |
| 102 | Subject to the limitations set forth in this paragraph, the CPD will reopen for further investigation any investigation (including | | CPD reopens for further investigation any investigation the Monitor determines to be incomplete. | Investigative files; records of reopening investigations. |

| MOA ¶ | MOA PROVISION | MOA REQUIREMENTS, ACTIVITIES TO BE MONITORED | DEFINITION OF COMPLIANCE | DOCUMENTS AND SOURCES |
|---|---|---|---|---|
| | use of force, injury to prisoner and citizen complaint investigations) the Monitor determines to be incomplete. The Monitor will provide written instructions for completing any investigation determined to be incomplete. The Monitor will exercise this authority so that any directive to reopen an investigation is given within a reasonable period following the investigation's conclusion. The Monitor may not exercise this authority concerning any investigation the disposition of which has been officially communicated to the officer who is the subject of the investigation. | | | |
| 103 | The parties agree that the CPD will hire and retain, or reassign a | | A full time compliance coordinator for CPD serves as the liaison between CPD and the Monitor, | Compliance Coordinator records. |

| MOA ¶ | MOA PROVISION | MOA REQUIREMENTS, ACTIVITIES TO BE MONITORED | DEFINITION OF COMPLIANCE | DOCUMENTS AND SOURCES |
|---|---|---|---|---|
| | current CPD employee, for the duration of this Agreement, to serve as a full-time CPD Compliance Coordinator. The Compliance Coordinator will serve as a liaison between the CPD, the Monitor and DOJ, and will assist with the CPD's compliance with this Agreement.  At a minimum, the Compliance Coordinator will: coordinate the CPD's compliance and implementation activities; facilitate the provision of data, documents and other access to CPD employees and material to the Monitor and DOJ as needed; ensure that all documents and records are maintained as provided in this Agreement; and assist in assigning compliance tasks to CPD personnel, as directed by the Chief | | and assists with CPD compliance. | |

148

| MOA ¶ | MOA PROVISION | MOA REQUIREMENTS, ACTIVITIES TO BE MONITORED | DEFINITION OF COMPLIANCE | DOCUMENTS AND SOURCES |
|---|---|---|---|---|
| | of Police or his designee. The CPD Compliance Coordinator will take primary responsibility for collecting the information the Monitor requires to carry out the terms of this Agreement. | | | |
| 104 | Between 90 and 120 days following the effective date of this Agreement, and every three months thereafter until this Agreement is terminated, the City will file with the Monitor a status report, including any supporting documentation, delineating all steps taken during the reporting period to comply with this Agreement. | | CPD files an MOA Status Report every three months during the pendancy of the Agreement. | MOA Status Reports. |

**APPENDIX B**

**DRAFT**
**CITY OF CINCINNATI INDEPENDENT MONITOR**
**INVESTIGATIONS TEMPLATE**

Tracking No:          _____    Date of Incident: _____
Type of Investigation:    ___ Use of Force          __ Complaint
                __ Hard hands/Takedown          __ IIS Investigation
                __ Chemical Spray               __ CCRP Investigation
                __ Taser                   __ CCA Investigation
                __ Canine
                __ Physical Force
                __ Firearms

## I.  For all Investigations – Force and Complaints

### A.  Investigations

1.    Did the proper entity investigate the allegation?

| YES: | | If not, list the circumstances |
|---|---|---|
| NO: | | |
| N/A: | | |

2.    Was the investigating supervisor involved in the incident, or the one who authorized the force used?

| YES: | |
|---|---|
| NO: | |
| N/A: | Unknown |

3.    Were the relevant witnesses (including CPD officers and supervisors if relevant) identified and interviewed?  Was there a witness canvass, if appropriate?

| YES: | | Canvass? | |
|---|---|---|---|
| NO: | | No | |
| N/A: | Unknown | N/A | Unknown |

150

4.      Were material inconsistencies among witnesses and evidence identified and explored?

| YES: | |
|------|--|
| NO: | |
| N/A: | |

5.      Were the areas of relevant inquiry, follow-up questions, missed?

| YES: | |
|------|--|
| NO: | |
| N/A: | |

6.      Did the investigating supervisor avoid improper leading questions?

| YES: | |
|------|--|
| NO: | |
| N/A: | Unknown |

7.      Was an MVR available?  If so, did the investigating supervisor review the MVR?  If not, was this a circumstance in which it was appropriate that an MVR not be used?

| MVR Used | | MVR reviewed | | MVR not necessary | |
|----------|--|--------------|--|-------------------|--|
| No MVR | | Not reviewed | | Should have had | |
| N/A: | Unknown | N/A | | N/A | |

8.      Were group interviews avoided?

| YES: | |
|------|--|
| NO: | |
| N/A: | Unknown |

9.      Were relevant police reports, photos, medical records, diagrams and measurements, forensic tests, other evidence gathered (more relevant for IIS and force complaints than CCRP complaints)?

| YES: | | If not, list documents not gathered: |
|------|--|--------------------------------------|
| NO: | | |
| N/A: | Unknown | |

151

10.    Did the investigation demonstrate that the investigator avoided bias (in favor of police, against complainant) in questions or in the description of evidence and events?

| YES: | |
|------|------------|
| NO: | |
| N/A: | Unknown |

11.    Was misconduct not related to initial allegation or use of force identified and properly investigated?

| YES: | |
|------|------------|
| NO: | |
| N/A: | Unknown |

### B.    Review and Adjudication

12.    Was all relevant evidence considered?

| YES: | |
|------|------------|
| NO: | |
| N/A: | Unknown |

13.    Was an effort made to make a credibility determination, if feasible?

| YES: | |
|------|------------|
| NO: | |
| N/A: | Unknown |

14.    Was the determination based on evidence and sound analysis?

| YES: | |
|------|------------|
| NO: | |
| N/A: | Unknown |

15.    If the Unit Commander identified any underlying problems or training needs, was a recommendation relayed to an appropriate CPD entity?

| YES: | |
|------|------------|
| NO: | |
| N/A: | Unknown |

16.    Does the file include a report prepared by the investigator?

| YES: | |
|------|--|
| NO: | |
| N/A: | |

17.    Does the report include:

        a.  Description of force incident or misconduct alleged?
        b.  Summary of relevant evidence gathered?
        c.  Proposed findings and analysis supporting findings?

| YES: | (a) | (b) | (c) |
|------|-----|-----|-----|
| NO: | | | |
| N/A: | | | |

18.    Was the complaint completed in 90 days?  If not, was there an explanation of special circumstances that caused the delay?

| YES: | | Explanation | |
|------|--|-------------|--|
| NO: | | No Expl. | |
| N/A: | Unknown | N/A | |

## II.  For Force Investigations/Complaints

### A.    Use of Force

19.    Was subject given warning, or opportunity to submit to arrest?

| YES: | |
|------|--|
| NO: | |
| N/A | Unknown |

20.    If incident involved mentally ill individual, was MHRT officer dispatched as first responder?  Did MHRT officer respond?

| MHRT Dispatched | | MHRT | |
|-----------------|--|------|--|
| No Dispatch: | | No Response | |
| N/A | Unknown | Unknown | |

153

21. Was the force used reasonably related to the level of resistance and actions of the suspect?

| YES: | |
|------|---|
| NO: | |
| N/A: | |

### i.   Chemical Spray

22. Was spray necessary to protect officer or others from harm, or to effect arrest of actively resisting subject, or escape of the subject?

| YES: | |
|------|---|
| NO: | |
| N/A: | |

23. Was spray used only in cases where verbal commands would have been ineffective?

| YES: | |
|------|---|
| NO: | |
| N/A: | Unknown |

24. If into a crowd, was supervisor's authorization obtained?

| YES: | |
|------|---|
| NO: | |
| N/A: | Unknown |

25. Was verbal warning given, where feasible, and time allowed for subject to comply?

| YES: | |
|------|---|
| NO: | |
| N/A: | Unknown |

26. Was spray targeted at face and upper torso?

| YES: | |
|------|---|
| NO: | |
| N/A: | Unknown |

27.     Was duration of spray and distance of spray reasonable?

| YES: | |
|------|---------|
| NO: | |
| N/A: | Unknown |

28.     Was decontamination offered?

| YES: | |
|------|---------|
| NO: | |
| N/A: | Unknown |

29.     Was subject kept in a face down position longer than necessary?

| YES: | |
|------|---------|
| NO: | |
| N/A: | Unknown |

30.     If subject was restrained, was spray necessary to avoid injury to suspect, officer or others, or to prevent escape of subject?

| YES: | |
|------|---------|
| NO: | |
| N/A: | |

31.     If the spray was used on a person in a police vehicle, was the subject restrained with a seat belt or lap bar?  If not, is there an explanation for lack of restraint?

| YES: | | Explanation | |
|------|---------|-------------|---|
| NO: | | No Expln. | |
| N/A: | Unknown | N/A | |

### ii.   Canine

32.     If the deployment was off-leash (or in a circumstance that made a bite likely), was the deployment for a commercial building search, an offense of violence, or for a person reasonably suspected of being armed?

| YES: | |
|------|---------|
| NO: | |
| N/A: | |

33.    Was the deployment authorized by a supervisor?

| YES: | |
|---|---|
| NO: | |
| N/A: | Unknown |

34.    Was a clear and loud announcement made?  If so, was a sufficient interval provided to allow the suspect to surrender?

| YES: | | Time | |
|---|---|---|---|
| NO: | | No Time | |
| N/A: | Unknown | N/A | Unknown |

35.    If there was a bite, did the suspect pose a risk of imminent danger (e.g., armed), or was suspect actively resisting or escaping?

| YES: | |
|---|---|
| NO: | |
| N/A: | |

36.    If the suspect was hiding when bitten, was there a reasonable likelihood (knowable by the handler) that the suspect could have been apprehended using less forceful means?

| YES: | |
|---|---|
| NO: | |
| N/A: | |

37.    Was the canine called off by the handler at the first safe moment?

| YES: | |
|---|---|
| NO: | |
| N/A: | Unknown |

38.    Was appropriate medical attention provided?

| YES: | |
|---|---|
| NO: | |
| N/A: | Unknown |

### iii.    Beanbag Shotgun

39.    Was the beanbag shotgun necessary to subdue or incapacitate a subject to prevent imminent physical harm to the officer, subject or another?

| YES: | |
|---|---|
| NO: | |
| N/A: | |

40.    Was a verbal warning given and an appropriate interval provided for the suspect to surrender?

| YES: | |
|---|---|
| NO: | |
| N/A: | Unknown |

### iv.    Firearm Discharges

41.    Were all shots accounted for, and location of all officers identified, if feasible?

| YES: | |
|---|---|
| NO: | |
| N/A: | Unknown |

42.    Was Firearms Discharge Board convened to review investigation?

| YES: | |
|---|---|
| NO: | |
| N/A: | |

### B.    Investigations

43.    Was a force form (Form 18) filled out?  Did it indicate each and every use of force used?

| YES: | | Every force | |
|---|---|---|---|
| NO: | | Not all | |
| N/A: | | N/A | |

157

44.     Did supervisor evaluate the need for, and ensure that subject received, medical attention where needed?

| YES: | |
|------|-------------|
| NO: | |
| N/A: | Unknown |

45.     If incident involved a foot pursuit, was pursuit evaluated regarding compliance with CPD policy?

| YES: | |
|------|-------------|
| NO: | |
| N/A: | Unknown |

46.     Did supervisor appropriately review the basis for the initial stop and seizure for compliance with policy and law?

| YES: | |
|------|-------------|
| NO: | |
| N/A: | |

47.     Was each use of force appropriately evaluated (separately)?

| YES: | |
|------|-------------|
| NO: | |
| N/A: | |

48.     Were interviews taped (for investigations other than CI sprays, tasers, and hard hands/takedowns without injury)?

| YES: | |
|------|-------------|
| NO: | |
| N/A: | Unknown |

49.     Was the investigation reviewed by a Lieutenant or higher?  Were investigation's deficiencies identified or corrected?

| YES: | | Flaws | |
|------|---------|---------------|--|
| NO: | | Not Corrected | |
| N/A: | Unknown | N/A | |

50.     If a canine bite, beanbag, or spray on restrained person, did Inspections provide a written review?

| YES: | |
|------|---------|
| NO: | |
| N/A: | Unknown |

## III.     For all Complaint Investigations

51.     Any evidence of barrier to complaint filing, or of discouragement of complaint?

| YES: | |
|------|---------|
| NO: | |
| N/A: | Unknown |

52.     If complaint received in place other than IIS, was it referred to IIS within five days?

| YES: | |
|------|---------|
| NO: | |
| N/A: | Unknown |

53.     If received at CPD, was it referred to CCA within a reasonable time?

| YES: | |
|------|---------|
| NO: | |
| N/A: | Unknown |

54.     Was complaint assigned a unique number, and the number given to complainant?

| YES: | |
|------|---------|
| NO: | |
| N/A: | Unknown |

## IV.     For IIS Complaint Investigations

159

55. Was complaint closed using one of four dispositions (unfounded, not sustained, exonerated, sustained)?

| | |
|---|---|
| YES: | |
| NO: | |
| N/A: | |

56. Were interviews taped?

| | |
|---|---|
| YES: | |
| NO: | |
| N/A: | |

57. Does report identify all misconduct issues (including ones other than initial allegation), and contain a summary and analysis of evidence and proposed findings?

| | |
|---|---|
| YES: | |
| NO: | |
| N/A: | |

58. Was investigation completed within 90 days from complaint?

| | |
|---|---|
| YES: | |
| NO: | |
| N/A: | Unknown |

59. Was appropriate discipline taken?

| | |
|---|---|
| YES: | |
| NO: | |
| N/A: | Unknown |

**V.     For CCRP Complaints**

60. Was the complaint properly routed as a CCRP complaint (e.g., not a force, pointing firearms, search or seizure, or discrimination complaint, which all go to IIS)?

| | |
|---|---|
| YES: | |
| NO: | |
| N/A: | |

160

61.    Was officer action fully investigated prior to resolution meeting?

| YES: | |
|------|----------|
| NO: | |
| N/A: | Unknown |

62.    Does report include summary and analysis of evidence, and a determination that the officer's actions complied with CPD standards, or did not comply with CPD standards?

| YES: | |
|------|----------|
| NO: | |
| N/A: | |

63.    Was one of four dispositions used to close the investigation?

| YES: | |
|------|----------|
| NO: | |
| N/A: | |

64.    Was investigation reviewed by District/Unit Commander?

| YES: | |
|------|----------|
| NO: | |
| N/A: | Unknown |

65.    Was appropriate corrective action taken, and noted in ESL?

| YES: | |
|------|----------|
| NO: | |
| N/A: | Unknown |

DELIB:2607483.3\121694-00001